# In The United States Court of Federal Claims

Nos. 98-168C, 02-1632C & 03-2699C

(Filed under seal:  March 7, 2007)

(Reissued:  April 2, 2007)[1]

_____

| | |
|---|---|
| NORTH STAR ALASKA HOUSING CORPORATION, | * Trial; Government contract; Lease of |
| | * development for military housing; Bad faith; |
| | * Breach of covenant of good faith and fair |
| Plaintiff, | * dealing; Specific statements evidencing |
| | * animus; Actions taken by defendant |
| v. | * indicative of bad faith; Breach of lease |
| | * provisions; Abuse of dispute resolution |
| THE UNITED STATES, | * process – loss of independence; Damages; |
| | * Loss in value of development; Other |
| Defendant. | * damages; Relief granted. |
| | * |

_____

## OPINION
_____

*Paul Wesley Killian* and *Fani C. Geroff,* Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for plaintiff.

*Timothy Paul McIlmail*, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Peter D. Keisler*, for defendant.

**ALLEGRA, Judge**:

> *Just follow the Miami Hurricane's Game Plan.  Blitz Fisher the first time he takes the handoff from Wartes.  Force them to go for the short gains.  Keep them out of the red zone.  On offense, exercise good ball control and mix up the plays to throw off their timing.  Try to draw them offsides and into a penalty situation. And always remember that you have home field advantage.*[2]

---

[1] An unredacted version of this opinion was issued under seal on March 7, 2007.  The parties were given an opportunity to propose redactions, but no such proposals were made. Accordingly, the opinion is issued in its original form, with minor corrections.

[2] Thomas Beech Peterson, Chief of Housing, Department for Public Works, State of Alaska, United States Army.

Despite what might appear, this is neither a case about football, nor even sports – at least, the athletic sort.  Rather, it is a government contract case, before the court following trial in Fairbanks, Alaska, as well as trial and closing arguments in Washington, D.C.  Armed with charged quotes like the above, plaintiff alleges, *inter alia*, that defendant's representatives acted in bad faith in administering the subject housing contract – driven by animus that led them to breach the contract repeatedly and to interpret other provisions in a fashion calculated to deny plaintiff the benefits of the bargain.  So the question is – did defendant act in bad faith?  And the answer, in light of the record, is – yes.

## TABLE OF CONTENTS

I.   FINDINGS OF FACTS   ..................................................................................................3

   A.   Background..........................................................................................................3

   B.   Critical Terms of the Lease   ...........................................................................4

      1.   Basic Provisions   ................................................................................. 4
      2.   Change of Occupancy ......................................................................... 9
      3.   Downtime ...........................................................................................12

   C.   The Dispute: A Chronology...............................................................................13

      1.   1989 through 1995 ..............................................................................13
      2.   1996 and 1997 .....................................................................................15
      3.   1998 .....................................................................................................22
      4.   1999 and 2000 .....................................................................................25
      5.   2001 and 2002 .....................................................................................27
      6.   2003 and forward ................................................................................33

   D.   Proceedings to Date.............................................................................................35

II.   DISCUSSION .............................................................................................................36

   A.   Jurisdiction .........................................................................................................36

   B.   Bad Faith ............................................................................................................41

      1.   Standard of Proof ................................................................................41

      2.   Did Defendant Act in Bad Faith?.......................................................45
         a.   Specific Statements Evidencing Animus - "Just follow the
              Miami Hurricane's Game Plan."......................................................45

   b. Actions Taken by Defendant Indicative of Bad Faith –
     "Force them to go for the short gains.  On offense, exercise good
     ball control and mix up the plays to throw off their timing.
     Try to draw them offsides and into a penalty situation." ..............49

     1. Actions that Increased Downtime ..................................... 51
     2. Downtime Calculations.......................................................57
     3. Actions Otherwise Designed to Increase North Star's
      Costs ..................................................................................60
     4. Actions Designed to Reduce North Star's
      Compensation..................................................................... 64
     5. Other Issues ...................................................................66

   c. Abuse of the Dispute Resolution Process –  "always
     remember that you have home field advantage". .........................71

  4. Redux...........................................................................................76

 C. Damages ......................................................................................... 77

  1. Loss of Value ..................................................................... 77
  2. Other Damages ................................................................. 83

III. **CONCLUSION** ........................................................................................85

 Fact Appendix I .................................................................................88
 Fact Appendix II ............................................................................... 95
 Fact Appendix III ............................................................................. 98

## I. FINDINGS OF FACT

Based on the record, including the parties' stipulations, the court finds as follows:

### A. Background

North Star Alaska Housing Corporation (North Star) is a Seattle, Washington-based corporation, whose president and owner is Richard Fischer.  After a competitive bidding process, North Star was awarded a contract to design and build a 400-unit housing project for soldiers and their families at Fort Wainwright, Alaska, in the southeast section of Fairbanks, Alaska.  The award resulted in a long-term relationship between North Star and the Army Corps of Engineers (Army), the terms of which are outlined in a series of contracts between the two parties.  Lease No. DACA: 85-1-86-11 requires North Star to lease property on Fort Wainwright for thirty-two years, through June 26, 2018.  Lease Contract No. DACA: 85-9-86-27 requires North Star to

lease the same property with residential buildings and other improvements back to the government.  Lease No. DACA: 85-5-88-17, entered into on November 6, 1987, is the lease of the improved property from North Star to the Army for a term of nineteen years and six months, through May 5, 2007.  Under this agreement (the Lease), the Army agreed to rent all 400 units in the development; it pays shelter rent for the use of the housing and maintenance rent for maintenance and operational services.  The residential development resulting from this project is referred to as Birchwood Estates (Birchwood).  *See generally, North Star Alaska Housing Corp. v. United States*, 30 Fed. Cl. 259, 265 (1993) (describing these events).

The last decade of the administration of the leaseback phase of Birchwood has been quarrelsome, to say the least.  Prior to the initiation of this action, the parties agreed to settle a prior suit filed by North Star involving various claims arising out of the leaseback.  Subsequent to that settlement, problems with the leaseback continued and North Star disputed various actions taken by the Army's representatives in the administration of the contract.  Ultimately, North Star filed claims with the contracting officer regarding a number of these matters.  After some procedural machinations, various of these claims were incorporated into the First Amended Complaint filed in this case by North Star on August 23, 1999.  Following settlement negotiations and an extended debate regarding whether a binding settlement had occurred, plaintiff filed a Second Amended Complaint in this case on April 16, 2002, which included essentially the same seven counts in the First Amended Complaint, but expanded somewhat on plaintiff's prior allegations of bad faith.

## B.      Critical Terms of the Lease

To determine whether plaintiff's contractual rights have been breached, the court first must determine what those rights are.  *See San Carlos Irrigation and Drainage District v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751, 759 (2003).  At the outset, then, the court must outline the provisions in the Lease that underlie the disputes that will be discussed in greater detail below.

### 1.      Basic Provisions

Article I of the Lease provides that the "Premises" includes "land situated on the Fort Wainwright Military Reservation . . . together with the improvements constructed and provided thereon."  Article IV of the Lease specifies that "the Government shall pay to [North Star] an annual rental . . . consist[ing] of a shelter rent and a maintenance rent" and that the "portion of the annual rental attributable to maintenance shall be increased or decreased at the commencement of each year."  Article VIII of the Lease states that –

> [i]n addition to rents stipulated in Article IV of this Lease, the Government, at its option, may pay [North Star] an incentive fee not to exceed 5 percent (5%) of the maintenance rental for all housing units, for the period of time for which [North Star's] performance of the obligations and responsibilities contained herein are evaluated and found by the Government to substantially exceed the established

standards.  The amount of the incentive fee shall be determined by an Incentive
Fee Board based upon the performance of [North Star] in operating the Premises
in accordance with its obligation.  Exhibit 'C' contains the provisions to establish
the makeup of the Board and the procedures for determining such bonuses."[3]

Exhibit C to the Lease is the "Maintenance, Repair and Operational Services Standards Annex"
(herein referred to as the "maintenance annex"), in which most of the details regarding how
Birchwood is to be run are found.[4]

Various provisions in the Lease map the contours of the parties' responsibilities in
regards to the property – these obligations flow to and from North Star, the Army, and the soldier
occupants of the units.  Regarding North Star's responsibilities in maintaining the property,
section E of the maintenance annex declares that –

[North Star] shall be responsible for maintaining all real property assets provided
for in this lease agreement including dwelling units . . . to a standard that prevents
deterioration beyond that which results from normal wear and tear, and corrects
deficiencies in a timely manner to assure full life expectancy of the facilities and
equipment.  The level of maintenance shall assure all structures are free of
missing components or defects which would affect the safety, pleasing appearance
or habitability of the units or would prevent any electrical, mechanical, plumbing
or structural system from functioning in accordance with the design intent. . . .
The quality of the work and the repaired areas shall be fully compatible with
adjacent surfaces or equipment.  All replacements shall match existing
dimensions, material, quality of work, finish, color and design. . . .  Wherever the
term 'pleasing appearance' is used in this or subsequent paragraphs, it shall be
construed to mean an appearance similar to the original finished appearance with
only minor, nonobjectionable deterioration resulting from normal use.  The

---

[3] Section H.4. of the maintenance annex provides that "[a]n incentive fee, for
exceptional performance of standards contained in this annex, not to exceed 5 percent of the
'Maintenance Rental', will be determined on an annual basis by a board composed of three
(Army) Officers or civilian personnel who will evaluate [North Star's] performance over the
preceding twelve-month period.  The board will make a determination within 60 days after the
end of the period to grant all, some, or none of the incentive award fee."

[4] Section B.18. of the maintenance annex defines "Maintenance" as "[t]he recurring
periodic or scheduled work required to preserve real property facilities, systems, moveable
equipment, and accessories in such condition that they may be effectively utilized for their
designated purpose."  Article IV of the Lease provides that "[i]t is expressly understood and
agreed to by [North Star] that the obligations of the Government to make any payments under
this agreement and Lease [are] subject to the availability of appropriations for that purpose."

housing unit shall be evaluated against the maintenance standards contained
herein to determine deficiencies requiring corrections.

A series of other provisions in the maintenance annex requires North Star to maintain interior wall systems, linoleum and other tile floor coverings, carpeting, house accessories, outside recreational equipment, and painting.[5]  Section G.1. of the maintenance annex obligates North Star to ensure that refuse is collected "twice weekly with three days between collections," while section G.3.(a) of the maintenance annex requires North Star to provide janitorial services.

Resident handbooks that were issued periodically during the years in question gave soldiers and their families instructions on how to clean their units.  *Inter alia*, the 2000 version of this handbook instructed residents to "maintain [the] quarters as a prudent homeowner, and report any needed repairs;" "[t]o keep the premises clean and safe inside and outside;" "[t]o dispose of trash properly and in a timely manner;" "[t]o use all electrical, plumbing, sanitary, heating and appliances properly and in accordance with applicable manuals;" to maintain the appearance of yards, landscaping and playgrounds; and to exercise care in dealing with cigarettes, matches and lighters.  The handbook emphasized that residents would be responsible for pet damage.  An appendix to the handbook stressed that: (i) "[i]f the resident willfully or negligently destroys, defaces, damages, impairs, or removes any part of the premises (including fixtures, facilities, and appliances) or willfully or negligently permits any person to do so, replacement or repair will be at the resident's expense;" and (ii) "[t]he residents will at their own expense . . . replace or repair all broken or damaged glass, screens, flooring, wood plaster, drywall, and locks occurring during their occupancy, normal wear and tear excepted."

Other provisions in the Lease distinguish between permissible modifications to the units, ordinary wear and tear, and occupant-caused damage.  Article VII of the Lease recites that "[t]he Government shall have the right . . . to make alterations, attach fixtures, and erect additions,

---

[5]  The Lease is particularly specific regarding painting, indicating in section E.8.(c) of the maintenance annex that –

> [p]aint . . . shall be carefully applied with good clean brushes, approved rollers or by airless spraying. . . .  Finish coats shall be smooth and free from runs, sags or other surface preparation defects.  Each coat of paint shall be of sufficient thickness to cover completely the previous coat or surfaces.

Further, section E.8.(d) of the maintenance annex provides that "[c]omplete interior painting will be accomplished as required in conjunction with the change of occupancy work.  Complete interior painting will be accomplished at the first change of occupancy occurring subsequent to the 3rd, 6th, 9th, 12th, 15th, and 18th years of the lease agreement."  This provision additionally states that "[c]omplete or partial interior painting during all other changes of occupancy, except where required in connection with maintenance and repair, will be at the discretion of [North Star]."

structures, or signs in or upon the Premises.  However, no such changes shall be made to any improvement without the written consent of [North Star]."  As to occupant damage, Section C.1.(s) of the maintenance annex specifies that –

> [d]amages to a housing unit or to other improvements within the project which are beyond normal wear and tear and are caused by the Government or an occupant, his dependents, or invited guests, which are not corrected by the Government or occupant, shall be repaired by [North Star].  The cost of such repairs shall be billed to the Government. . . .  Repair of damages which occur to the units or other improvements that cannot be attributed to the Government, his agents, officers, occupants, their dependents, or invited guests, shall be accomplished by [North Star] at no cost to the Government.

Section D.7.(c) of the maintenance annex provides that "[i]n the event the occupant fails to properly clean the unit for any reason, or correct damages beyond normal wear and tear for which the occupant is responsible, it shall become [North Star's] responsibility to satisfactorily clean and repair the unit for the next occupant."  Section C.2.(c)(10) of the annex indicates that the government is required to notify North Star "via work authorization of occupant-caused damages or conditions requiring correction or cleaning and reimburs[e] [North Star] for accomplishment of same."  Section C.3.(a) of the maintenance annex provides that "occupants shall be liable for loss or damage to the housing unit or equipment caused by the abuse or negligence of the assigned occupant, dependents, or guests."

To minimize debates regarding the cost of various repairs, Section C.1.(t) of the maintenance annex sets forth that –

> [North Star] shall, with the approval of the Government, establish a list of cleaning and repair costs for dwelling unit components which will establish the normal maximum amounts to be charged in the event of damage to property and equipment installed within a living unit over and above normal wear and tear. The list of repair costs will be based upon the latest published edition of applicable Engineered Performance Standards (EPS) Manuals (Army TB 420-series, Navy NAVFAC P-700 Series, Air Force AFM 85-series) which will be utilized to estimate manhour requirements. . . .  The manhour requirements will be multiplied by the Department of Labor Service Contract Act Wage Determination rate plus materials at wholesale cost plus reasonable overhead and profit. . . .  Such a list will be subject to change annually or from time to time by mutual agreement of [North Star] and the Government.  Examples of items which might be included on this list are cleaning of stove, refrigerator, and entire dwelling unit, replacement of interior door, patching/repairing hole in interior door, patching/repairing hole in dry wall . . . .

Under section C.2.(c)(11) of the maintenance annex, the Government is required to "[a]pprove [an] annual . . . list of repair costs for occupant damages and printed occupant instructions as

submitted by [North Star]."  Further, section H.2. of the maintenance annex states that for those items of work for which North Star is entitled to reimbursement, "the Government shall issue a work authorization, in writing, authorizing the accomplishment of such work," indicating that North Star's "charges for this work will be based upon the approved list of repair costs." Likewise, sections H.3.(a) and (b) of the maintenance annex indicate that North Star is to submit invoices for services performed in response to the work authorizations, that the billing should be "in accordance with the approved List of Repair Costs," and that "[u]pon the Government's verification of work actually performed invoices will be processed for payment."

The Lease prescribes certain staffing requirements fore the site.  The Army appoints a "housing project manager," who, under section B.15. of the maintenance annex, is "charged with the responsibility for the day-to-day administration of the housing site and fulfillment of the Government's responsibilities under the terms of [the] lease agreement."  Amplifying the responsibilities of this job, section C.2.(b) of the maintenance annex explains that the manager "shall serve as the primary point of contact for matters involving the day-to-day coordination and administration of the Government's responsibilities."  Correspondingly, under section B.28. of the maintenance annex, North Star appoints a "site manager," who is its "[p]rimary point of contact authorized to act . . .  in all matters regarding work required at the housing site."  Section C.1.(c)(2) of the maintenance annex provides that "[North Star] shall furnish sufficient personnel to perform all work specified within this annex."[6]  In this regard, section C.1. of the maintenance annex provides that – "[North Star] is responsible for the . . . maintenance, repair, replacement . . . and all operations required to support the housing site.  This includes . . . housing units . . . and all other components and systems of the total housing site insofar as such responsibilities are not normally undertaken by local governmental authorities."  Section C.1.(j) of the maintenance annex provides that "[t]he quality and workmanship of maintenance, repair, replacement, and operational services shall be first class in every respect and will be subject to the approval of the Government."[7]

_____

[6]  Section D.1. of the maintenance annex provides that "[North Star] is responsible for managing the total work effort associated with the maintenance and other services required herein to assure fully adequate and timely completion of these services. . . .  [North Star] is expected to assure an adequate staff of personnel, with the necessary management expertise, at the housing site continuously to assure the completion of the work in accordance with sound and efficient management practices."

[7]  Section C.1.(h) of the maintenance annex provides that "[a] facility history file for each housing unit . . . identified by address shall be maintained by [North Star].  Each file shall contain a copy of all Government-issued work authorizations, preventative maintenance inspection reports[,] . . . routine maintenance or repair, and renovation work orders in progress or completed.  The Government shall require access to these files and they shall be available for periodic review by the Government.  All documents shall be filed within 10 days of the completed transaction."

The Lease also provides for performance monitoring and the resolution of disputes. Thus, section C.2.(c)(17) of the maintenance annex says that the government must "give [North Star] written notice of either noncompliance or unsatisfactory work on the part of [North Star]." Section D.3. of the maintenance annex states that –

> [North Star] shall meet with the Government periodically as called for by the Government.  A mutual effort will be made to resolve all problems identified. The written minutes of these meetings, prepared by the Government, shall be signed by [North Star] and the Government.  Should [North Star] not concur with the minutes, [North Star] will state, in writing, to the Government any areas of disagreement.

Further, section C.2.(c)(15) of the maintenance annex provides that the government is required to "[s]chedule, arrange, and conduct performance evaluation meetings with [North Star], and any other parties deemed necessary by the Government."

## 2.    Change of Occupancy

The Lease contains a number of provisions governing changes of occupancy.[8]  *Inter alia*, it provides a specific set of procedures for determining deficiencies in a particular unit, who is responsible for the costs for repairing those deficiencies, and how and when those deficiencies are to be remedied.  Central to these mandates are a detailed set of inspection procedures.

Section D.7.(b) of the maintenance annex states that North Star "is responsible for conducting or participating in various types of inspections as described below," which inspections "shall be conducted in accordance with the technical standards and guidance provided here."  In this regard, the Lease provides for a pre-termination inspection, a termination inspection and an acceptance inspection.  Section C.2.(c)(7) of the annex makes the government responsible for scheduling and coordinating these inspections, while section C.2.(c)(8) of the annex requires the government to advise North Star "of proposed occupancy changes and date of pretermination and termination."  In this regard, section D.7.(b)(1) of the maintenance annex adds:

> The Government will schedule a pre-termination and termination inspection after being advised by the occupant of an impending move.  These inspections will be scheduled during normal working hours.  The Government will, in writing, notify [North Star] of the date, time, and address of each inspection.  The Government will make every effort to provide this notice 21 days in advance of the projected

---

[8]  Section B.7. of the maintenance annex defines "Change of Occupancy" as "[t]he termination of assignment by the Government of [an] occupant to a unit or the assignment of [an] occupant by the Government to a unit and the associated downtime occurring between these two events."

change of occupancy.  Because of short-time occupant orders or other extenuating circumstance, [North Star] can expect an average of 10-14 days advance notice. [North Star], or [its] representative, is required to attend the pre-termination inspection.

As to pre-termination inspections, section D.7.(b)(2) of the maintenance annex indicates that –

> During the pre-termination inspection, [North Star] shall identify and prepare work orders covering all painting, maintenance, and repair work required of [North Star].  The Government shall jointly identify, with the occupant, all damage to property and installed equipment which is over and above normal wear and tear and which is the occupant's responsibility to correct.  The Government will provide the occupant with a list of this work and associated costs for which the occupant is liable, as contained on the approved list of repair costs, and provide a copy to [North Star].  At the conclusion of this inspection, the Government shall notify, in writing, [North Star] of the firm date and time for the final inspection and the date and time that the unit will be turned over to [North Star] for accomplishment of change of occupancy work.  [North Star], in turn, shall immediately provide the Government with a firm written commitment as to the date and time that the unit will be turned back over to the Government for assignment to the next occupant.

These pre-termination inspections are designed, in part, to allow North Star to prepare for the work that it will perform during the downtime following the change in occupancy.

Regarding the termination inspection, section D.7.(b)(3) of the maintenance annex states that "[t]he Government will conduct the termination inspection jointly with the occupant after the furnishings have been removed."  It further indicates that North Star's "representation at the termination inspection is at [its] discretion."  The termination inspection is performed after the occupant has been afforded an opportunity to remedy certain of the deficiencies identified at the pre-termination inspection.  It also allows the parties to adjust, as necessary, the schedule for the Army to turn a unit over to North Star and for North Star to return the unit for a new tenant.  In this regard, section D.7.(b)(3) of the Lease explains –

> Should the date and time that the unit will be turned over to [North Star] change for any reason, the Government shall immediately notify [North Star] in writing of the revised date and time.  [North Star] will then immediately notify the Government, in writing, of the revised date and time that the unit will be turned over to the Government for assignment.  Subsequent to the termination inspection, the Government will issue to the [North Star] a work authorization for the repair of damages, or accomplishment of cleaning, which are the responsibility of the occupant but were not completed at the time of the termination inspection.

Section D.7.(a) of the maintenance annex indicates that "[w]ork identified by [North Star] or [the] Government during the pre-termination and final termination inspections which is required to make a unit ready for the next occupant, shall be accomplished while the unit is vacant." It states that "[t]his work includes any routine maintenance and repair, as well as interior painting." Section C.1.(p) of the maintenance annex requires that after North Star performs the necessary repairs and replacements and, "[p]rior to acceptance of a unit by the Government," North Star "shall clean the entire unit" and "shall insure units meet the same standard of cleanliness the Government requires of terminating occupants." This work includes "removal of all stains, fingerprints, and paint spots, cleaning of all dust and dirt, washing of windows, cleaning of all appliances, cleaning of all ceramic tile, and washing of floors."

Section D.7.(d) of the maintenance annex reads that "[u]pon completion of all change of occupancy work, [North Star] will notify the Government of work completion and unit availability," at which point the Army conducts the third of the change of occupancy inspections, the "acceptance inspection." Section B.2. of the maintenance annex defines the "Acceptance Inspection" as "[t]he inspection of a vacant unit between changes of occupancy or subsequent to completion of renovation work to ensure that all work has been completed satisfactorily and that the unit is in a presentable condition for viewing and acceptance by a prospective occupant." Providing further information about these inspections, section C.2.(a) of the maintenance annex declares –

> [a]cceptance inspections of all dwelling units will be conducted . . . after completion of repair or rehabilitation work on the unit. The Government shall conduct these inspections jointly with [North Star]. The Government will schedule these inspections to occur on the same date that the work is completed if notification of work completion is received before 12:00 noon, or before 12:00 noon of the next workday, if such notification is received after 12:00 noon, at a time that is mutually agreeable. The Government has the right to refuse to accept the unit if the work has not been completed or performed satisfactorily or is otherwise not in accordance with the provisions of this annex. The Government shall, immediately upon conclusion of the acceptance inspection, notify [North Star] in writing of acceptance or refusal. If the unit is refused, the Government shall also notify [North Star], in writing, of all discrepancies requiring correction.

Section H.1.(c) of the maintenance annex provides that "[i]n the event [North Star] fails to complete change of occupancy maintenance work by the date identified by [North Star] as when the unit would be returned to the Government . . . the Government shall assess liquidated damages based on the most current average daily rate of BAQ [basic allowance for quarters] plus VHA [variable housing allowance] plus average daily lease cost per unit for each calendar day subsequent to that date."

### 3.     Downtime

Many of North Star's claims here involve "downtime," defined by Section D.5. of the maintenance annex as "the period during which a housing unit is vacant for reasons of change of occupancy, maintenance work, major repair or unhabitability, or restoration of units damaged by fires or acts of God."  That section emphasizes that "[North Star] shall ensure that downtime while a unit has been turned over to [it] does not exceed the allowable time prescribed [in sections D.5.(a) and (b) of the maintenance annex]."  It further stresses that "[d]owntime must be minimized in order to maximize occupancy of these units."  Section B.10. of the maintenance annex similarly defines "Downtime" as "[t]he period of time during which a unit is vacant and has been officially turned over to [North Star] for accomplishment of required work," and adds that "[f]or purposes of this lease agreement, downtime is measured in working days, vice calendar days."

The Lease contains a detailed description of how downtime is to be calculated.  Section D.5.(a) of the maintenance annex, entitled "Change of Occupancy Downtime," provides that "[t]he total number of downtime days for units vacant for purposes of change of occupancy maintenance shall not exceed the number of moveouts (excluding moveouts for purposes of scheduled repairs or fires and acts of God) per month multiplied by 3 days."  It indicates further that "if [in] any 5-day work period, more than eight units are turned over to [North Star], two additional days will be allowed for each unit in excess of eight."[9]  Likewise, section D.5.(b) of the maintenance annex, entitled "Scheduled Repair or Renovation Downtime," provides that –

> [d]owntime for reasons of scheduled repair or renovation will be completed on the basis of the actual number of days any specific unit has been turned over to [North Star] for such work.  The downtime period will begin with the date the

---

[9]  As to the "3-day" rule, the Lease gives the following example:  "For example, if there are 10 move-outs in 1 month, the total allowable downtime for that month is 30 days."  As to the "5-day rule," the Lease gives the following example –

> For example, if there are 17 move-outs in a month, the total allowable downtime is 51 days.  However, if 11 of these units were turned over to [North Star] within a 5-day work period, an additional 6 days will be allowed for a total of 57 days in allowable downtime (representing the additional 2 days for each of the units in excess of eight turned over within a 5-day work period added to the 51 days allowed for 17 move-outs).

Despite Lease provisions suggesting that downtime is to be measured on an average monthly basis, section D.7.(d)(1) of the maintenance annex states that "[a]ll change of occupancy work must be completed within three working days after the unit becomes available, which shall be determined from the date the unit is turned over to [North Star] by the Government for change of occupancy work."

Government turns the unit over, in writing, to [North Star] for this purpose and will end when the Government accepts, in writing, the unit from [North Star] subsequent to work completion.

Section D.7.(d)(2) of the maintenance annex provides that "[t]he downtime period will be determined as follows:  If the unit becomes available prior to 12:00 noon, the period will begin at 1:00 p.m. that day.  If the unit becomes available at 12:00 noon or later, the maintenance period will begin at the start of the following work day."

The Lease provides for penalties should North Star fail to comply with the downtime provisions.  Section D.5.(b) of the maintenance annex indicates that "[d]eductions for [North Star's] failure to adhere to the scheduled downtime will be in accordance with clause H.1. [of the maintenance annex]."  Section H.1.(d) of the annex provides that "[i]f the downtime in any one month for units vacant for purposes of change of occupancy work exceeds the allowable downtime for that month (established in accordance with clause D.5.(a) [of the maintenance annex]), the Government shall assess liquidated damages based on the most current average daily rate of BAQ plus VHA plus average daily lease cost for each calendar day in excess of the allowable downtime."

## C.     The Dispute:  A Chronology

The findings in this segment are described chronologically, rather than by the subject dispute (*e.g.*, downtime or incentive fees), because the record demonstrates that conflicts involving the Lease fed on each other, with new disputes springing up periodically to further complicate matters.  Understanding this synergy is key to a proper understanding and analysis of plaintiff's bad faith claims.

### 1.     1989 through 1995

During the first several years after the contract was awarded, disputes began to arise, among them concern over the phase-in of the project itself, refuse collection, the timing of various rent payments, and whether defendant was required to have an on-site manager.  However, these issues were addressed under the dispute resolution mechanism provided by the contract; the parties otherwise enjoyed a positive working relationship.  Indicative of this is the fact that, as illustrated in the following chart, from 1987 through 1992, North Star received various incentive fee awards, often accompanied by glowing transmittal letters that lauded its efforts:[10]

_____

[10]  For example, the Army's January 4, 1989, letter announcing the fee award for 1988 indicated that North Star had "demonstrated exceptional response to the soldiers and their families" and had "done very high quality work."  Likewise, a 1991 letter from the Army awarding North Star an incentive fee, thanked North Star for "the high standards of work accomplishment, excellent customer service and very professional project management," and commented, "[t]he incentive fee award is well deserved by your staff and is government money

| Period | Incentive Fee Award |
|--------|---------------------|
| 1987 (interim period) | $13,236.09 |
| 1988 | $42,921.00 |
| 1989 | $56,113.93 |
| 1990 | $50,295.78 |
| 1991 | $52,398.78 |
| 1992 | $53,326.19 |

In 1993, when several issues were not resolved to its satisfaction by contracting officer decisions, North Star filed a lawsuit in this court. On December 22, 1993, this court granted, in part, and denied, in part, the parties' cross-motions for summary judgment. Despite this litigation, North Star continued to receive essentially the maximum incentive fees allowed – $54,041.30 for 1993 confirmed by a decision issued on February 2, 1994, and $55,225.00 for 1994 confirmed by a decision issued on January 11, 1995.

In September of 1995, the lawsuit was settled. In the settlement agreement, North Star offered "to assume full responsibility for refuse collection and disposal," for which the United States agreed to provide North Star $1,000 per month. However, a disagreement eventually arose over what this provision entailed. On November 22, 1995, the Fort Wainwright Director of Public Works informed the Commander, U.S. Army Engineer District Alaska that "[t]he Army standard for adequate housing is weekly curbside trash pick-up." On December 1, 1995, the contracting officer pointed North Star to the Lease provision requiring that North Star "insure that refuse is collected twice weekly" and directed North Star to provide the same type of refuse collection and disposal as required by the Lease.

During this same year, disputes began to arise concerning the calculation of downtime and changes of occupancy. But, again, these disputes appear to have been handled amicably, with Suzanne M. Harrison, the Chief of the Housing Division at Fort Wainwright, indicating in an August 17, 1995, memorandum that "[a]s always, North Star was very cooperative in assisting Housing in gaining maximum utilization of these 400 units." Others, however, had different ideas. An October 27, 1995, memorandum that was coordinated by Thomas B. Peterson, the Chief of Housing for the Army's Department for Public Works in Alaska, instructed, as to the Lease's downtime provisions, that North Star's "failure to meet timeframes so computed should

_____

well spent." Indeed, a January 1993, letter notified North Star that the Birchwood project had been highlighted at a recent hearing of the Senate Defense Appropriations Subcommittee, where it was "described in a US Army, Pacific, fact sheet as an extremely successful project and a prototype for future Army housing initiatives."

result in the enforcement of penalties."  Several weeks later, on November 22, 1995, Karen Goodrich, then the Chief of Housing at Fort Wainwright, alerted Mr. Peterson that a dispute continued as to what the 1995 settlement required in terms of trash removal.[11]  That same day, Mr. Peterson wrote the Commander of the U.S. Army Engineer District for Alaska, stating that North Star has "unilaterally eliminated trash collection services."  While admitting that "weekly curbside trash pick-up" was the Army standard, Mr. Peterson indicated that North Star's failure to pick up trash represented an "unanticipated, unfortunate and totally unsatisfactory elimination of services [that] needs to be resolved immediately."[12]  He requested "intervention to correct this blatant abrogation of support responsibility for 801 Birchwood residents."  On November 29, 1995, the day that North Star apparently was to announce its trash removal policies to the tenants, Mr. Peterson sent a facsimile to two North Star officials in which he warned that "I suggest that you defer tonight's discussion of this issue or Post Commander Reps will be forced to tell tenants to disregard your letter of instruction," adding that "[t]his divisiveness will cause us other problems and open a pandoras [sic] box."  The record suggests that, notwithstanding this facsimile, North Star communicated with the tenants regarding trash removal.

Subsequent efforts to resolve this dispute over refuse collection proved unsuccessful.  On December 29, 1995, Mr. Peterson wrote North Star suggesting, apparently for the first time, that the issue concerning refuse collection could impact North Star's ability to receive an incentive fee.[13]

### 2.    1996 and 1997

On January 10, 1996, the Army wrote North Star indicating that "the unilateral notification of residents by North Star of your intention to eliminate required trash collection services" and "the failure to provide the level of trash collection services to which you agreed in the Sep 95 settlement" had caused North Star's performance to be rated "less than exceptional" in November and December of 1995, a rating that, in turn, caused the Army to reduce the

---

[11]  Although at other points in the record it appears that the debate involved both the periodicity of the pick ups and whether they would be curbside, Ms. Goodrich, in her memorandum, apparently focused only on the former issue, as she stated that "[a]n out of court settlement was reached to allow the contractor to decrease pick-up from twice a week to once a week."

[12]  While, in his memorandum, Mr. Peterson appears to suggest that North Star had ceased all trash pick up, other parts of the record suggest that the dispute involved whether such service would be provided once or twice a week.

[13]  In an undated letter that appears to have been issued prior to December 29, 1995, Mr. Peterson indicated that another disagreement over the interpretation of the Lease would "not impact or affect the performance standards used to establish the annual incentive award."

incentive fee.  North Star unsuccessfully appealed this decision to the Army's Director of Public Works at Fort Richardson, Alaska.

In the spring of 1996, a dispute began to develop regarding change of occupancy turnaround time.  Prior to this time, North Star had consistently repaired vacant units and turned them back to the Army in less than the time specified by the Lease.  At a meeting held on July 10, 1996, Mr. Peterson complained that North Star was falling behind in turning units back on a timely basis.  At the meeting, he indicated the Army's intent to begin turning over units to North Star for repair in blocks – 8 units to be released each Monday.  In the minutes of this meeting, Mr. Peterson is reported to have stated that the latter process was designed to ensure that the Army would not be "penalized" by requiring it to provide North Star with additional down time, indicating that his goal was "to issue them in a sequence that keeps it to an average of three days."[14]  In a August 12, 1996, memorandum to Col. Albert J. Kraus, the Commander of the Alaska District, Mr. Peterson recapped the meeting, highlighting the turnover problem while emphasizing that "[t]he change of occupancy turnaround time is a significant factor in determining overall performance award."  In August of 1996, Col. Kraus was replaced by Col. Wm. David Brown.

The incentive fee award meeting for 1996 occurred on January 8, 1997.  Following the meeting, Mr. Peterson sent an e-mail to Mr. Edward Miller, then the Army's Birchwood manager, chastising him for being unprepared.  At that meeting, Mr. Miller had made assertions regarding North Star's performance for which he lacked documentation.  Criticizing this, Mr. Peterson indicated, in his e-mail, that "I don't think we want to emphasize to Fischer that after all your time on site, you are just now starting to keep a formal record of your inspections, that will just embarrass us all."  At the meeting, North Star apparently also argued that, under the Lease, it was entitled to additional days for approved work authorizations.  In an undated letter, Col. Brown subsequently rejected that interpretation.  On February 10, 1997, Col. Brown, in an internal memorandum, proposed that the Army's rent payment for 1996 be reduced by $41,256.57 "based on excessive change of occupancy down time."[15]  On April 16, 1997, Col. Brown wrote North Star announcing an incentive fee award for 1996 of $39,000, indicating that "[t]he only rated areas which were significantly less than exceptional were between occupancy vacancy rates."  Nonetheless, the letter indicated that actual payment of the fee might be delayed

---

[14]  Recall, that, in terms of downtime, section D.5.(a) of the maintenance annex states, "if [in] any 5-day work period, more than eight units are turned over to [North Star], two additional days will be allowed for each unit in excess of eight."

[15]  On April 9, 1997, an evaluation meeting was conducted at which Mr. Fischer complained regarding the Army's practice of holding units after they had been received from the cleaners and releasing them in a group, implying that this practice was contributing to downtime delays.  Mr. Peterson and Ms. Goodrich essentially responded that they had adopted the practice to ensure that the Army did not release more than 8 units in a five-day period so as inadvertently to afford North Star additional downtime under the Lease.

because of "the ongoing attempts to collect overdue accounts receivable from North Star." On May 22, 1997, Mr. Fischer indicated that he was unaware of any overdue accounts and asserted that North Star was not being treated "even handedly." Col. Brown disagreed with the latter characterization in a letter dated June 6, 1997, yet also indicated that "future awards will probably be made 'subject to the availability of funding.'"

The refuse collection and downtime issues continued to fester. On June 10, 1997, Mr. Dennis Klein, the Chief of the Army's Real Estate Division in Alaska and the Contracting Officer for the Lease, wrote Mr. Fischer indicating that he had been notified by Mr. Peterson that "recent changes in refuse collection and disposal in the Birchwood housing complex [have] resulted in service that is below the level required by the subject lease." Mr. Klein warned that the failure to commence twice weekly collection on or before June 23, 1997, could result in the imposition of penalties. On June 11, 1997, Mr. Fischer responded, taking exception to the imposition of penalties and indicating that North Star had repeatedly requested a contracting officer's decision on the refuse point, but had not received that decision. On June 13, 1997, Mr. Klein wrote, confirming his receipt of the June 11, 1997, letter. On June 20, 1997, Mr. Fischer sent a second letter to Mr. Klein, stating –

> It is quite obvious to us that your action on this matter was punitive. The post commander at Fort Wainwright has not regarded once a week pick up as a problem [and] in fact was not informed of your action prior to our recent contact with him. The first that his office knew of the change you demanded was our call to him to inquire as to what days he would suggest the garbage be picked up.

Mr. Fischer concluded – "We consider the above actions to be in bad faith in your dealings with us."

On July 9, 1997, North Star and the Army conducted a maintenance evaluation and incentive meeting for the months of April through June of 1997. At that meeting, Mr. Miller offered the results of his evaluations, to which North Star raised numerous exceptions. In a memorandum dated July 9, 1997, the Army unilaterally adopted a depreciation schedule for all carpeting, thereby reducing the reimbursement amount that North Star would receive for replacing carpeting with occupant damage. This memorandum, issued by Ms. Mae Harrell, then the Army's housing manager at Birchwood, stated –

1. Effective immediately, all charges for damages to carpet will be figured using a ten (10) year life expectancy in ALL housing areas.

2. If the carpet is determined to be ten (10) years old, it will be replaced as fair wear and tear and not [sic] charge will be brought against the occupant. If the damage is due to pet odor, the occupant will be charged for sealing the floor and any other measures required to abate the pet odor.

3.      When determining the depreciation on damaged carpet, subtract
        10% of the total value for each year that the carpet has been
        installed.  This does not include the labor for installing the carpet
        only the materials.

On July 11, 1997, Mr. Fischer sent the Army a letter addressing Mr. Miller's ratings on a point-by-point basis.  On August 1, 1997, Col. Brown responded, agreeing that Mr. Miller's evaluation was "incomplete and unsatisfactory in so far as presenting a clear objective record."  This letter indicated that the evaluations were being reconsidered, but, nonetheless, asserted that North Star should replace carpeting that is "in worn and poor condition" which had "outlived its useful economic life."  Thereafter, it appears that Col. Brown sent North Star a letter providing a more detailed response to North Star's dissatisfaction with the specific evaluation comments made previously by Mr. Miller.  This letter asserts that North Star had initiated a legal action against Mr. Miller and indicates that the lawsuit "will not help to improve on site working relationships" and may generate "some negative feelings on both sides for the foreseeable future."  In the letter, Col. Brown increased North Star's ratings on several, but not all, of the factors on which North Star had appealed.

On August 7, 1997, Mr. Fischer wrote Mr. Klein indicating that North Star would not begin to collect refuse twice weekly until "a clear demand" to that effect was made.  This letter indicated that the "refuse collection has been the subject of a request that you issue a contracting officer's decision since May 22, 1996."  On August 13, 1997, Mr. Klein requested North Star to commence twice-weekly collection of garbage, trash and bulk items beginning August 18, 1997.  On September 5, 1997, Mr. Peterson e-mailed Ms. Goodrich criticizing Mr. Miller's performance and indicating, with respect to the evaluation meetings – "I guess my point is, it isn't business as usual anymore, we need to relook and prepare better than ever."  On September 25, 1997, Mr. Robert A Welch, then Chief of the Army's Acquisition Branch, Real Estate Division, in Anchorage, requested North Star to provide formal notice to the tenants of the twice-weekly refuse collection.  North Star, however, refused to do so, operating apparently on the view that it had been instructed otherwise by Mr. Klein.

At a quarterly evaluation meeting held on October 15, 1997, the parties disputed the Army's use of depreciation for carpeting.  A transcript indicates that the following exchange between Mr. Fischer and Col. Brown transpired:

BROWN:      Okay, so if there's pet damage on a nine year old carpet, then your position
            is the government is responsible for paying the whole amount, basically?

FISCHER:    Absolutely or any other damage for that matter.  Any time the government
            damages anything they're responsible, I would think.

BROWN:      Even considering the fact that that – I don't know what the industry
            standard is.  I don't know what it is.  It may be five years.  It may be
            fifteen years, but --

FISCHER:      It's also not relevant.

BROWN:        Well, it is relevant, Dick, because I'm going to make it relevant.

FISCHER:      Okay, you go ahead and make it relevant.

BROWN:        And whether you want to accept it or not.  You know, common sense tells you if that carpet has been and whatever the industry standard is – I don't know what it is, but we're going to determine what it is and you are either going to come up with a depreciated schedule or we're going to come up with one and I'm going to investigate the possibility of – I mean you think about it from a common sense point of view.  If that carpet has a – let's say for example, and I'm not saying that's it, but let's say for example, its got a ten year life cycle on it and let's say it's at 90 percent, say we have dog damage to it, okay.  It has been 90 percent used of its useful life at that point, you should be replacing it year number 10 anyhow.  So the government's responsibility from a common sense point of view is we should be responsible for the remaining life of that carpet, because you have benefited from the first nine years of that carpet and we should be responsible for the remainder of it if a dog tears it up.  If you had the carpet in there for one year and we have to replace it, then we shouldn't be responsible for the nine years of remaining life.  It has been in there – if the useful life is ten years and a dog tears it up and the useful life is ten years, we shouldn't have to be responsible for any of it.  So, it's all going to depend on what that is that if you don't want to deal with us on this, then what I'm going to do is I'm going to get with the lawyers and we're going to come up a depreciated schedule and then I will – we will figure out some way to deduct that from your payments and then if you want to sue us, have at it, but you know what is fair here and you need to work with us on this and we'll work with you on it, but if you don't, I'm going to do exactly what I said I'm going to do and let the chips fall where they will, cause you know that's the right thing.  You know that.

FISCHER:      Absolutely not.  I totally disagree with you.

BROWN:        Okay fine, let's move on, move on to the next one.

GOODRICH:  I think Billie was finishing up her portion of the --

FISCHER:      So –

BROWN:        I told you right up front what I'm going to do about it and if you want to talk about it, we will.

FISCHER:   I'd be happy to talk about it, you just cut me off, so.

BROWN:   Well, you told me you totally disagree so we'll just move on.

FISCHER:   I do disagree totally and I have good reason for it and I'd be real pleased to go into it, if you wish.

BROWN:   Okay, go ahead.

FISCHER:   Okay.  We have cooperated and we will continue to cooperate and any time a carpet is not serviceable we're going to replace it.  That's what we're doing and that's what we'll continue to do.  If that carpet is damaged, we have no way of determining whether that carpet – when that carpet will not be serviceable.  Depending upon the care of the unit, it could be that the carpet is serviceable for 20 years.  We don't know.

BROWN:   Well, there's industry standards for that and we can determine that.

FISCHER:   Well that's not per our contract.  Industry standards are not part of our contract.

BROWN:   Well, that's fine, you know --

FISCHER:   It says when the carpet is no longer serviceable.

BROWN:   If that's your position, that's your position and we'll go from there.

FISCHER:   Well, Colonel, that seems to be the way you care to settle all these things.

BROWN:   No, I just can't seem to get any – any, you know, common sense, you're a business man and if the shoe was on the other foot, you would say exactly what we're saying out here.  You know and –

FISCHER:   We have a responsibility to keep these units in impeccable condition and that's what we're doing and we're not going to be responsible whether some tenant damages something in these units.

BROWN:   No, and you should not be.

FISCHER:   That's right.

BROWN:   You should not be.

FISCHER:   And that's our position.

-20-

BROWN:        And neither should the government be totally responsible for 10 year old carpet in total when a dog damages it and you know that.

FISCHER:      If the life of the --

BROWN:        Okay, let's move on.  I don't even care to talk to you any more about this issue.  You're very unreasonable on this and I knew you were going to be- so let's just move on to another issue.  We'll just let your lawyers and our lawyers deal with this, because I'm going to figure out a way that I can take it right out of your pay.

Later, at this same meeting, Col. Brown ordered that future evaluation meetings not be recorded.

In the late summer or early fall of 1997, the Army hired a contractor to conduct a survey of the Birchwood residents, with a view toward using the survey results in making incentive fee determinations.  On November 14, 1997, Mr. Fischer wrote Col. Brown emphasizing that, contrary to the latter's assertion, "[t]here is no lawsuit pending against Mr. Miller" and complaining about Col. Brown's decision to move the evaluation meetings to Fort Richardson, Alaska.  Regarding the increasing tensions between the parties, Mr. Fischer asserted –

Our contract provides a clear forum for contractual resolution of differences of opinions.  We would expect to follow these procedures.  Differences of opinion on contractual matters which we have had in the past have not affected the Army's assessment of North Star's performance.  This was the case until your decision to demerit North Star for the difference in the manner that the turnaround time has been interpreted this past year.

Mr. Fischer again asserted that the Army was dealing with North Star in "bad faith" and indicated that he would not be dealing with further correspondence on this matter because "[i]t is clear to me and I dare say to everyone present at the last quarterly meeting that you have a personal problem with me."  On November 25, 1997, North Star requested a contracting officer's decision with respect to both the turnaround time and refuse collection issues.

On December 9, 1997, Mr. Peterson prepared a memorandum for the DPW staff in which he asserted that issues involving downtime and carpet depreciation should impact the decision whether to grant North Star an incentive fee for 1997.  In this regard, he argued –

From an ethical perspective, I think the board would be acting in contravention of the government's interests if it were to approve a substantial cash award during a period when the contractor's failure to apply sound and efficient management practices (*i.e.*, failure to pro rate the cost of carpet IAW industry standards) has become a substantive cost issue. . . .

> I don't think that the Board can ethically ignore North Star's failure to fairly
> apportion the carpeting cost.  An approval of an incentive award which could be
> construed by the contractor as either ignoring or encouraging continued actions by
> North Star which result in double payment for carpeting maintenance costs would
> be a dereliction [sic] of the Board's explicit and implicit duties in representing the
> best interests of the U.S. Government.

Accordingly, it appears that, at least by this time, the fact that North Star was raising various
claims with the contracting officer was viewed by Mr. Peterson as a reason to deny it an
incentive fee.  On December 11, 1997, the Army's District Engineer wrote North Star indicating
that the contracting officer decisions on the issue of twice-weekly refuse collection and down
time would be issued within 45 days of North Star's November 25, 1997, request.

On December 12, 1997, Mr. Peterson e-mailed Col. Brown and Ms. Goodrich, reiterating
that it would be "unethical to pay an incentive award to North Star for a time period during
which they have . . . blatantly refused to discuss equitably apportioning costs" for carpet.  Mr.
Peterson indicated that "[a]s a member of the Board, I feel that we are bound by formal principles
of ethical conduct to select the 'no incentive award' option until the government's maintenance
concerns are addressed/resolved."  In an e-mail December 22, 1997, Mr. Peterson further asserted
that North Star's position with respect to carpet replacement was not in "good faith."

### 3.      1998

On January 28, 1998, Mr. Klein sent Col. Brown a copy of his decision on the downtime
issue.  This decision concluded –

> I find and conclude that the contract allows for a maximum occupancy downtime
> per unit of three days for completion after turnover by the Government to [North
> Star], if eight or less units are turned over within any given 5-day work period.  I
> find that if more than eight units are turned over within any 5-day work period,
> then the allowable occupancy downtime is increased to five days per unit for units
> in excess of eight.  I further find and conclude that the maximum allowable
> aggregate occupancy downtime in any given month cannot be interpreted to
> permit occupancy downtime maintenance on the units to run consecutively.

This decision was mailed to North Star on January 29, 1998.  That same day, Col. Brown sent
North Star a letter in which he announced an incentive fee award of only $21,272, less than half
of the prior awards.  On March 9, 1998, North Star filed a complaint in this court, primarily to
address the depreciation issue.  The contracting officer's decision on the carpet depreciation issue
was mailed to North Star on March 26, 1998.  This decision by Mr. Klein concluded –

> I find and conclude that when it is determined, based upon inspection, that
> because of normal wear and tear, carpet no longer has a pleasing appearance as
> defined in the contract, then it is the responsibility of [North Star] to replace such

carpet.  I find and conclude that the contract requires that the expected useful life of carpet be established by reasonable proof.  I find that where carpet is replaced due to pet or other occupant damage beyond normal wear and tear, the replacement cost paid by the Government is required to be depreciated based on the age of the carpet in relation to its expected useful life and reasonable replacement schedule.

These contracting officer decisions resolved little in terms of the parties' disputes over particular units.  Indeed, new issues incessantly arose.

One of these issues involved what North Star referred to as "stockpiling" – the Army's practice of holding units that had been vacated by service members for days, sometimes weeks, and occasionally months, and then releasing them to North Star, for maintenance and repairs, in batches.  Various Army officials contended that this process was designed to prevent the Army from inadvertently releasing more than eight units to North Star within a 5-day work period, so as to trigger the extended 5-day downtime period.[16]  North Star, however, complained bitterly that stockpiling made it difficult for it to perform the necessary repairs within the allotted time, complicating, in particular, the scheduling of subcontractors for tasks such as carpet and vinyl replacement.[17]  In a June 3, 1998, memorandum, North Star's site manager complained to Ms. Goodrich that this practice was "another effort by the Army to make it as difficult as possible for North Star to perform its contract," asserting further that North Star "regards this action to be another exercise of bad faith on the part of the Army in dealing with North Star."

---

[16]  At trial, Mr. Harold Hopson, who eventually become the contracting officer on the Lease, admitted that stockpiling requires North Star to have more staffing and makes it more difficult for North Star to meet the downtime requirement.  He further testified that he mistakenly thought the Army was releasing the units as they were cleaned.  Mr. Rodney Everett, who was the Contracting Officer Representative at Birchwood, testified that stockpiling made North Star's task "very difficult" and that he would not have administered the Lease in this fashion.

[17]  In his testimony, Mr. Eldon Wartes, who would eventually become North Star's site manager at Birchwood,  explained –

> Q:   What was the impact of that behavior on your work when you
>        started in 1998?
>
> A:    It's huge.  These units all issued at the same time . . . .  There's no
>        way I can schedule subcontractors to be in these units all at the
>        same time.  It's just a scheduling nightmare.

Mr. Wartes further testified that stockpiling has strained his relationship with various local subcontractors, particularly when schedules were changed by the Army at the last moment.

These complaints, however, fell on deaf ears as Mr. Peterson instead was focused on reducing North Star's rent for what he perceived as excess downtime and, if possible, contracting out the repair and maintenance functions to a third party.  In a July 8, 1998, e-mail to Mr. Klein, Col. Brown and Ms. Goodrich, he wrote that "[a]lthough we now have the benefit of several favorable CODs, we still seem to be floundering as to the best course of action for deducting rent, withdrawing work for accomplishment by an alternate source, etc."  On July 13, 1998, Mr. Peterson wrote Mr. Klein urging that rental deductions be made against North Star and stating "[w]e expect your support to finalize this action this week and so inform NorthStar."  The next day, July 14, 1998, Mr. Klein responded –

> It is important that we focus on providing the soldier with the best service and housing available.  I perceive that as your role as a housing manager.  We will work with you to accomplish that goal.  Please refrain from directing the Contracting Officer.  A number of the contractual issues  you frequently address are under consideration in the Federal Court of Claims and are subject to review and determination by the attorney's handling this case.

Mr. Klein added that a contracting officer representative would attend the next evaluation meeting, "but will not be able to make commitments relating to assessment of damages or reductions of rent."  Rejecting this position, Mr. Peterson, in an internal memorandum, dated July 20, 1998, complained that Mr. Klein had raised "disturbing issues" regarding the "quality of the coordination and support which we feel that we are entitled to receive."  He indicated that his office "needs a strong, aggressive proponent" and "may not find it" in Mr. Klein's office.  This memorandum also recommended that a "[f]ormal strategy for access to Birchwood" be developed for when the Lease expired in 2007, suggesting that Mr. Peterson was already focusing on replacing North Star nearly a decade before that opportunity would first arise.  On July 20, 1998, Mr. Peterson formerly responded to Mr. Klein's e-mail of July 14, stating, *inter alia*, that "[y]our first paragraph [quoted above] seems to be giving us poor legal advice," and that, instead, there should be a "bias toward action."  On July 22, 1998, Mr. Klein responded, stating that "I am totally confused at your memo," indicating further that "[t]here appears to be a lot of jumping to conclusions and emotional overtones."

In the fall of 1998, the Army again surveyed the Birchwood residents.  The survey contained several questions that appeared to ask residents their views regarding the ongoing contractual disputes between the parties.  For example, one question stated, "[i]n their original proposal, [North Star] proposed the replacement of carpet in each unit at approximately seven year intervals," and asked the tenants essentially how often they would like to have their carpet replaced.  Another question stated that North Star "advised the government, in June 1998, that they had experienced an almost complete turnover of employees," and asked the residents "[d]id you, as a tenant, experience any decline in service which you felt was attributed to this high employee turnover."  The survey also had one or more questions that implied that North Star was responsible for certain reductions in service that, in fact, had been prompted by the Army (*e.g.*, the elimination of a location where residents could obtain household supplies).  Another question asked tenants whether they had "pleasant" or "unpleasant" living experiences without identifying

maintenance issues that were the Army's responsibility, potentially leaving the false impression that all the deficiencies at Birchwood were North Star's fault.

On December 30, 1998, Mr. Peterson prepared a "discussion" paper in which he advocated that North Star not receive an incentive fee for 1998.  In so arguing, he relied heavily upon several factors:  (i) that there continued to be disputes regarding carpet replacement; (ii) that an audit was pending regarding the contractor's alleged failure to meet agreed upon standards; (iii) the results of annual resident survey, which he refers to as a "primary evaluation tool;"[18] and (iv) that funding for the Army's overall resident program had been reduced and that any incentive fee not paid to North Star could be used to "mitigate reductions in maintenance/ repair programs."  This memorandum concluded "[b]ased upon the facts as above, particularly FY 99 . . . funding posture in USARK [the U.S. Army in Alaska], the Board (Mr. Peterson and Ms. Goodrich) place a low overall priority on the approval of any incentive award for 1998 and recommend that 'none' be approved at this time."

### 4.   1999 and 2000

On or about February 1, 1999, Mr. Everett became the Contracting Office Representative based at Birchwood.  In May of 1999, North Star was notified that it would receive a incentive fee of $3,730 for 1998.  The letter announcing this fee cited the survey results as the primary reason why the fee was so low, but did not mention budget considerations, despite the rationale expressed in Mr. Peterson's internal memorandum.

In the months that followed, increasing disagreements occurred between the parties concerning downtime calculations, stockpiling and various other issues.  Mr. Peterson continued to believe that he was not receiving adequate support from the contracting officer.  For example, on September 9, 1999, he e-mailed Mr. Klein, complaining that Mr. Everett had not been present at several meetings, indicating that his absence was a "major failure" and "pretty embarrassing to me."  Mr. Peterson, however, apparently was unaware that Mr. Everett was on vacation, a point that Mr. Klein made on September 13, 1999, in explaining the situation to his superior, Lt. Col. Sheldon Jahn.  In that e-mail, Mr. Klein indicated that "[t]here will always be unpopular COR determinations but I fully expect each call to be based upon the contract/lease provisions and made without prejudice to any of the parties."  Col. Jahn responded to Mr. Klein, indicating, in reference to Mr. Peterson, "I am not sure why there always seems to be this immediate accusation approach to concerns."  Nonetheless, Mr. Peterson continued to send Mr. Klein e-mails requesting that changes be made in draft contracting officer decisions (CODs).  In one e-mail, dated October 25, 1999, Mr. Peterson made several recommendations regarding a pending COD concerning an incentive fee award, indicating that the decision should refer to North Star's alleged policy of "establishing a 'below market' wage scale for Birchwood employees."  A

---

[18] Those results indicated, for example, that 49 percent of the residents were dissatisfied with North Star's "decision" to eliminate the self-help store.  Perhaps not surprisingly, 46 percent of the residents said that carpeting should be replaced every seven years, while 44 percent said that it should be replaced more frequently.

November 8, 1999, e-mail from Mr. Everett to Mr. Peterson invites comments on a draft of a position paper that indicates that "Fair Wear and Tear determinations cannot be used to create a de-facto depreciation schedule."

On December 17, 1999, Mr. Peterson again shipped out an e-mail in advance of the incentive fee meeting, urging once more that North Star not receive an award.  In another e-mail dated December 29, 1999, he elaborated on why he opposed an award, stating, "remember that if we award even $1, this goes into the record books as an exceptional rating."  (Emphasis in original).  An attachment to this e-mail indicated that one of the reasons that Mr. Peterson was opposed to giving North Star an incentive fee for 1999 was because North Star was challenging, in this court, the diminished fee it received in 1998.

As the year 2000 unfolded, the parties disagreed as to which government officials were empowered to order North Star to perform work.  North Star asserted that only the contracting officer had this authority, but that view was rejected by Mr. Klein.  The latter, in a February 24, 2000, letter to North Star emphasized that the Army's Project Manager "has the authority and responsibility to identify maintenance needs and to direct North Star to perform maintenance as required."  On February 29, 2000, Col. Mark C. Nelson, by then the new Director of Public Works, notified North Star that no incentive award would be made for 1999.  Col. Nelson's letter cited a variety of reasons for this decision, among them statistics taken from the most recent resident survey.[19]  The dispute between the parties involving refuse collection took a new turn when, in April of 2000, the Army indicated that North Star could no longer use the Fort Wainwright landfill for household trash.  While North Star complained about this action, the record reveals that the landfill was closed to all such trash for environmental reasons, and not just to trash collected by North Star.

In May of 2000, the parties negotiated what they believed was a settlement of the 1998 lawsuit.  Apparently under the settlement, defendant eliminated various practices – for example, the Army began to spread the release of units to North Star over a calendar week, rather than concentrating them on a single day.[20]  Depreciation also ceased.  Yet, various new debates

---

[19]  The 1999 resident survey continued to raise issues before the residents that were being disputed by the parties.  Among other things, it indicated that under the contract, "[e]xterior painting" is scheduled "at five year intervals or 'more often as required,'" and asked the residents to evaluate North Star's painting efforts in light of this requirement.

[20]  Describing the impact this change wrought, Mr. Wartes testified:

Q:     Was there impact on your workload as a result of that?

A:     Immediately scheduling was easier.  I had units to schedule all
       week, instead of one day or two days of the week.  I had units that
       weren't filling for a couple of days without having work done in

continued to arise among the parties, including disputes over who was responsible for replacing $13 butter dishes and $10 ice trays.  In September of 2000, Connie Kiser became the 801 housing project manager.  In December of that year, North Star issued a series of memoranda complaining that the Army was not enforcing various safety and cleanliness regulations.  On December 19, 2000, North Star filed notice in this court that it was rescinding the settlement agreement.

### 5.      2001 and 2002

On January 30, 2001, Mr. Peterson again relayed complaints to Mr. Klein regarding the level of support that Public Works was receiving from Mr. Everett, indicating that his superior "feels that Rod [Everett]'s position should be more responsive to supporting our requirements (specifically to supporting Connie [Kiser]), more proactive, and most importantly, accomplishing measurable results."  Later, on January 31, 2001, in discussing another dispute in which Mr. Wartes indicated that he would not take direction from Ms. Kiser, Mr. Peterson e-mailed Mr. Klein, stating that Mr. Wartes's position precluded an incentive fee award for 2000 and that "[i]t's time to back [Ms. Kiser] 100%."   By at least this time, the parties began to have additional disputes regarding the inspections under the Lease, with issues arising concerning the timing and notification of those inspections and whether the Army was entitled to conduct inspections at times not specified in the Lease.  Apparently commenting on those disputes, on February 9, 2001, Mr. Peterson sent Mr. Klein and others an e-mail in which he stated –

> If our project manager's interpretation of the lease is correct, this should be completely and clearly expressed to [North Star] by Rod.
>
> If there is lease ambiguity, our project manager's position should still be supported as completely and clearly as possible by Rod.  He is not paid to be neutral, but to aggressively support a reasonable government position.

In June of 2001, the Army announced that North Star would not receive an incentive award for 2000, citing again the resident surveys,[21] as well as excessive downtime, but also referring to an issue involving overcharges for lock installation.[22]

---

them, because I had six of them at the same time.  Yes, it made things much easier.

[21]  Among the questions on the 2000 survey was "[h]ow satisfied are you with the twice weekly curbside refuse collection?"

[22]  Regarding the latter point, a June 15, 2001, letter from the Army to Mr. Wartes cited North Star for "[k]nowingly charging the government and military families for new materials while recycling used lock-sets."  The record, however, suggests that by this time, North Star already had admitted this mistake and had reimbursed the Army for the charges involved.

On July 24, 2001, Lt. Col. Michael T. Meeks, the Director of Public Works, issued a memorandum to the Army Engineer District requesting that a protocol be established under which all contracting officer decisions would be reviewed by employees in Public Works. This memorandum requested that "[a] staff summary . . . shall be attached to each draft COD and this will be used by the FWA Housing Office to note concurrence/noncurrence and any comments." The memorandum further indicated that –

> [i]n the event of nonconcurrence, the USARAK staff, including the Staff Judge Advocate will review the draft COD. A summary of the USARAK and proposed changes in wording will be provided to the Office of Real Estate and reviewed prior to finalizing the COD.

Col. Meeks added that "[t]his procedure will insure that Public Works and USARAK comments are reviewed and incorporated, as appropriate," and listed Mr. Peterson as the contact for this action. Various documents in the record, as well as testimony at trial, indicate that this procedure was implemented at least as early as August 17, 2001.

In a November 5, 2001, e-mail, Mr. Peterson recommended that the lockset issue, as well as other unidentified allegations of fraud, warranted an outside investigation of North Star by the Army's Internal Review and Audit Compliance Office Army (IRACO). In this e-mail, Mr. Peterson asserted that "[t]his issue continues to preclude any consideration for incentive award until it is finally resolved to the government's satisfaction." By early December of 2001, he and Ms. Kiser decided that they would require North Star to submit individual invoices for certain repair and replacement items, even though the Lease seemingly provided that such items would be listed in a repair cost book to be negotiated annually by the parties. In one e-mail sent to Mr. Peterson, Ms. Kiser stated: "I feel that the lock set issue is just the tip of the ice berg." On December 11, 2001, Mr. Peterson sent an e-mail to the contracting officer and a variety of other Army personnel citing the lockset issue and the resulting audit as grounds for denying North Star any incentive fee for 2001.

In January of 2002, Mr. Harold Hopson replaced Mr. Klein as the contracting officer for the Lease. On January 8, 2002, a hearing was held in this case at which defendant's motion for summary judgment to enforce the settlement agreement was denied. On January 15, 2002, Ms. Harrell e-mailed Col. Meeks complaining about a variety of issues and indicating that "[t]he bottom line [is] we want to get rid of the settlement." On January 28, 2002, Mr. Hopson wrote North Star indicating that defendant was withdrawing from the settlement agreement and would seek to recoup any payments made to North Star based upon that agreement.

Following the collapse of the settlement agreement, the situation worsened considerably. Almost immediately, and despite howls of complaint from North Star, Mr. Peterson and Ms. Kiser resumed the practice of stockpiling, releasing units in groups of eight on Mondays and Fridays without regard to how long the units had been vacant. In February of 2002, the Army indicated that it had received the results of the IRACO audit, which had found that various work authorizations were missing from the Birchwood files. In a letter dated February 28, 2002, which

is not in the record, but referenced by other correspondence, Col. David B. Snodgrass indicated that the missing files precluded the Army from considering a performance award for North Star for 2001 or for any part of 2002 for which the issue remained unresolved.  On March 6, 2002, Ms. Kiser forwarded to North Star the repair list for 2002, substantially reducing the number of items listed therein and emphasizing that "[a]ll items not included in the list will require invoicing at the time the work is required."  Extending a concept that previously had been applied only to a few items (*e.g.*, carpeting), her memorandum further indicated that "[p]rices approved in this listing are subject to depreciation to be determined on a case by case basis."

On March 15, 2002, Mr. Wartes wrote Col. Snodgrass objecting to his incentive fee determination.  This letter indicated that the overcharges regarding the locksets involved $135, which had already been refunded to the Army (possibly as early as November of 2000).  The letter also asserted that the Birchwood files that allegedly were missing had been pulled for a spreadsheet analysis, that North Star had shown the auditors the boxes containing those files, but that the auditors had declined an invitation to review those documents.  North Star indicated that the auditors had not complained about any missing files and that the first that it became aware there was a continuing issue concerning the files was when it received the incentive fee letter. Apparently prompted by a memorandum received from Ms. Kiser, on April 17, 2002, Mr. Everett wrote Mr. Wartes complaining about excess downtime in February and March 2002, and indicating that liquidated damages of $2,874.47 would be deducted from the next rental payment. On April 30, 2002, North Star wrote Mr. Everett requesting that he provide the backup documentation for his downtime calculations.  In the succeeding months, particularly, in May of 2002, the parties continued to dispute a variety of issues, including whether Ms. Kiser was authorized to modify unilaterally the repair cost book and to require invoices for the items not covered in her price list.  In internal e-mails dated May 22, 2002, a representative from IRACO indicated that the lockset issue alone was insufficient to warrant further audit, but that an expansion of the audit, nonetheless, should be sought.  By way of explanation, the auditor indicated that "our audit results, used as evidence, could prove crucial in supporting our (the Govt) [sic] case against the lawsuit brought by North Star."  The same day, Mr. Peterson responded that his office "greatly support[s] expanding the investigation."

Again prompted by a memorandum sent by Ms. Kiser, on May 22, 2002, Mr. Everett sent North Star a letter asserting that there had been excess downtime in April and assessing liquidated damages in the amount of $2,308.25.  On May 24, 2002, Mr. Wartes responded to this letter, asserting that "[n]o justification has been provided for your calculation of excess downtime," and indicating that he had still not received a response to his April 30, 2002, request for the backup documentation for defendant's calculation of downtime for February and March. On June 27, 2002, Ms. Rhonda Sekyra, North Star's Treasurer, wrote Ms. Kiser cataloguing the problems that North Star was experiencing regarding the turnover of units, including the Army's practices of: (i) revising turnover dates and failing to provide timely notifications; (ii) not distinguishing between change of occupancy downtime and repair and renovation downtime; (iii) failing properly to conduct pre-termination inspections; and (iv) failing to issue proper work authorizations.  The record reveals that disputes involving individual units continued throughout this period.  In July of 2002, the parties again exchanged correspondence, in which the Army

reemphasized that Ms. Kiser was authorized to direct North Star to perform work.  In a letter dated July 18, 2002, Mr. Wartes highlighted that the Army had apparently begun using depreciation in calculating the reimbursement owed North Star for blinds and counter tops replaced as the result of occupant damage.

On July 31, 2002, Mr. Everett sent North Star a letter in which he determined that there was excess downtime for May and June of 2002, indicating that $2,350.61 would be deducted from North Star's next rental payment.  On August 1, 2002, Mr. Wartes contested this determination and again demanded back-up documentation, while noting that requests for such documentation for February, March and April had still not been satisfied.  On August 8, 2002, Mr. Wartes wrote Ms. Kiser alleging a new practice – that the Army was ignoring pet damage, leaving it to North Star to determine whether carpeting so damaged would be left in a unit or replaced at its expense.[23]  Correspondence during this period also suggests yet another new bone of contention between the parties – indications that Ms. Kiser was inspecting units outside of the regular turnover regime, at which inspections North Star representatives were not present, and using information obtained during those inspections as a basis for requiring North Star to perform repairs and maintenance.

On August 29, 2002, Mr. Peterson sent an e-mail to Ms. Kiser, with copies to various other officials, in which he summarized the results of the then completed IRACO audit.  This e-mail indicated:

> We had a pre-final briefing today.  The final audit will document a series of relatively minor problems which we will pass on to [North Star] to correct, but no real big ticket items.  There is about $20K in double billings which we will ask [North Star] to correct and reimburse, but most of that appears to be from Ed Miller's sloppy work, not any [North Star] conspiracy.
>
> The audit will document a quantum improvement in the quality of government oversight since Connie took over, and all auditors emphasized what a great job

---

[23]  Commenting on the impact of this, Mr. Wartes testified –

This is just one of many types of instances where there was a double standard, where the government when it perceived it was damaged, you know, it would be their responsibility.  They would note it, and let it go on for [the] next occupant versus the most infinitesimal thing they could find that they would perceive to be North Star's responsibility, they would force us to replace it.

At another point in his testimony, Mr. Wartes noted that the practice of not repairing occupant damage gave residents the false impression that North Star was not maintaining Birchwood, thereby negatively impacting North Star's scores in the resident surveys.

you are doing (as measured by the sharp decline in gov [sic] work authorizations
and challenges to their attempts to charge the government).  Well done!

Other documentation in the record verifies that the monthly work authorizations issued by the
Army to North Star went from $13,468.08 per month in 2000, to $15,039.60 per month in 2001,
and then down to $5,257.15 per month in 2002.  An e-mail from Ms. Kiser indicates that this
reduction was "due to imposition of depreciation schedule and aggressive monitoring of
occ[upant] damage vs fair wear."[24]

On September 4, 2002, North Star filed a claim with Mr. Hopson detailing numerous
alleged violations of the Lease, accusing the Army of:  (i) failing to oversee occupant conduct;
(ii) failing to issue work authorizations for occupant-caused damage; (iii) issuing improper and
untimely work authorizations that reduce or eliminate the amount owed to North Star; (iv) failing
to issue work authorizations that employ the List of Repair Costs; (v) taking  depreciation on all
replacement items (*e.g.*, flooring, counter tops, blinds, and appliances); (vi) using additional
inspections as the basis for ordering maintenance and repairs; (vii) deviating otherwise from the
turnover inspection regime specified by the Lease; (viii) placing a disproportionate number of
temporary occupants at Birchwood; (ix) assessing liquidated damages against North Star and the
failure to provide documentation for the calculation of those damages; and (x) failing to make
incentive fee awards to North Star.  North Star attributed these various violations to "bad faith,"
asserting, in particular that "[t]he Government's discriminatory treatment of Birchwood
constitutes a bad faith violation of the Government's contractual obligation to oversee the day-to-

---

[24]  In her deposition, Nikisha Goins, formerly one of the government inspectors at
Birchwood, provided a much different impression as to how these work authorizations were
reduced.  Describing Ms. Kiser's *modus operandi*, Ms. Goins commented that "I think I would
say I was . . . being used as a tool to make North Star pay for stuff."  She further explained that
Ms. Kiser instructed her, as follows:

> Just that when I'm doing inspections, you know, . . .  either Eldon [Wartes] has to
> pay for it or the occupants have to pay for it . . . .  It was pretty much I was being
> used to go out there to do the inspection, assess the damages but bring as less
> charges back to the government as possible in other words.

Along these same lines, Ms. Goins specifically stated that Ms. Kiser had directed her to save the
government money and that, correspondingly, the Army failed to replace items at Birchwood that
it replaced at other housing facilities at the fort.  "[N]othing was coming out of [Ms. Kiser's]
pocket," she stated, "[i]t was either the occupant was going to pay for it or Eldon was going to
pay for it."  Amplifying the latter point, she indicated that in her view the military families "got a
raw end of the deal living at Birchwood," as "every little thing" was charged to them.  Ms. Goins
further indicated that one of the other inspectors cautioned her to keep copies of her inspections
because Ms. Kiser would change the results, sometimes without even seeing the unit involved.
In particular, she indicated that she made copies for "[t]he ones that were kind of shady . . . the
ones that were like I didn't feel comfortable."

day administration of the housing units and to enforce Army Family Housing rules and regulations." Among other things, the claim sought damages corresponding to the diminution in the value of Birchwood, a figure set at $12,146,000, as well as additional expenses for 1996 through 2001, totaling $813,390, for an overall damages figure of $12,959,390. Two days following the filing of this claim, on September 6, 2002, Mr. Peterson e-mailed Ms. Kiser recommending that she "install[] a trap door in front of your desk which you can release when Eldon [Wartes] is standing on it in front of your desk. Connected to a chute to the Chena River."

In the ensuing months, the parties continued to dispute a variety of issues, including whether the Army was obliged to have a North Star representative at the final inspections and whether depreciation was applicable to various items. These exchanges were marked by further charges and counter-charges of "bad faith." On October 11, 2002, in an e-mail to Mr. Fischer, Mr. Wartes asserted that Ms. Kiser was signing documents for inspections that she had not conducted (a practice that was confirmed by the testimony of two of her employees). On or about October 15, 2002, it appears that Ms. Kiser introduced yet another requirement – that upstairs and downstairs carpeting needed to match in color (*e.g.*, that if the upstairs carpet was brown, the downstairs carpet had to be brown, or both needed to be blue). In an undated memorandum issued at about this time, Ms. Kiser noted that even where carpeting was being replaced due to occupant damage, North Star was obliged to replace, at its expense, other carpet in the unit to ensure that the old and new carpeting matched. At about the time of this memorandum, Mr. Peterson began transitioning into retirement (an event punctuated by the infamous "Miami football" e-mail that began this opinion). On October 15, 2002, Mr. Wartes wrote Ms. Barbara S. Lehman, who had replaced Mr. Peterson, complaining that the surveys designed by the Army were biased against North Star.

Various e-mails sent in October of 2002 indicate that, despite the meager findings produced by the first IRACO audit, various Army personnel were attempting to convince Congressional staffers that North Star's claims should be the subject of a Government Accounting Office audit. In November of 2002, Ms. Kiser adopted a new practice in regards to painting. Specifically, the Lease envisioned that a unit would be painted if it became vacant after certain specified Lease anniversary dates (*e.g.*, November 6, 2002), whether or not an inspection actually revealed a need for painting. The record indicates that in the latter part of 2002, Ms. Kiser began twin practices designed to maximize such cyclical paintings – the first was to hold units vacant until after the anniversary date had passed; the second was to assign units to temporary occupants, so that the unit would become vacant shortly after the anniversary dates. In some instances, these practices, which were confirmed by the testimony of the former inspectors, required units to be fully painted twice within a matter of months. On November 19, 2002, North Star filed its complaint in Case No. 02-1632C. In December of 2002, the parties traded complaints, each asserting that the other was attempting to reduce costs by avoiding its responsibilities under the Lease. The Army's position in this regard was voiced in in an audit document released by IRACO on December 17, 2002, while North Star's response took the form of a December 24, 2002, letter to Mr. Hopson.

### 6.      2003 and Forward

On January 30, 2003, Acting Housing Division Chief Cynthia Larson e-mailed Mr.
Hopson to complain about a draft COD that apparently did not hold that depreciation was
applicable to counter tops and other materials installed in units.  In this e-mail, Ms. Larson wrote
–

> Rod [Everett] provided Connie [Kiser] with the draft for the COD on the above
> mentioned units [646 and 833].  I have some grave concerns with [the] findings.
> We have already been down this road before and DO NOT want to go down it
> again.  The issue of depreciation is not up for discussion, as we see it.  Our
> direction came specifically from Don Kinner, DOJ in a teleconference with the
> COE, Housing, and DOJ, in which he stated depreciation will apply to everything;
> where the question was asked specifically, does depreciation apply only to carpet
> or all repair items.  Don Kinner's [sic] stated it applied to everything.  I believe if
> we allow this COD to go out as is, we are opening ourselves up for complete
> failure on all key issues and litigation will CONSUME our daily efforts.

> The contract states any repair or replacement shall match in kind and color to all
> adjacent surfaces.  With this said, we have been applying this to all repairs and as
> I under[stand], Ann is stating that this is only applicable to carpet replacement and
> no other repairs.  Again, our stand has to be unified and we have not been
> applying this concept, based on guidance from the COE.  We CANNOT change
> ships mid stream, if we do, all previous work will be negated, and the judge has
> already accused us of inconsistency in our methodologies.

> I feel with this being such a SIGNIFICANT change to the day to day operations,
> we need to have a meeting and discuss PRIOR to this COD being released and
> come up with a CONCRETE PLAN of action.  I feel precedence will be set and
> HOLD ON, we're on the roller coaster again.

(Emphasis in original).  On January 31, 2003, Mr. Hopson sent North Star the final version of the
COD regarding units 646 and 833.  That COD indicated that "[c]ountertop material will be
depreciated based upon a schedule to be determined by the Government after North Star submits
pertinent cost information."  On February 12, 2003, Mr. Hopson e-mailed Ms. Harrell, indicating
that the comments on draft CODs provided by her office were "invaluable."

On February 20, 2003, Col. Snodgrass sent North Star a letter denying it any incentive fee
for 2002.  As basis for this decision, the letter cited, *inter alia*, the audit and the lockset issue, the
results of the resident survey,[25] and North Star's practice of challenging Ms. Kiser's authority to

---

[25]  Among the questions asked by the 2002 survey were "[h]ow satisfied would you be
with less than the twice-weekly trash pickup you now receive?"  Although inartfully framed, this
question again raised with the tenants an issue being debated by the parties.

direct work.  On March 4, 2003, North Star responded to this letter.  It noted that the lockset issue – which the December 2001 IRACO audit had revealed involved only $135 – had been used "to deny incentive fee awards to North Star since 2000."  North Star further complained that the resident surveys were biased against it, specifically asserting that the surveys were designed to give residents the false impression that North Star was at fault for the Army's failure to enforce certain policies (*e.g.*, pet control).  On March 24, 2003, the Army provided North Star with a summary of the findings of the IRACO follow-up investigation that was conducted between May and August of 2002.  Those findings continued to maintain that the facility history files did not contain the work authorizations that were approved by the Army.  The audit also verified that, in four instances, North Star had installed used locksets and billed the Army for the installation of new ones.  The summary concluded that "IRACO's findings have been forwarded to the Army's Criminal Investigation Command to determine whether further investigation is warranted."  On March 28, 2003, the court granted defendant's motion to stay the 1998 case pending the resolution of the criminal investigation; that stay remained in force until May 5, 2004.

During the first quarter of 2003, the parties continued to argue over inspection procedures, with the Army maintaining that it had the right to inspect units at any time and North Star asserting that such *ad hoc* inspections could not supplant the inspection protocols established by the Lease.  Ultimately, this dispute led to a contracting officer decision, dated May 22, 2003, which held that while the Army could conduct additional inspections, "North Star must be notified of and permitted to attend any inspection being performed for the purpose of identifying maintenance requirements."  Many of the issues previously identified continued to be hot topics of dispute between the parties for the remainder of 2003 and into 2004.  As if these were not enough, two new sets of issues were raised during this period.  First, a variety of issues arose when the Army, on June 5, 2003, ordered North Star to perform cleaning services that had previously been performed by another Army contractor – the Army afforded North Star five additional days of down time where a "full cleaning is required," but indicated that additional down time would be determined by the Army on a case-by-case basis where "only a partial cleaning or a minimum amount of cleaning is required."  Second, in a letter dated July 10, 2003, North Star accused the Army of refusing to authorize work for occupant damage, but then, upon a later change of occupancy, insisting such work was required by fair wear and tear.  During this period, stockpiling continued, periodically spiking,[26] and the conflict between the parties was further heightened when Ms. Kiser, for the first time, used a black light to determine that the painting in a unit was inadequate, thereby allegedly identifying flaws that were not visible to the naked eye.

---

[26]  For example, on Friday, August 8, 2003, Ms. Kiser released four units, all of which required extensive subcontractor work.  Then, on Monday, August 11, 2003, she released five more units requiring subcontractor work.  The nine units released on those days had been vacant, prior to being turned over to North Star, for time periods ranging from 28 to 82 days.

On November 20, 2003, plaintiff filed its complaint before this court in case No. 03-2699C.  On March 9, 2004, the Army denied North Star an incentive fee for 2003, citing many of the issues that had been raised in prior award decisions (although not raising the lockset issue). In June of 2004, Ms. Lori Dallas replaced Ms. Kiser as the Housing Project Manager/Site Manager of Birchwood.

### D.    Proceedings to Date

As noted, on March 9, 1998, North Star filed its initial complaint in this case.  In 1998 and 1999, there were numerous disputes between the parties involving electronic discovery and other issues.  On August 23, 1999, North Star filed an amended complaint.  On April 6, 2000, Judge Bruggink stayed the case pending settlement discussions.  On May 26, 2000, the parties entered into an agreement establishing the preliminary terms of a settlement.  On December 19, 2000, North Star filed a notice of recision, claiming that the settlement agreement remained unconsummated.  On January 3, 2001, this case was reassigned to the undersigned.  On June 14, 2001, defendant filed a motion for summary judgment, seeking to enforce the settlement. Following briefing, on January 9, 2002, the court denied the motion for summary judgment, based upon the existence of genuine issues of material fact.  On January 31, 2002, defendant issued its own notice of recision of the settlement and the settlement thereby was deemed abandoned.

Further discovery ensued.  On April 16, 2002, North Star filed a second amended complaint.  On April 19, 2002, defendant filed a motion for summary judgment on the merits of this case.  On June 3, 2002, the court scheduled this case for a trial to begin on October 16, 2002. Following additional discovery, the court, in an unpublished opinion dated July 3, 2002, granted, in part, and denied, in part, defendant's motion for summary judgment.  Thereafter, the parties indicated that they were making substantial progress toward settlement, leading the court, on July 19, 2002, to postpone the trial and further stay the case.  Settlement, however, did not materialize.  On March 12, 2003, defendant, at a status conference, requested that the case be further stayed pending completion of the Army Criminal Investigations Division investigation of North Star.  Before this request was acted upon, on March 28, 2003, North Star filed a motion for summary judgment.  After additional filings regarding the criminal investigations were received, the court granted defendant's request and the case was stayed (with periodic progress reports) until May 5, 2004.  On that day, the court lifted the stay, in part, to allow defendant to respond to the plaintiff's March 28, 2003, motion for summary judgment.  Shortly after this response was filed, further discovery disputes arose.  On September 2, 2004, the court consolidated Case Nos. 02-1632C and 03-2699C with the earlier 1998 case.  On October 4, 2004, the court issued an order granting, in part, and denying, in part, plaintiff's summary judgment motion.  On January 18, 2005, the court issued an order requiring expert discovery and establishing a trial date of August 15, 2005.

Trial in this case occurred between August 15 and 23, 2005, at which both fact and expert witnesses were presented.  Further trial in this matter was conducted on September 2, 2005.

Following the filing of extensive post-trial briefs, closing argument in this case occurred on July 20, 2006.

## II.   DISCUSSION

With the foregoing findings as reference points, the court proceeds to consider the claims made by plaintiff and defendant's responses thereto.

### A.   Jurisdiction

In a motion *in limine* filed before trial, as well as during its closing argument and in its post-trial briefs, defendant asserted that a variety of the claims raised by plaintiff in its amended complaints should be dismissed for lack of jurisdiction. It contends that these claims were not properly filed with the contracting officer and that no decisions, therefore, were rendered on these matters. Because subject matter jurisdiction is a "threshold matter," it must be addressed before the court turns to the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998); *Nippon Steel Corp. v. United States*, 219 F.3d 1348, 1352 (Fed. Cir. 2000).

This court has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under . . . the Contract Disputes Act of 1978 [(CDA]." 28 U.S.C. § 1491(a)(2); *see also Applied Cos. v. United States*, 144 F.3d 1470, 1477 (Fed. Cir. 1998). In this framework, the "strict limits" of the CDA constitute "jurisdictional prerequisites to any appeal." *England v. The Swanson Group, Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004) (citing *Sharman Co. v. United States*, 2 F.3d 1564, 1569 n.6 (Fed. Cir. 1993)). Hence, jurisdiction is lacking "unless the contractor's claim is first presented to the contracting officer and that officer renders [or is deemed to render] a final decision on the claim." *England*, 353 F.3d at 1379; *see also D.L. Braughler Co., Inc. v. West*, 127 F.3d 1476, 1480 (Fed. Cir. 1997); *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541 (Fed. Cir. 1996); *Bath Iron Works Corp. v. United States*, 20 F.3d 1567, 1578 (Fed. Cir. 1994). And these requirements must be met separately for each claim raised – there is no pendent or ancillary jurisdiction. *See Joseph Mortin Co. v. United States*, 757 F.2d 1273, 1281 (Fed. Cir. 1985); *see also Health Ins. Plan of Greater N.Y., Inc. v. United States*, 62 Fed. Cl. 33, 48 (2004).

Section 605 of the CDA expressly requires that "[a]ll claims by a contractor against the government . . . shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a); *see also England*, 353 F.3d at 1379. Where the amount of a claim exceeds $100,000, the claim must be certified by the contractor. 41 U.S.C. § 605(c)(1). While the CDA does not define further the content of a "claim," FAR § 2.101 defines a "claim" as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48 C.F.R. § 2.101; *see also England*, 353 F.3d at 1379; *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575-76 (Fed. Cir. 1995). This definition,

which has often been employed by courts analyzing whether the CDA requirements are met,[27] thus distinguishes between claims that seek monetary relief and other types of demands involving "the adjustment or interpretation of contract terms" or "other relief arising under or relating to the contract."  Neither type of claim must be submitted "in any particular form or use any particular wording."  *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987); *see also Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1578 (Fed. Cir. 1992) ("certain 'magic words' need not be used and the intent of the 'claim' governs"); *Engineered Demolition, Inc. v. United States*, 70 Fed. Cl. 580, 587 (2006).  Indeed, various cases suggest that a claim may arise from the combination of more than one document submitted to the contracting officer.  *See Clearwater Constructors, Inc. v. United States*, 56 Fed. Cl. 303, 309 (2003); *Exec. Ct. Reporters, Inc. v. United States*, 29 Fed. Cl. 769, 774 (1993) ("a series of letters can be read together to comprise a clear and unequivocal statement giving the contracting officer notice of the basis for the contractor's claim"); *Al Munford, Inc. v. United States*, 30 Fed. Cl. 185, 189 (1993) ("Such a statement may be in the form of one or several documents.").

In other regards, the requirements for monetary and nonmonetary claims diverge somewhat.  The Federal Circuit has described the requirements of a monetary claim in practical terms, stating that "[a]ll that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim."  *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003) (quoting *Contract Cleaning*, 811 F.2d at 592); *see also Ace Constructors, Inc. v. United States*, 70 Fed. Cl. 253, 266 (2006).  Consistent with this "common sense" view, this court has consistently interpreted the "sum certain" requirement to include amounts in dispute that "can be easily determined by a simple mathematical calculation or from the contractor's submission to the contracting officer."  *Metric Constr. Co. v. United States*, 14 Cl. Ct. 177, 179 (1988).[28]  In this regard, the claim must provide enough specificity so as to meet the twin purposes of the CDA's administrative exhaustion requirement – to screen out unwarranted or inflated claims, *see CPS Mech. Contractors*, 59 Fed. Cl. at 764; *Kirkham Constrs., Inc. v. United States*, 30 Fed. Cl. 90, 93 (1993) (citations omitted), and to facilitate resolution of contract disputes by negotiation, at the agency level, rather than by litigation, *H.L. Smith, Inc. v. Dalton*, 49 F.3d 1563, 1566 (Fed. Cir. 1995) (citations omitted); *see also* S. Rep. No. 95-118 at 7-8 (1978) (claim requirement was to "induce resolution of more contract disputes by negotiation prior to litigation").  If no sum certain is specified, the contracting officer cannot settle the claim by awarding a specific amount of money "because such a settlement would not preclude the contractor from filing suit seeking the difference between the amount awarded and some larger

---

[27]  *See, e.g.*, *Envtl. Tectonics Corp. v. United States*, 72 Fed. Cl. 290, 294 (2006); *Renda Marine, Inc. v. United States*, 71 Fed. Cl. 378, 387 n.9 (2006).

[28]  *See also CPS Mech. Contractors, Inc. v. United States*, 59 Fed. Cl. 760, 764 (2004); *Exec. Ct. Reporters*, 29 Fed. Cl. at 775; *Sun Eagle Corp. v. United States,* 23 Cl. Ct. 465, 472 (1991).

amount never specifically articulated to the contracting officer." *Exec. Ct. Reporters*, 29 Fed. Cl. at 775; *see also CPS Mech. Contractors*, 59 Fed. Cl. at 765.

By comparison, a nonmonetary claim – one seeking, for example, the interpretation of contract terms – need not seek a "sum certain." *See CW Gov't Travel, Inc. v. United States*, 63 Fed. Cl. 369, 382 (2004); *Clearwater Constructors, Inc.*, 56 Fed. Cl. at 309 ("To state a non-monetary claim there is no requirement that the contractor make a request for a sum certain."); *GPA-1, LP v. United States*, 46 Fed. Cl. 762, 767 (2000). Rather, "the phrase 'as a matter of right' in the regulatory definition of a 'claim' requires only that the contractor specifically assert entitlement to the [nonmonetary] relief sought. That is, the claim must be a demand for something due or believed to be due." *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1265 (Fed. Cir. 1999); *see also CW Gov't Travel*, 63 Fed. Cl. at 383. Such a claim, if denied or deemed denied, thus supplies the prerequisite for this court to exercise jurisdiction in a case in which a contractor is seeking merely declaratory relief. *Alliant Techsystems*, 178 F.3d at 1268; *Garrett v. General Elec. Co.*, 987 F.2d 747, 750-51 (Fed. Cir. 1993).

Defendant asserts that more than a dozen of North Star's monetary claims were not presented to the contracting officer with sufficient detail so as to meet the regulatory definition of a "claim," particularly the "sum certain" requirement thereof. Plaintiff does not contend that there is a single document that establishes, for any of these questioned monetary claims, a "sum certain" request. Rather, it contends that the amounts sought as to these claims were "easily calculable" based upon information accessible to the contracting officer at the time the claims were made – information either supplied by plaintiff or originating with defendant. Essentially, plaintiff asserts that the respective contracting officers should have been able to take cost, billing or other accounting information that they had, combine it with various requests made by plaintiff for money owed, and arrive at the "sum certain" that plaintiff was seeking. The court is sympathetic to plaintiff's plight, particularly given the specter that significant time was expended at trial on claims that were belatedly attacked by defendant on jurisdictional grounds. Indeed, to date, defendant has provided no acceptable explanation as to why it did not perceive the alleged jurisdictional defects until, in some instances, the eve of trial, and, in other instances, even after trial. Yet, it is axiomatic that subject matter jurisdiction may be raised at any time. *See Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004), *cert. denied*, 545 U.S. 1127 (2005); *Fanning, Phillips & Molnar v. West*, 160 F.3d 717, 720 (Fed. Cir. 1998). And the fact is – discomforting or not – that jurisdiction is lacking as to many of the challenged monetary claims.

While plaintiff suggests that administrative claims can be cobbled together from various documents that were possessed by defendant, as to most of the claims at issue, there are no select group of documents, supplied by plaintiff or otherwise, that provide a "clear and unequivocal" indication as to the amount sought by plaintiff. Contrary to plaintiff's importunings, determining a sum certain for many of these claims is not a matter of simple mathematics. In some cases, only portions of the relevant costs are documented; in others, historical cost data is available for similar transactions, but not for those that are the subject of the claim; and in still others, the

relevant data is entirely missing.[29]  Moreover, while the decisional law suggests that several documents may be combined into a claim for purposes of the CDA, that combination must still make clear how much the plaintiff is willing to accept in settlement of its claim.  Thus, for example, multiple documents seemingly could form a claim if one unambiguously stated the costs involved and another cross-referenced the earlier document and sought a final decision to recover those costs.  *See, e.g.*, *Al Munford*, 30 Fed. Cl. at 189-90; *see also Contract Cleaning Maint.*, 811 F.2d at 588-89, 592.[30]  But, such is not the case where various documents list the costs involved with an issue, but no document definitively claims all or some specified amount of those costs.  To hold, in the latter situation, that the administrative exhaustion requirements of the CDA are satisfied would be to defeat the primary purpose for having those requirements, which, as noted, is to provide the agency with a concrete opportunity to settle the claim in advance of litigation.  Such a holding threatens legal uncertainty in an area of law that is reasonably well-settled, a result unwarranted even by the belatedness of some of defendant's jurisdictional arguments.[31]

---

[29]  Indicative of this, the amounts plaintiff has sought as to some of its claims have shifted significantly during the course of this litigation.  This is perhaps best exemplified by comparing North Star's damage estimates before and after trial, as the following chart reveals:

| Damage Claim | Pretrial | Post-trial |
|---|---|---|
| Increase in operating expenses | $1.3 million | $1.3 million |
| Decrease in market value of Birchwood | $8.6 million | $8.6 million |
| Other damages not covered above | $1,602,730 | $2,639,565 |

It is, of course, the last of these three categories in which the claims jurisdictionally challenged by defendant primarily lie.

[30]  Such an approach, indeed, is envisioned by 48 C.F.R. § 2.101, which, in defining "claim" states that "[a] voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim.  The submission may be converted to a claim, by written notice to the contracting officer as provided in 33.206(a)."

[31]  Nor will this court hold, as plaintiff suggests, that the contracting officers here had an independent obligation to obtain a listing of the specific costs at issue.  The obligation to request a sum certain plainly lies squarely on the contractor's shoulders and cannot be off-loaded in the fashion plaintiff seeks.

Nor does the so-called "enlarged claim" doctrine offer plaintiff any solace here.  Under this doctrine, additional compensation may be sought, without prior certification by a contracting officer's final decision, for "new matters inherent in the claims previously presented."  *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 701 (1994).[32]  For the doctrine to apply – (i) "the increase in the amount of the claim [must be] based on the ***same set of operative facts*** previously presented to the contracting officer;" and (ii) "the contractor neither knew nor reasonably should have known, at the time when the claim was presented to the contracting officer, of the factors justifying an increase in the amount of the claim."  *AAI Corp. v. United States*, 22 Cl. Ct. 541, 544 (1991) (quoting *Kunz Constr. Co. v. United States*, 12 Cl. Ct. 74, 79 (1987) (emphasis in original)); *see also Johnson Controls World Services, Inc. v. United States*, 43 Fed. Cl. 589, 593 (1999).  Yet, aside from what North Star knew and when, it remains that the claims at issue are not based upon the same set of operative facts, but, at best, similar occurrences during different time periods.  Under these circumstances, the enlarged claim doctrine avails plaintiff naught, as the decisional law so reflects.[33]

Reflecting the foregoing, the court's specific jurisdictional findings are summarized in the attached Fact Appendix I, which lists the relevant paragraphs of the various complaints raising certain claims, the document(s) that plaintiff purports represent a CDA claim, and various findings regarding those documents.  These findings reveal that, while the total number of claims that remain jurisdictionally viable is much reduced over those that originally went to trial, the most significant of the claims here are unaffected.  That is true, in part, because many of the latter claims seek only declarations – relief that, as noted, does not require a prior request for a sum certain.  *See Clearwater Constrs.*, 56 Fed. Cl. at 309, 311; *see also CW Gov't Travel*, 63

---

[32]  *Accord Cerberonics, Inc. v. United States*, 13 Cl. Ct. 415, 417 (1987) ("If the complaint brought here is based on the same set of operative facts underlying the claim presented to the contracting officer, then this court has jurisdiction. . . ."); *J.F. Shea Co. v. United States*, 4 Cl. Ct. 46, 54 (1983) ("It would be most disruptive of normal litigation procedure if any increase in the amount of a claim based upon matters developed in litigation before the court had to be submitted to the contracting officer before the court could continue to a final resolution on the claim.").

[33]  *See, e.g.*, *Pueblo of Zuni v. United States*, 2006 WL 3788824 at *9-10 (D.N.M. Oct. 16, 2006) (contract disputes in different fiscal years "did not involve the same operative facts"); *Johnson Controls World Services, Inc. v. United States*, 43 Fed. Cl. 589, 595 (1999) (claims involved facts that though similar, were  "sufficiently distinct" to preclude application of doctrine); *ECC Int'l Corp. v. United States*, 43 Fed. Cl. 359, 367 n.6 (1999) (doctrine inapplicable where plaintiff "relies on facts . . . that were never presented to the contracting officer and never addressed in a final decision"); *compare Modeer v. United States*, 68 Fed. Cl. 131, 137 (2005), *aff'd*, 183 Fed. Appx. 975 (Fed. Cir. 2006) (enlarged claim doctrine applicable to cover rent for entire period of government holdover tenancy even though contractor's claim was only for the first month of the holdover period).

Fed. Cl. at 381-82.  Indeed, most of the substantive issues raised are implicated by plaintiff's banner claim – that defendant acted in bad faith, a topic to which the court now turns.

### B.      Bad Faith

"The need for mutual fair dealing," the Federal Circuit has instructed, "is no less required in contracts to which the government is a party, than in any other commercial arrangement." *Maxima Corp. v. United States,* 847 F.2d 1549, 1556 (Fed. Cir. 1988); *see also St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black J., dissenting) ("It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their Government.").  Most of plaintiff's claims may be viewed as a variation on a theme – that the government officials involved here, in sundry ways, acted in bad faith.  Accordingly, while various of plaintiff's allegations could be viewed as asserting breaches independent of its bad faith claims, the court believes that the evidence of animus here is such that it is more appropriate to view all those allegations as being at least potentially impacted by the government's bad faith.

### 1.      Standard of Proof

Because it is an implied term of every contract that each party will act in good faith towards the other, a party may breach a contract by acting in bad faith.  *Link v. Dept. of the Treasury*, 51 F.3d 1577, 1582 (Fed. Cir. 1995); *see also Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).  As an aspect of these duties, "[e]very contract . . . imposes an implied obligation 'that neither party will do anything that will hinder or delay the other party in performance of the contract.'"  *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) (quoting *Luria Bros. v. United States*, 369 F.2d 701, 708 (Ct. Cl. 1966)); *see also H & S Mfg., Inc. v. United States*, 66 Fed. Cl. 301, 310 (2005), *aff'd* 192 Fed. Appx. 965 (Fed. Cir. 2006).  Such covenants require each party "not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp.*, 395 F.3d at 1304; *see also Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988), *modified on other grounds by*, 857 F.2d 787 (Fed. Cir. 1988).  This "duty not to hinder is breached when the Government commits 'actions that unreasonably cause delay or hindrance to contract performance.'"  *H & S Mfg.*, 66 Fed. Cl. at 311 (quoting *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1542 (Fed. Cir. 1993)).  Such a breach occurs when, in the words of Judge Posner, there has been "sharp dealing," defined as taking "deliberate advantage of an oversight by your contract partner concerning his rights under the contract." *Mkt. St. Assocs. L.P. v. Frey*, 941 F.2d 588, 594 (7th Cir. 1991); *see also Centex Corp.*, 395 F.3d at 1304 (The covenant "include[s] the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.").

When a contractor alleges bad faith, in order "to overcome the presumption of good faith [on behalf of the government], the proof must be almost irrefragable." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003).  Translated into more common

parlance, "well nigh irrefragable proof" has been described as "clear and convincing evidence." *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002). "In the cases where the court has considered allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some ***specific intent to injure the plaintiff***." *Torncello v. United States*, 681 F.2d 756, 770 (Ct. Cl. 1982) (emphasis in original); *see also Galen Med. Associates, Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004); *Librach v. United States*, 147 Ct. Cl. 605, 614 (1959); *cf. Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 757-72 (2005). Courts have found bad faith when confronted by a course of government conduct that was "designedly oppressive," *Struck Const. Co v. United States*, 96 Ct. Cl. 186, 222 (1942), or that "initiated a conspiracy" to "get rid" of a contractor, *Knotts v. United States*, 121 F. Supp. 630, 636 (Ct. Cl. 1954). *See also C. Sanchez & Son, Inc.*, 6 F.3d at 1542. As these cases illustrate, the "irrefragable proof" standard, though daunting, is not intended to be impenetrable, that is, it does not "insulate government action from ***any*** review by courts." *The Libertatia Assocs., Inc. v. United States*, 46 Fed. Cl. 702, 707 (2000) (emphasis in original); *see also L.P. Consulting Group, Inc. v. United States*, 66 Fed. Cl. 238, 243 (2005); *Manson Const. Co. v. United States*, 64 Fed. Cl. 746, 753 n.11 (2005).[34]

Perhaps sensing weaknesses in its case, defendant attempts to fasten a layer of legal kevlar onto the "bad faith" standard that truly would make it impregnable. It contends, for example, that there can be no bad faith unless it is shown that a breach of an express contract provision has occurred. To be sure, the implied covenant of good faith and fair dealing cannot be used to expand or override contractual duties in the express contract. *See, e.g., Bradley v. Chiron Corp.*, 136 F.3d 1317, 1326 (Fed. Cir. 1998); *Renda Marine, Inc. v. United States*, 66 Fed. Cl. 639, 648 (2005). But, it does not follow, *a fortiori*, that the covenant must be deemed fulfilled unless the express terms of the contract are breached. Rather, the covenant may be breached if, in ways unenvisioned by the contract, a party proceeds in a fashion calculated to frustrate or hinder performance by its contracting partner. Such was the holding in *Centex Corp.*, 395 F.3d at

---

[34] In *Tecom*, 66 Fed. Cl. at 771, this court held that "[t]he presumption of good faith conduct of government officials has no relevance" in considering "claims that the duties to cooperate and not hinder performance of a contract have been breached." It further held that in such circumstances, proof of a violation need not be by clear and convincing evidence. *Id.* at 769. It is unclear whether *Tecom* may be squared either with Federal Circuit precedent or the jurisprudential underpinnings of the doctrine, in which performing in good faith and bad faith are often viewed as mutually exclusive. *See, e.g.*, Richard A. Lord, 23 Williston on Contracts § 63:22 (4th ed. 2002) ("It is axiomatic that before a court will consider a claim that the implied duty of good faith has been violated, there must be some factual basis for . . . bad faith on the part of the defendant."); Robert S. Summers, "The General Duty of Good Faith – Its Recognition and Conceptualization," 67 Cornell L. Rev. 810, 819 (1982) (the "good faith" standard "functioned as an excluder to rule out a wide range of heterogeneous forms of bad faith"). Whatever may be the larger fate of the *Tecom* approach, this court finds it unnecessary to explore its application here for, as will be seen, plaintiff prevails under even the more rigorous standard, which requires a clear showing of animus.

1306, in which the Federal Circuit found that the covenant could be violated by a hindering action, provided the plaintiff was not seeking "an expansion of the government's duties under the contract or for a duty that is inconsistent with some provision of the contract."[35]  In other words, the covenant may be breached if the contract is enforced in a fashion designed to "interfer[e] with the plaintiffs' enjoyment of the benefits contemplated by the contract, which is among the core functions served by the implied covenant of good faith and fair dealing."  *Centex Corp.*, 395 F.3d at 1306.  Indeed, the covenant perhaps plays its most crucial role where one party under a contract exercises discretion in favor of the other – "[t]he office of the doctrine of good faith is to forbid the kinds of opportunistic behavior that a mutually dependent, cooperative relationship might enable in the absence of the rule."  *Mkt. St. Assocs.*, 941 F.2d at 595.[36]  To hold that, absent a separate breach, the covenant is not violated would be to deprive this implied promise of any vitality in the particular universe for which it was designed – that of contract discretion – indeed, stripping it of any real significance in terms either of the expectations of performance or the remedies available for nonperformance.

Nor is defendant correct in asserting, *in fine*, that plaintiff must show that each action harmful to North Star was independently animated by animus.  Such a standard would require

---

[35]  *See also United States v. Basin Elec. Power Coop.*, 248 F.3d 781, 796 (8th Cir. 2001), *cert. denied*, 534 U.S. 1115 (2002) ("[s]ince good faith is merely a way of effectuating the parties' intent in unforseen circumstances, the implied covenant has 'nothing to do with the enforcement of terms actually negotiated'"); *Craig-Buff, Ltd., P'ship v. United States*, 69 Fed. Cl. 382, 388 (2006) ("a claim for a breach of the implied covenant of good faith and fair dealing is not limited to specific contract terms").

[36]  This conclusion is reinforced by the Restatement (Second) of Contracts, which describes the good faith requirement in circumstantial terms that do not track the specific terms of any given contract –

> Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified.  But, the obligation goes further: bad faith may be overt or may consist of inaction . . . . A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of power to specify terms, and interference with or failure to cooperate in the other party's performance.

Restatement (Second) of Contracts § 205 comment d. (1981); *see also* Harold Dubroff, "The Implied Covenant of Good Faith in Contract Interpretation and GAP-Filling: Reviling a Revered Relic," 80 St. John's L. Rev. 559, 564-571 (2006) (tracing the origins of the doctrine); Steven J. Burton, "Breach of Contract and the Common Law Duty to Perform in Good Faith," 94 Harv. L. Rev. 369, 378-94 (1980) (emphasizing the role of the covenant where there is "discretion in performance").

neither "well nigh" nor "irrefragable" proof, but, rather, "downright impossible" proof.  The artificial rigor it would introduce would require a plaintiff to establish a nexus between an expression of animus and each of perhaps dozens of actions taken over an extended period of time.  In other words, plaintiff would need to produce not one "smoking gun," but an arsenal of them – each distinctly tethered to a particular harmful action.  If nothing else, this approach would hamstring the court, preventing it from viewing a continuing course of varied conduct as itself objective indication that the actor had ill intent.  It would also make it exceedingly difficult to find bad faith where a group of actors is involved, only some of whom directly exhibited animus.  Perhaps for these reasons, the specific matching sought by defendant not only finds utterly no support in the decisional law,[37] but clashes decidedly with the approach taken by the Court of Claims in *Struck*.  There, the court stated that "[i]f the aggregate of the actions of all of the agents would, if all done by one individual, fall below the standard of good faith, [the government] for whom the various agents acted should be held to have violated that standard." 96 Ct. Cl. at 221; *see also Libertatia*, 46 Fed. Cl. at 710.  The law thus proceeds from the eminently logical conclusion that if evidence clearly and convincingly demonstrates a pattern of animus on the part of particular individuals, unreasonable actions taken by those same individuals were actuated by that enmity.[38]  To hold otherwise would be to render the "good faith" rule a hollow maxim.

Truth be told, however, the foregoing discussion is more academic than dispositive for, as will be seen, this is not a close case.  The bad faith here was pervasive and, over time, metastasized, spreading through and corrupting virtually the entire relationship between plaintiff and defendant.  As will be seen, that bad faith plainly animated actions by key government officials that effectuated not only a breach of the covenant of good faith and fair dealing, but also many express contract provisions.  To a discussion of these finer points, the court now proceeds.

---

[37]  A review of cases that have made or sustained "bad faith" findings reveals no such analysis.  *See Struck*, 96 Ct. Cl. at 222 (finding a lack of good  faith in the context of overall government conduct that was "designedly oppressive"); *Hubbard v. United States*, 52 Fed. Cl. 192, 196 (2002) (finding bad faith based upon evidence indicating hostility and intent to injure contractor); *Libertatia*, 46 Fed. Cl. at 707-12 (finding, in general, bad faith on the part of the contracting officer representative and other government employees while concluding that the government's termination for default should be converted to a termination for convenience); *see also Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002); *Knotts*, 121 F. Supp. at 636.

[38]  Tellingly, at closing argument, defendant's counsel admitted that if the animus in question were based upon racism, a plaintiff would not need to show that every action taken against it was animated by that discrimination.  Yet, conceding that certain forms of discrimination are more invidious than others, defendant's counsel could not explain why the proof demands of his rule would differ, depending on the underlying nature of the bad faith exercised in a given case.

### 2.     Did Defendant Act in Bad Faith?

The dispositive issue here then is whether defendant's representatives acted, with animus, in a fashion calculated to hinder plaintiff's performance.  If they did, this would be the type of opportunistic behavior in an ongoing contractual relationship that would violate the duty of good faith performance.  And, defendant's representatives – particularly, Mr. Peterson and Ms. Kiser – did precisely that.

#### a.     Specific Statements Evidencing Animus –
#### "Just follow the Miami Hurricane's Game Plan"

A specific intent to injure may be exhibited by the express statements of key government officials.  *See, e.g., Libertatia*, 46 Fed. Cl. at 706-09; *see also* Artie McConnell, "Bad Faith as a Limitation on Terminations for Convenience:  As Bad as They Say, or Not so Bad?", 32 Pub. Cont. L.J. 411, 416 (2003) ("extraordinary and outspoken distaste on the part of the Government clearly demonstrates the intent to injure necessary to support a finding of bad faith").  The record here is littered with statements made by key government officials exhibiting animus toward North Star.

As noted at the very outset of this opinion, Mr. Peterson, then Chief of Housing for Alaska, sent an e-mail to most of the government officials involved in supervising the Birchwood contract, in which he colorfully summed up his view of how to administer the Lease.  What he wrote bears repeating:

> Just follow the Miami Hurricane's Game Plan.  Blitz Fisher [sic] the first time he takes the handoff from Wartes.  Force them to go for the short gains.  Keep them out of the red zone.  On offense, exercise good ball control and mix up the plays to throw off their timing.  Try to draw them offsides and into a penalty situation.  And always remember that you have home field advantage.

Such statements, unfortunately, were neither isolated in number nor unusual in tenor.  Thus, in October of 1997, when the hostilities between the parties were in their nascent stage, Col. Brown set the tone for his subordinates when, in rejecting Mr. Fischer's position on carpet depreciation, he stated at a meeting, "[w]e'll just let your lawyers and our lawyers deal with this, because I'm going to figure out a way that I can take it right out of your pay."  Seemingly always embracing confrontation, rather than cooperation, Mr. Peterson, in July of 1998, complained that his employees were "floundering as to the best course of action for deducting rent" and "withdrawing work for accomplishment by an alternative source," clearly establishing these as independent goals to be achieved in the administration of the Lease.  During this same period, he began to urge his colleagues to consider how the Army would replace North Star when the Lease terminated – even though that event could occur, at the earliest, nine years hence.  Later, Mr. Peterson wrote an e-mail to Ms. Kiser in which he acerbically stated "I recommend installing a trap door in front of your desk which you can release when Eldon is standing on it in front of your desk.  Connected to a chute to the Chena River."  Shortly thereafter, when Mr. Wartes

confronted Ms. Kiser about her manipulation of the schedule to North Star's detriment, she indicated that the reason she had done so was "because I can."

Defendant asserts that these statements represent merely the accumulated frustration of government officials who were dealing with a difficult situation. But, government employees who worked at Birchwood testified that Ms. Kiser and others acted in a calculated fashion to harm North Star. Thus, former housing inspector Yolanda Klumb, who worked at Birchwood for approximately two and one-half years, testified that Ms. Kiser often called Mr. Wartes a liar in her presence and at staff meetings. Ms. Klumb, however, testified that she did not believe that Wartes had ever lied to her and that he was a "very knowledgeable person" about maintenance. She concluded, rather, that it was Ms. Kiser who often bent the truth to her purposes. For example, Ms. Klumb believed that Ms. Kiser changed her inspection reports, so that items that should have been listed as "occupant damage" were instead reflected as "fair wear and tear." In this regard, she convincingly testified:

> I was authorized at inspections to make certain determinations, certain items that I can deem fair wear and tear . . . . And then I have heard her on numerous occasions saying, well, she's not going to pay that. Eldon's going to pay it, or I'm sorry, North Star is going to pay it completely. And I had already made the determination that something was supposed to be . . . occupant damage as opposed to fair wear and tear.

Ms. Klumb further testified that Ms. Kiser's repeated attempts to shift the "brunt of whatever confrontation was going on" to Mr. Wartes were a "standing joke" in the office. She admitted to Mr. Wartes, on another occasion, that Ms. Kiser was "out of control."[39]

---

[39] At her deposition, she more bluntly indicated that Ms. Kiser was "screwing over" Mr. Wartes. At trial she indicated that the latter phrase might not have been "quite the right word for me to use," but, nonetheless, reemphasized that Ms. Kiser was not working with Mr. Wartes. At another point in her testimony, Ms. Klumb indicated:

Q:     Okay. And do you feel from your observations during your three
       years there that Mr. Wartes was treated unfairly?

A:     Yes, I do.

Q:     Okay. Can you tell us how?

A:     I believe that he tried to do his job when he – he tried to work
       things through trying to make things fair, but I don't think Connie
       Kiser worked with him quite the way she should have . . . . I think
       he did try to go that extra mile to help. He certainly helped me in
       many ways when I was lacking the knowledge . . . .

Ms. Klumb's observations were buttressed by those of Nikisha Goins, another former housing inspector, who testified, via deposition, that she was "being used as a tool to make North Star pay for stuff." She elaborated that she was "being used to go out there to do the inspection, assess the damages, but bring . . . less charges back to the government." She recalled being instructed by Ms. Kiser to reduce government spending on carpet and painting and cited several instances in which Ms. Kiser refused to authorize the replacement of items that, in her view, should have been replaced at the government's expense. Ms. Kiser, in fact, reportedly encouraged Ms. Goins to think of Mr. Wartes as the "big bad wolf," leading Ms. Goins to conclude that many of Ms. Kiser's decisions about what to fix or pay for were based on her personal animosity toward Mr. Wartes and a desire to impact negatively North Star. As Ms. Goins stated, "Connie . . . did not like Eldon and it seemed like she took that very personal in a lot of decisions she made on whether to fix things, or not fix them. It just became personal and I was being used to take her frustration out on him."[40] By comparison, Ms. Goins indicated that over time, she had no problems working with Mr. Wartes, whom she found cooperative. Ms. Goins, however, could not say the same of Ms. Kiser, whom she found uncooperative and, at times, coercive. Indeed, both Ms. Klumb and Ms. Goins were so distrustful of Ms. Kiser that they made duplicate copies of their inspection paperwork, fearful that Ms. Kiser was altering their reports to reflect occupant damage as fair wear and tear.

Of course, in her sworn testimony, Ms. Kiser denied that she held any animus whatsoever toward Mr. Wartes or North Star and emphasized repeatedly that her actions were prompted only by a sincere desire to administer Birchwood effectively. The record, however, demonstrates otherwise – and by clear and convincing evidence. For one thing, as noted above, Ms. Kiser's

---

Notably, Ms. Klumb's observations were corroborated by documents contemporaneously prepared by Mr. Wartes (*e.g.*, an August 1, 2003, e-mail to Mr. Fischer), which captured various comments she made criticizing Ms. Kiser.

[40] Various statements made by Ms. Goins, consistent with her deposition testimony, were memorialized by Mr. Wartes in a June 27, 2002, e-mail to Mr. Fischer, in which Mr. Wartes indicated –

> Niki [Goins] also told me . . . that she told Connie that if she . . . was called to testify in court that she was going to have to tell the truth and she hoped Connie had a job after. She also said she is going to start making a copy of what she gives Connie because she believes (just like another inspector Yoli said last year) that Connie changes her paperwork after she turns it in to her. Niki admitted that there is no way we could know what the Government expects us to do because Connie will not let us see that paperwork the inspector fills out.

When asked at her deposition whether she had said such things, Ms. Goins answered affirmatively, adding that Ms. Kiser "could do whatever she wanted, how she wanted and when she wanted."

claims were flatly contradicted by not one, but two of her former employees – Ms. Klumb and Ms. Goins.  Indeed, although hesitant and halting on the stand, Mr. Everett, the Contracting Officer Representative at Birchwood, ultimately could not deny that, in an apparent reference to Ms. Kiser and Mr. Peterson, he had told Mr. Wartes (in the presence of others) that "upper management" had "agendas" and was "set[ting] up [Northstar] for failure with how they are issuing units to you."  In addition, during the trial, Ms. Kiser denied making statements that contemporaneous e-mails convince the court she made.  For example, while Ms. Kiser denied ever saying that Mr. Peterson would ignore a contracting officer decision with which he disagreed, an e-mail prepared by Mr. Wartes and sent only to Mr. Fischer, dated April 22, 2000, stated –

> I told Connie we were going to have to ask for a Contracting Officer Decision on these matters, and she said "Fine, go ahead.  If Tom Peterson doesn't agree with the Contracting Officer's decision, he won't abide with it anyway."

The record also reveals that Ms. Kiser was less than forthcoming with North Star.  One particular incident stands out – she indicated in an April 20, 2001, memorandum to Mr. Wartes that she had ordered testing of a white powder found under carpet and that an outside laboratory had determined that it was, in part, residue from the pad breaking down.  Yet, the actual laboratory reports, dated March 30, 2001, indicate nothing of the sort, but instead stated that the white powder was sodium sulfate and calcium carbonate.  Ms. Kiser plainly knew this – in an internal e-mail dated April 23, 2001, she informed Mr. Peterson and others that "[a]ll we received was the letter saying that there were cleaning/drying agents in the white powder.  Mae said someone told her that there was also residue from carpet backing breaking down but I don't have anything in writing on that."  Yet, in an obvious attempt to mislead North Star, Ms. Kiser, on May 7, 2001, restated to Mr. Wartes that the white powder included deteriorated carpet backing.  Based on the foregoing, as well as her demeanor at trial, the court finds that Ms. Kiser's self-serving testimony was evasive, incredible and, ultimately, unreliable.

Likewise, the court finds incredible the testimony offered by Mr. Peterson, whom the record suggests was most blameworthy in this matter.  His testimony at trial was thoroughly contradicted by a variety of documents in the record.  For example, he blithely testified that Mr. Everett was not required to support the Army's position if there was an ambiguity in the contract.  Yet, in a February 9, 2001, e-mail, Mr. Peterson sternly wrote that "[i]f there is lease ambiguity, our project manager's position should still be supported as completely and clearly as possible by Rod [Everett]."  He denied ever telling Ms. Kiser that he believed that North Star was attempting to blackmail the government with respect to incentive fees, and then was presented with an e-mail in which he referred to that very allegation and asked that the message be kept "closehold."  And while Mr. Peterson testified that his Miami football analogy was a "well-intentioned joke" directed to Col. Meeks, an alumnus of that university, he neither explained the provocative and detailed content of the message in those terms, nor why he sent this "inside" joke to six other

individuals (including the contracting officer).[41]  Also left unexplained were Mr. Peterson's many other sardonic quips, not to mention why, for that matter, he felt the urge repeatedly to "jest" about North Star and its staff to his superiors, subordinates and the contracting officers in the midst of so many heated contractual disputes.[42]  In the court's view, based upon the record as a whole, Mr. Peterson's testimony had a decidedly hollow ring and is unworthy of reliance.[43]

In sum, the record provides a virtual rancid cornucopia of electronic messages and other communications evidencing a specific intent by key government officials to injure North Star.

> **b.      Actions Taken Indicative of Bad Faith – "Force them to go for the short gains.  On offense, exercise good ball control and mix up the plays to throw off their timing.  Try to draw them offsides and into a penalty situation"**

Bad faith may also be exhibited by conduct – both that which explicitly violates the contract and that which simply violates the covenant of good faith and fair dealing.  *See Malone*, 849 F. 2d at 1445; *L.P. Consulting Group*, 66 Fed. Cl. at 243; *see also Am-Pro Protective Agency, Inc.*, 281 F.3d at 1241; *Scribner v. Worldcom, Inc.*, 249 F.3d 902, 910 (9th Cir. 2001); *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 288-89 (3d Cir. 2000).[44]  Various cases hold that the government breaches the covenant of good faith and fair dealing where it interprets a contract in a way purposely designed to prevent the contractor from performing in a timely fashion.  *See, e.g., Triax Co., Inc.*, 88-3 B.C.A. ¶ 20,830 (1988); *see also S & S Equip.*, 89-1 B.C.A. ¶ 21,469 (1988); John Cibinic, Jr., Ralph C. Nash, Jr. & James F. Nagle, Administration of Government Contracts 302 (4th ed. 2006) (hereinafter Cibinic, Nash &

---

[41]  The record reveals that this e-mail was sent in preparation for an evaluation meeting and in response to an e-mail sent by Col. Meeks in which the latter commented – "Looks like I am going to be sued just like everyone else."

[42]  One is reminded of Samuel Johnson – "Of all the Griefs that harass the Distrest, [s]ure the most bitter is a scornful Jest."

[43]  By comparison, the court found Mr. Wartes' testimony to be very reliable, particularly because it was repeatedly reinforced by written statements he made in contemporaneous e-mails and other documents.  In important regards, his testimony was also corroborated by Ms. Klumb, Ms. Goins and Mr. Everett.

[44]  In addition, the Restatement emphasizes that the obligation of good faith is "violated by dishonest conduct such as conjuring up a pretended dispute, asserting an interpretation contrary to one's own understanding, or falsification of facts."  Restatement (Second) Contracts § 205, comment e (1981); *see also id.* at comment a ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.").

Nagle).  Here, the breaches of the Lease that occurred increasingly as the years progressed serve to reinforce the conclusion that the statements highlighted above were neither idle jokes nor venting, but rather windows into the minds of government officials who repeatedly effectuated their animus toward North Star in conduct.

For reasons that soon will become evident, it is useful, at the outset, to identify several interpretational guides that may assist the court in construing the Lease.  First, as an overarching matter, the court, in interpreting a contract, seeks to "effectuate its spirit and purpose."  *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (quoting *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978)); *see also Hercules, Inc. v. United States*, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002).  Toward that end, contract interpretation "begins with the plain language of the agreement." *Gould*, 935 F.2d at 1274; *see also Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479, 1483 (Fed. Cir. 1998); *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1479 (Fed. Cir. 1997).  "[A]n interpretation which gives a reasonable meaning to all parts," the law provides, "will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona*, 575 F.2d at 863; *see also Fortec Constr. v. United States*, 760 F.2d 1288, 1292 (Fed. Cir. 1985); *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 729-30 (2004).  "A contract is thus to be interpreted as a whole."  *Northrop Grumman Corp.*, 136 F.3d at 1483.  Under this approach, when the contract language is unambiguous, the court's inquiry is at an end.  *Textron Defense Sys. v. Widnall*, 143 F.3d 1465, 1468 (Fed. Cir. 1998).

But what if a contract term is ambiguous?  Of course, such an ambiguity does not exist simply because the parties disagree as to the meaning of a provision.  *See Cmty. Heating & Plumbing Co., Inc. v. Kelso*, 987 F.2d 1575, 1578-79 (Fed. Cir. 1993); *Brunswick Corp. v. United States*, 951 F.2d 334, 337 (Fed. Cir. 1991).  Rather, "[a] contract is ambiguous," the Federal Circuit has stated "if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language."  *Cmty. Heating & Plumbing*, 987 F.2d at 1579; *see also Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986).  In such instance, the court "may appropriately look to extrinsic evidence to aid in [its] interpretation of the contract."  *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1354 (Fed. Cir. 2006) (quoting *Metro Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006); *see also Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004); *City of Tacoma, Dep't of Pub. Utils. v. United States*, 31 F.3d 1130, 1134 (Fed. Cir. 1994).  Such parol evidence may include the negotiating history of the contract, *see Gardiner*, 467 F.3d at 1354, or the course of performance, *see Metro. Area Transit*, 463 F.3d at 1260.[45]

---

[45]  As the Restatement states –

> Where an agreement involves repeated occasions for performance by either party
> with knowledge of the nature of the performance and opportunity for objection to
> it by the other, any course of performance accepted or acquiesced in without
> objection is given great weight in the interpretation of the agreement.

Even where a contract is unambiguous, "a course of dealing can supply an enforceable term to a contract (or may even supplement or qualify that contract) provided the conduct which identifies the course of dealing can reasonably be construed as indicative of the parties' intentions – a reflection of their joint or **common** understanding." *Sperry Flight Sys. Div. of Sperry Rand Corp. v. United States*, 548 F.2d 915, 923 (Ct. Cl. 1977) (emphasis in original); *see also L.P. Consulting Group*, 66 Fed. Cl. at 241. In determining whether the parties' conduct reflects such a joint or common understanding, *Gresham & Co. v. United States*, 470 F.2d 542 (Ct. Cl. 1972), instructs:

> When a party with knowledge or the means of knowledge of his rights and of the material facts does what amounts to a recognition of the transaction as existing, or acts in a manner inconsistent with its repudiation, or permits the other party to deal with the subject matter under the belief that the transaction has been recognized, or abstains for a considerable length of time from impeaching it, so that the other is reasonably induced to supposed that it is recognized, there is acquiescence . . . .

*Id*. at 554-55 (quoting *Harvey Radio Labs., Inc. v. United States*, 115 F.Supp. 444, 449 (Ct. Cl. 1953), *cert. denied*, 346 U.S. 937 (1954)); *see also Amtec Corp. v. United States*, 69 Fed. Cl. 79, 88 (2005); *United Computer Supplies, Inc. v. United States*, 43 Fed. Cl. 351, 357-58 (1999), *aff'd*, 230 F.3d 1382 (Fed. Cir. 2000). In short, "a contract requirement for the benefit of a party becomes dead if that party knowingly fails to exact its performance, over such an extended period, that the other side reasonably believes the requirement to be dead." *Gresham*, 470 F.2d at 554; *see also L.P. Consulting Group, Inc.*, 66 Fed. Cl. at 241; *Int'l Resource Recovery, Inc. v. United States*, 60 Fed. Cl. 428, 431-32 (2004).

The following segments summarize actions that occurred in the administration of the Lease, highlighting those that constitute breaches of the Lease and those that are, in addition (or instead), indicative of defendant's bad faith here.

### (1)     Actions that Increased Downtime

As the court's findings reveal, the Lease contains a series of notification and inspection protocols that are intended to provide North Star with sufficient advance notice of the work required to be performed during a change of occupancy so as to allow it to plan accordingly.

---

Restatement (Second) of Contracts § 202(4); *see also Metro. Area Transit*, 463 F.3d at 1260; *Macke Co. v. United States*, 467 F.2d 1323, 1325 (Ct. Cl. 1972) ("how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself"). The Federal Circuit has also looked to extrinsic evidence "to confirm that the parties intended for [a] term to have its plain and ordinary meaning." *Teg-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006); *see also Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc).

These same provisions, of course, are intended to benefit the Army, which should have a major interest in minimizing the amount of time that a unit remains vacant, thereby facilitating the smooth transfers of service members and their families.  Yet, despite what should have been a shared objective, the record clearly supports plaintiff's claim that certain Army officials took steps designed to unduly complicate and increase the cost of North Star's performance in handling changes of occupancy.  These steps had the individual and cumulative effect of increasing downtime – the period for which a housing unit was vacant between changes of tenants – ultimately leading to rent reductions and other unnecessary costs being imposed against North Star.

      **Stockpiling Units for Same Day Release.**  For the first nine years of the Lease, the Army released units to North Star on a rolling basis, essentially when they came back from the cleaners.  This changed in either late 1997 or early 1998, shortly after the disputes regarding refuse collection and carpet depreciation began to erupt.  Then, as the record reveals, the Army began to release units in groupings of up to eight units, typically on Mondays.  Although Ms. Goodrich suggested that this approach was designed, in part, to assist North Star, neither she nor Mr. Peterson ever got that impression from North Star, which, *ab initio*, vigorously complained about this practice.  In particular, the contractor made clear that releasing units in such large batches greatly complicated its scheduling of work crews, including flooring subcontractors.  Mr. Everett, for one, recognized that the practice made it more difficult for North Star to meet the downtime requirements (but did nothing about it).  Nonetheless, this practice continued until May of 2000, ceasing when the parties entered into their preliminary settlement agreement in this case.  Not coincidentally, it was reinstated in January of 2002, shortly after the settlement collapsed, with the Army then generally issuing eight units per week split between Mondays and Fridays.  Of course, it was in this same "post-settlement" period that Ms. Kiser and others began taking other steps that, by all appearances, were designed to increase downtime and generate rent reductions.

      Defendant correctly asserts that nothing in the Lease limits how many units the Army may turn over to North Star during any given period of time.  Nor does there appear to be the sort of course of dealings here that could give rise to an independent contractual limitation.  Relying on various internal documents, as well as testimony by Ms. Goodrich and Ms. Kiser, defendant asserts that the practice was designed to ensure that the Army did not inadvertently release more than eight units during any 5-day work period, so as to trigger the additional downtime clause in the Lease.  Questioning at trial, however, revealed this excuse to be a sham, as it became clear that the Army could have easily addressed its concerns about downtime either by keeping track of how many units it had released during any given 5-day work period or by adopting a simple convention, such as releasing no more than two units per day for the first four work days of a given week.[46]  Moreover, the record refutes defendant's claim that there were operational reasons

---

    [46]  Indeed, at trial, the court was able to pose several hypotheticals to Ms. Kiser that she admitted would not have triggered the additional downtime the Army was purporting to avoid.  In one passage, Ms. Kiser testified –

for stockpiling – while the evidence reveals that some units remained vacant while soldiers contested determinations of occupant damage, there is neither indication that this problem was pervasive nor that these disputes accounted for the Army's stockpiling. Indeed, these "operational difficulties" apparently vanished during the year and a half that the preliminary settlement in this case was in place, during which time the Army returned to the practice of releasing units on a rolling basis, only to reappear suddenly once the settlement collapsed. The record thus supports a different conclusion – that Mr. Peterson and Ms. Kiser employed stockpiling over the period in question, not despite the fact that it caused North Star difficulties, but precisely *because* it did so. The latter objective is exemplified by Ms. Kiser's response to Mr. Wartes when he complained that Ms. Kiser had held a unit until right before lunch, thereby idling a large crew of North Star subcontractors. In testimony credited by the court and cited above, Mr. Wartes stated that he said – "Connie . . . why are you doing this?" And she reportedly replied, "because I can."[47]

---

Q:      . . . When you said that they were putting them on Mondays and Fridays to avoid, essentially, triggering the higher down times, are you really trying to say that you couldn't have figured out a way to have these be sort of spread out and still accomplish the same purpose?

A:      No, you could have. It would have taken a lot of time, because the process of scheduling –

Q:      Well, how about releasing them two a day? If you did two a day on Monday, Tuesday, Wednesday, Thursday and skipped Fridays, we figured out that works, doesn't it?

A:      Right.

Q:      That spreads them out, doesn't it?

A:      Right, but –

Q:      Would you ever have had a problem with calculating the eight over five days, if you would have done it just two at a time?

A:      No.

[47] Indeed, during the period that stockpiling was originally instituted, Mr. Peterson issued one of several e-mails in which he indicated that he was focused on "the best course of action for deducting rent, [and] withdrawing work for accomplishment by an alternate source." Moreover, there is certainly evidence that animus actuated the practice of stockpiling when it was reinstituted in 2002. Thus, in evidence credited by the court, Mr. Wartes indicated that in June 2002, Mr. Everett told him that "there is no doubt you are set up for failure with how they are issuing units to you" as "[t]here is no way you can do the work in the allotted time."

**Other Actions.**  While stockpiling was the root of many of North Star's ills, it was not the only action taken by Army officials to complicate the turnover process – with an eye toward diminishing the Army's outlays at the expense of North Star and imposing liquidated damages on the latter.  Among the other practices within this vein, which violated both the explicit terms of the Lease, as well as the covenant of good faith and fair dealing, were:

○      **Failure to provide adequate notice.**  Section D.7.(b)(1) of the maintenance annex provides that the Army will schedule a pre-termination and termination inspection after being advised by the occupant of an impending move and will notify North Star of the time of this inspection.  The provision assures that "[t]he Government will make every effort to provide this notice 21 days in advance of the projected change of occupancy," but notes that "[b]ecause of short-time occupant orders or other extenuating circumstances, [North Star] can expect an average of 10-14 days advance notice."  These notices are important as North Star is contractually obligated to attend the pre-termination inspections and has expressed a continuing desire to attend the termination inspections, which is its right under the Lease.  Moreover, the importance of North Star being present at these inspections has increased concomitantly with the number of disputes that have arisen regarding its responsibility for various repairs and maintenance.  The record, however, reveals numerous instances in which Army officials, particularly Ms. Kiser, did not make "every effort" to provide timely notice, but instead frequently rescheduled inspections at the last moment and, in some instances, provided no notice whatsoever – both without any indication of good cause.  Indeed, the record, as a whole, indicates that, at least in terms of Ms. Kiser, the delays and failures in giving notice were part of a calculated process designed to disrupt the change of occupancy, allow more costs to be assessed against North Star, and increase downtime with a view toward imposing rent reductions.[48]

○      **Failure to provide work authorizations.**  Section B.33. of the maintenance annex defines "Work Authorization" as "[a]n official document issued by the Government for the accomplishment of work by [North Star] and which is used to verify entitlement for reimbursement."  Section C.2.(c)(10) of the annex indicates that the Army is responsible for "notify[ing] [North Star] via work

_____

[48]  Among other things, it is particularly notable that as the disputes among the parties multiplied, the situations significantly increased in which less than 10 days' notice was given of a unit's change of occupancy.

-54-

authorizations of occupant-caused damages or conditions requiring correction or cleaning and reimbursing [North Star] for accomplishment of same;" section D.7.(b)(3) of the annex indicates that this requirement should be met "[s]ubsequent to the termination inspection."  Defendant does not deny that, increasingly, over the period in question, the Army failed to provide necessary authorizations, thereby breaching the Lease. Rather, it asserts that the failure to issue the authorizations did not prevent North Star from performing needed work – suggesting that, even without an authorization, North Star should have repaired occupant damage within the downtime period specified by the Lease and then sought reimbursement later.  But, this assertion misses the mark for three reasons: (i) the Lease, as well as the parties' continuing course of conduct in the first decade or so of the Lease, gave North Star the right to expect such authorizations on a timely basis and the Army's failure to provide them clearly delayed the turnover process;[49] (ii) this was one of a number of steps taken by Ms. Kiser that in combination delayed the turnover process; and (iii) this step was one of several taken by Ms. Kiser and others with a specific intent to harm North Star and to diminish, below good faith levels, the Army's expenditures on Birchwood.

○  **Failure to grant additional time for extensive repair work.** North Star asserts that, under the Lease, it is entitled to additional time to correct major occupant damage to units.  It cites, *inter alia*, section D.7.(a) of the maintenance annex, which refers to change of occupancy work as that which "includes any routine maintenance and repair."  While North Star emphasizes the word "routine" in this provision, any notion that change of occupancy work is limited to what is "routine" is belied not only by the use of the word "includes" in this provision, but also by section D.7.(c) of the

_____

[49]  The same can be said of North Star's claim that Army officials failed to provide a list of occupant damage after the pretermination inspection.  This was plainly required by section D.7.(b)(2) of the maintenance annex which states, as to the pretermination inspection, that "[t]he Government will provide the occupant with a list of this work and associated costs for which the occupant is liable, as contained on the approved list of repair costs, and provide a copy to [North Star]."  While defendant suggests that this provision did not specify whether the list had to be provided immediately at the end of the pretermination inspection, a review of the aforementioned text in context strongly intimates as much.  Moreover, during the periods pertinent to this litigation, the Army repeatedly failed to provide North Star with such a list at all, making any timing claims moot.  While defendant claims this breach was harmless, this court concludes otherwise, particularly viewing this breach in the context of the Army's overall conduct.

maintenance annex, which, in further describing "change of occupancy work," states that "[i]n the event the occupant fails to . . . correct damages beyond normal wear and tear for which the occupant is responsible, it shall become [North Star's] responsibility to . . . repair the unit for the next occupant . . . ."[50] Nonetheless, it appears that for the first ten or so years of the Lease, the Army, acting under what Mr. Everett described as a verbal agreement, allotted North Star additional days of downtime where carpet or vinyl needed to be replaced in a turned-over unit. In the court's view, this course of dealing evidenced a joint or common understanding that served to supplement or qualify the Lease, reasonably inducing North Star into believing that it would receive additional time for significant repair work. *See Sperry Flight Sys.*, 548 F.2d at 923. Accordingly, the Army's decision in late 1997 or early 1998 to abandon the practice of regularly providing extensions represented a breach of the parties' common understanding of how the Lease would be administered. And, as wielded with animus by Ms. Kiser, the failure to grant extensions for extensive repair work became yet another facet of the breach of the covenant of good faith and fair dealing.

o   **Improper use of extra-contractual inspections.** Contrary to plaintiff's claim, the Lease does not limit the Army's ability to conduct inspections of the units, but, instead, section C.2.(c)(16) of the maintenance annex allows the Army to "[i]nspect each phase, at the Government's discretion, of the services rendered under this annex during both [North Star's] work performance and after completion of the tasks." Nonetheless, this general right to inspect the units cannot be viewed as supplanting the detailed provisions in the Lease concerning the three-fold inspections that are to accompany changes of occupancy. As recognized by Mr. Everett in, *inter alia*, a November 1999 position paper, the latter protocols were timed and designed to give North Star sufficient notice of the work required in a unit to allow it to complete the work and turn the unit back within the downtime specified by the Lease. Toward that end, the Lease gave North Star the right to attend those inspections. These detailed provisions in the Lease, and the protections they afford North Star, would be meaningless if the

---

[50] North Star notes that the maintenance annex has a separate category for "Scheduled Repair or Renovation Downtime," which is to be "completed on the basis of the actual number of days any specific unit has been turned over to [North Star] for such work," but it appears that this provision, section D.5.(b) of the maintenance annex, does not cover change of occupancy work.

Army were permitted to identify work items after the termination inspections at "quality assurance" inspections that North Star did not attend.[51]  Accordingly, the court finds that the use of such inspections in the fashion employed by Ms. Kiser and others violated the Lease.  Moreover, based on the record as a whole, it finds that the adoption of this procedure by Ms. Kiser was actuated by her animus against North Star.

Taken in combination with stockpiling, the court believes the aforementioned actions all contributed to increase unduly North Star's downtime.[52]  Particularly given the intent underlying these actions, this course of conduct clearly constituted bad faith that breached the Army's duty to cooperate.  *Compare Hoel-Steffen Constr. Co. v. United States*, 684 F.2d 843, 849-50 (Ct. Cl. 1982) (unreasonable denials of approvals or delays in giving approvals called for by the contract are breaches of the duty of cooperation); *Appeal of Raytheon Serv. Co.*, 81-1 B.C.A. ¶ 15,002 (March 19, 1981); Cibinic, Nash & Nagle, *supra*, at 305-07.

### (2)   Downtime Calculations

Wholly apart from the actions designed to increase North Star's actual downtime, the record indicates that the Army's calculation of downtime violated the Lease in several regards.

Section D.5.(a) of the maintenance annex indicates that the "[t]he total number of downtime days for units vacant for purposes of change of occupancy maintenance shall not exceed the number of move-outs (excluding move-outs for purposes of scheduled repairs or fires and acts of God) per month multiplied by 3 days."  This same provision indicates that rent deductions may occur if North Star fails to "stay within prescribed downtime."  Plaintiff argues

---

[51]  North Star also alleges that the Army repeatedly, and with intent to harm, rejected its work at the acceptance inspections.  Section C.2.(a) of the maintenance annex plainly gives the Army "the right to refuse to accept the unit if the work has not been completed or performed satisfactorily or is otherwise not in accordance with the provisions of this annex."  Nothing in this provision, however, gave the Army the right to conduct overzealous or arbitrary inspections.  Yet, the record suggests that Ms. Kiser, in particular, did just that.  Her pedantic overzealousness is perhaps evidenced best by having her staff inspect the paint in Unit 961 using a black light, so as to detect background stains invisible to the naked eye.  Her arbitrariness also is evidenced by the various situations in which, as described by her inspectors, she changed their reports to favor the Army without so much as going to the unit involved.

[52]  Fact Appendix II summarizes the courts findings as to particular units, highlighting where various of the issues described above were encountered.  The findings reflected in the appendix are not comprehensive, in the sense of listing every single unit in which a particular violation occurred.  Rather, these findings serve primarily to illustrate the breadth of the practices adopted by Ms. Kiser and others, focusing, in particular, on those units discussed at trial.

that under this provision, downtime for a month is calculated on an aggregate basis – that is, the number of move-outs per month multiplied by three days – and that no reductions should occur if the actual downtime in a given month does not exceed this aggregate.  Not so, defendant asserts, focusing on section D.7.(d)(1) of the maintenance annex, which states that "[a]ll change of occupancy work must be completed within three working days after the unit becomes available, which shall be determined from the date the unit is turned over to [North Star] by the Government for change of occupancy work."

At first blush, it would appear that the cited provisions contradict each other.  However, plaintiff's interpretation of the Lease makes more sense for several reasons.  First, treating downtime in the aggregate draws support from an example given in Section D.5.(a) regarding the application of both the three- and five-day rules (the latter being triggered if more than eight units are turned over to North Star within any five-day work period).  That example states –

> For example, if there are 17 move-outs in a month, the total allowable downtime is 51 days.  However, if 11 of these units were turned over to [North Star] within a 5-day work period, an additional 6 days will be allowed for a total of 57 days in allowable downtime (representing the additional 2 days for each of the units in excess of eight turned over within a 5-day work period added to the 51 days allowed for 17 move-outs).

This example – particularly, the portion thereof explaining the 5-day rule – makes no sense if, as defendant asserts, North Star could be assessed a rent deduction if it took more than three days to turn back a given unit.  Second, it should be noted that it is section D.5.(a), and not section D.7.(d)(1), which authorizes the rent reductions – accordingly, while the Lease makes explicit the possibility of reductions if the average for a month is exceeded, it does not make any similar provision where a unit is turned over in more than three days.  Imposing a penalty in the latter situation thus would violate the normal canon that penalty provisions in contracts are to be strictly construed.  *See, e.g.*, *Priebe & Sons v. United States*, 332 U.S. 407 (1947); *see also* 11 Williston on Contracts § 32:9 (4th ed. 1990); 14 Williston on Contracts § 42:3 (4th ed. 1990).  It also would clash with section H.1.(d) of the maintenance annex, which indicates that rent reduction should occur "[i]f the downtime in any one month for units vacant for purposes of change of occupancy work exceeds the allowable downtime *for that month*" and states that the latter figure shall be "established in accordance with clause D.5.(a)."  (Emphasis added).[53]  Finally, in its pre-and post-trial briefs, defendant admits that the calculation of downtime

---

[53]  To be sure, section H.1.(c) of the maintenance annex indicates that the government shall assess liquidated damages "[i]n the event [North Star] fails to complete change of occupancy maintenance work by the date identified by [North Star] as when the unit would be returned."  However, unlike section H.1.(d), this provision neither cross-references section D.7.(d)(1), nor vice-versa.  Indeed, if anything, the H.1.(c) penalty provision supports North Star's claim that the Lease draws a distinction between normal changes of occupancy and those that require extraordinary maintenance and repair.

employs averaging, a concession that the court views as tantamount to conceding that section D.7.(d)(1) does not authorize reductions in rent if a particular unit is not turned over within three days, but only if the aggregate downtime for a given month is exceeded.

The fact that defendant cannot mount a defense of the interpretation taken by Ms. Kiser and others in administering the Lease is, in this court's view, evidence that the interpretation was unreasonable and, in light of other evidence, was part of an overall plan to punish North Star financially. This conclusion is reinforced by another position taken by Ms. Kiser beginning in 2002, now conceded to be wrong by defendant – including weekends and holidays in the downtime calculations that eventually led to excessive charges being made against North Star. In this regard, section B.10. of the maintenance annex explicitly states that "[f]or purposes of this lease agreement, downtime is measured in working days, vice [sic] calendar days." Moreover, in its post-trial briefs, defendant also admits that the Army improperly included in its downtime calculations: (i) time that occurred when defendant was late in conducting the acceptance inspection; (ii) downtime that occurred in one month in the calculation of another month's excessive downtime;[54] (iii) portions of days when the Army either released a unit in the afternoon or conducted the acceptance inspection in the afternoon; and (iv) periods corresponding to time that the Army had granted North Star to perform "excessive repairs." At least for the period from April through June of 2002, defendant admits that these various errors substantially overstated the liquidated damages that were assessed against North Star.[55]

Nonetheless, defendant contends that a "mere misinterpretation of lease provisions is not enough to demonstrate bad faith," citing *WRB Corp. v. United States*, 183 Ct. Cl. 409, 423-24 (1968); *see also Librach*, 147 Ct. Cl. at 614 (refusing to find bad faith where government conduct was "an honest mistake"). *WRB Corp.*, however, is instructive in distinguishing between "mere misinterpretations" of a contract and conduct that violates the covenant of good faith and fair dealing. In this regard, it provides the following survey of the law:

> [I]n *Roberts v. United States*, 174 Ct. Cl. 940, 357 F.2d 938 (1966), we held the Government in breach of contract because its inspector hindered the contractor's performance even though we did not find that a protest had been lodged with the contracting officer. But the inspector's conduct in *Roberts* involved more than a mere directive based on a misrepresentation of a specification. Over a period of more than 15 months he engaged in continual "overzealous supervision" which

_____

[54] Defendant concedes that this violated section D.5.(a) of the maintenance annex, which states that "[t]he total number of downtime days for units vacant for purposes of change of occupancy maintenance shall not exceed the number of move-outs . . . per month multiplied by 3 days."

[55] For example, in its post-trial brief, defendant states that "[a]pplying those calculation principles, the Government should have assessed North Star nine days of liquidated damages instead of 25 for April 2002 . . . , and six and a half days instead of 24 days for June 2002."

seriously hampered the contractor's efforts to perform. . . .   Similarly, in *Adams v. United States*, 175 Ct. Cl. 288, 358 F.2d 986 (1966), the contractor, despite his failure to appeal to the contracting officer, recovered losses ensuing from the "extremely rigid, unreasonable and arbitrary conduct" of an inspector "during a period of approximately 3 months" . . . , conduct which included substantial deviations from the inspection plan issued by the contracting agency . . . .

*WRB Corp.*, 163 Ct. Cl. at 423.   While, based on this passage, the court concluded that "[a] mere misinterpretation of a specification, by itself, is not enough" to breach the covenant of good faith and fair dealing, it also observed that "the [g]overnment cannot impede, hinder, or interfere with the contractor's work by an improper course of conduct." *Id.* at 424.   Other cases are to similar effect. *See, e.g., H.W. Zweig Co. v. United States*, 92 Ct. Cl. 472, 481 (1941) (liquidated damages annulled where undue delay caused by improper inspections); *Neal & Co., Inc. v. United States*, 36 Fed. Cl. 600, 645 (1996), *aff'd*, 121 F.3d 683 (Fed. Cir. 1997); *In re Zundel Bros.*, 85-3 B.C.A. ¶ 18,451 (1985); *In re Randall H. Sharpe*, 79-1 B.C.A. ¶ 13,869 (1979); *see also H & S Mfg., Inc.*, 66 Fed. Cl. at 311-12 (discussing relevant cases).   More than ample evidence reveals that the errors in downtime calculation here were driven by the desire of certain Army officials to injure North Star.[56]

### (3)   Actions Otherwise Designed to Increase North Star's Costs

Plaintiff also asserts that Army officials took other actions to drive up North Star's costs, while minimizing government outlays.   In particular, plaintiff raises the following allegations:

**Depreciation.**   Plaintiff challenges defendant's 1997 decision to implement unilaterally a 10-year depreciation schedule and to adjust reimbursements for carpet damages due to occupant negligence to reflect the remaining useful life of the carpet.[57]   Plaintiff also challenges similar decisions made by defendant to adopt a depreciation schedule with respect to other items, such as counter tops and vinyl.   Plaintiff claims that, on its face, defendant's use of depreciation schedules is inconsistent with section C.1.(s) of the maintenance annex, which expressly assigns to the Army the costs for repairing occupant-caused damages beyond normal wear and tear.   It further alleges, and has provided evidence to support this claim, that defendant's attempt to shift

---

[56]   Further indication of this may be drawn from the fact that, apparently unbeknownst to the contracting officer, Ms. Kiser, Mr. Everett and other Army officials steadfastly ignored multiple requests from North Star that they provide back-up documentation revealing how the allegedly excessive downtime had been calculated.

[57]   For example, under this scheme, if occupant damage caused carpeting to be replaced five years after its installation, the Army would reimburse North Star only for 50 percent of the cost of the new carpeting; if a carpet was more than 10 years old when so damaged, no reimbursement would be provided.

a portion of the cost of such repairs to plaintiff is inconsistent with the course of dealings established by the parties prior to 1997.

In previously denying defendant's motion for summary judgment on this issue, the court distinguished cases such as *Missouri Baptist Hospital v. United States*, 555 F.2d 290 (Ct. Cl. 1977) and *Dodge Street Building Corp. v. United States*, 341 F.2d 641, 644 (Ct. Cl. 1965), which limited the recovery of repair costs to the diminution in fair market value attributable to the government's breach of a contract. These cases, this court noted, though generally establishing that lessors should not receive a windfall when damage occurs on rented property, did not deal with a situation where the issue of who should bear the cost of repairs or replacement is directly resolved by the contract. *North Star Alaska Housing Corp. v United States*, No. 98-168C at 5-6 (Fed. Cl. July 3, 2002); *see also Vinoy Park Hotel Co. v. United States*, 125 Ct. Cl. 336, 338-39 (1953).

In asserting to the contrary, defendant relied upon an unpublished decision in *WDC West Carthage Assocs. v. United States,* No. 00-622C (Fed. Cl. May 30, 2002), in which, on remarkably similar facts, a judge of this court concluded that *Missouri Baptist* required incorporation of a depreciation adjustment when calculating the lessee's liability for "cost of repairs" associated with occupant damage to carpeting. This court, however, rejected the reasoning in *WDC West Carthage*, noting that it relied upon a state court decision that represented a minority view as to how reimbursement for damaged carpeting should be calculated.[58] Subsequently, the Federal Circuit reversed the lower court's opinion in *WDC West Carthage*, concluding, as this court had previously, that the *Missouri Baptist* line of decisions was inapposite. *WDC West Carthage Assocs v. United States*, 324 F.3d 1359, 1362-63 (Fed. Cir. 2003). In this regard, the Federal Circuit stated –

> We disagree with the Court of Federal Claims that the result in these cases governs the instant appeal. There was no dispute in these cases that a breach of contract had occurred and thus the sole issue in each case was the amount of damages to which the landlord was entitled due to the tenant's breach. These cases therefore determined the amount of damages for which a tenant is responsible when he or she breaches a contract by damaging leased property and by failing, upon termination of a lease, to return leased property in the condition that existed at the outset of the lease. Thus, in marked contrast to the instant case, the cases relied upon by the Court of Federal Claims were not concerned with

---

[58] *Compare, e.g.*, *Abernethy v. Cates*, 356 S.E. 2d 62, 65 (Ga. App. 1987) (tenant's action resulted in such extensive injuries that replacement of the property was required and, therefore, mitigation of costs by accounting for depreciation was not appropriate); *Holloway v. Liberty Mut. Fire Ins. Co.*, 290 So. 2d 791, 794-95 (La. App. 1974) (court refused to read depreciation reduction into insurance contract that promised to "restore damaged property to its original condition"); *Bunde v. Badger Carpet Dyers, Inc.*, 55 N.W. 2d 869, 870 (Wis. 1952) (proper measure of damages was not the cost of reproducing property less depreciation).

interpreting contract language, and certainly did not construe the lease language
the cost of such repairs at issue here.  They are, therefore, not relevant to the issue
presented in this case, which necessitates interpreting that language.

*Id*.  The court concluded, instead, that the case presented an issue of contract interpretation and,
relying on provisions analogous to those in the Lease, concluded that the government was
responsible for the full cost of replacing damaged carpeting without depreciation.  *Id*. at 1363-64;
*see also* Cases and Recent Development, 13 Fed. Circuit B.J. 146, 147 (2003) (*WDC West
Carthage* "illustrates that depreciation value is not automatically assumed in contracts involving
the government as a party.").

       In light of the Federal Circuit's decision, defendant again mounts no serious opposition
(apart from jurisdictional points) to plaintiff's claims regarding depreciation.  And, for good
cause – as in *WDC West Carthage*, the denial of any depreciation here is consistent not only with
the Lease language, but also with the parties' conduct for the first nine years of the Lease.  *See
WDC West Carthage*, 324 F.3d at 1363 ("We also note the parties' past conduct in upholding
Carthage Associates' interpretation of the subject leases.").  Moreover, the rationale espoused in
the Federal Circuit's decision plainly extends to all of the replaced items on which defendant
took depreciation here, none of which was authorized by the Lease.

       Defendant asserts that the lower court's ruling in *WDC West Carthage* indicates that the
Army's interpretation of the Lease was, at most, a "mere misinterpretation."  The record,
however, suggests that some of the officials who effectuated this interpretation of the Lease were
prompted by a desire to reduce arbitrarily the Army's expenditures.  Indeed, it cannot be
overlooked that carpet depreciation was unilaterally adopted by the Army on July 9, 1997, in the
midst of various disputes, including over refuse collection.  Several months after this policy was
announced, Col. Brown lectured Mr. Fischer on this point at an evaluation meeting held on
October 15, 1997, at which he stated – "if you don't want to deal with us on this, then what I'm
going to do is I'm going to get with the lawyers and we're going to come up [with] a depreciated
schedule and then I will – we will figure out some way to deduct that from your payments and
then if you want to sue us, have at it," adding "I'm going to figure out a way that I can take it
right out of your pay."  Yet, while a close call, the court believes that there is not clear and
convincing evidence that Col. Brown, Mr. Peterson and others were actuated by animus in
initially adopting depreciation.

       Over time, however, this practice took on new dimensions.  Particularly as viewed
through the prism of the many statements of animus in the record, it is clear that the use of
depreciation clearly became yet another weapon by which Mr. Peterson, Ms. Kiser and others
could effectuate their animus toward North Star.  And this certainly was true by the time that
these officials, responding to a July 3, 2002, ruling by this court shedding considerable doubt on
the legality of the depreciation practice, extended depreciation to counter tops, vinyl and other
types of materials installed in the units.  Indeed, at this time, these officials took the view that
while the Army was liable for occupant damage only reduced by the impact of depreciation,
North Star was responsible for replacing, at its expense, carpeting, vinyl and other materials that

had to match the color of the materials replacing those that had been damaged.  In the court's view, the combination of these various events, together with the statements made by key officials revealing animus, lead to the conclusion that the imposition of depreciation eventually came to violate the covenant of good faith and fair dealing.

**Other Conduct**.  The latter conclusion – that depreciation eventually was applied in bad faith to increase North Star's costs – is reinforced by a host of other actions taken by Mr. Peterson, Ms. Kiser and others, during the same time period, to diminish North Star's profitability.  In this regard, two practices stand out:

- ○ **Failure to correct occupant damage**.  First, during periods relevant to this suit, Ms. Kiser adopted the practice of failing to correct occupant damage, so that, according to Ms. Goins, it would be viewed, upon the next tenant change over, as normal wear and tear.  This practice, of course, not only adversely affected North Star, but also the service members and their families who had to live in the unrepaired units**.**  It also undoubtedly caused the tenants to view North Star in a dim light, perhaps explaining some of the survey results.

- ○ **Repair list and invoices**.  Second, Ms. Kiser unilaterally altered the process for preparing work authorizations.  In this regard, the Lease required that the parties establish a List of Repair Costs that "will be subject to change annually or from time to time by mutual agreement of [North Star] and the [Army]," and required North Star, in the work authorizations, to be reimbursed at the rates established by this list.  Instead, beginning in the spring of 2002, Ms. Kiser began unilaterally to remove items from the List of Repair Costs (flooring items, in particular) and then demanded invoices to support reimbursement of the individual delisted costs.  The latter requirement is not found in the Lease, which, in section H.3. of the maintenance annex, only envisions that invoices will be provided on a monthly basis, covering more than one work authorization.  Indeed, sections H.2. and H.3. of the annex emphasize the use of the approved list of repair costs, leading the court to conclude that the invoices to which these provisions refer are not at all the sort that Ms. Kiser required.  This change in practice again imposed new burdens on North Star (particularly where a given item was purchased in bulk and North Star did not have a specific invoice covering the use of a portion of the bulk item in a particular unit) and necessarily delayed the turnover process, contributing again to what the Army would later characterize as excessive downtime.

-63-

In sum, it appears that Mr. Peterson, Ms. Kiser and others had a hidden agenda designed to require North Star to shoulder costs that were the Army's responsibility and, in general, to complicate the turnover process.  *Cf. Neal & Co.*, 36 Fed. Cl. at 631 (no finding of bad faith where "[agency] actions were not the product of a "'hidden agenda'" designed to force [the contractor] to shoulder the costs that were actually the fault of the [agency]").

### (4)    Actions Designed to Reduce North Star's Compensation

The various actions described above eventually led the Army to assess liquidated damages against North Star in the form of reduced rents.  They also paved the way for the Army to deny North Star incentive fees under the Lease.  The court will deal with each of these matters *seriatim*.

**Abatement of Rent.**  Section H.1.(c) of the maintenance annex provides that "[i]n the event [North Star] fails to complete change of occupancy maintenance work by the date identified by [North Star] as when the unit would be returned to the Government . . . the Government shall assess liquidated damages based on the most current average daily rate of BAQ [basic allowance for quarters] plus VHA [variable housing allowance] plus average daily lease cost per unit for each calendar day subsequent to that date."  Likewise, section H.1.(d) of the maintenance annex provides that "[i]f the downtime in any one month for units vacant for purposes of change of occupancy work exceeds the allowable downtime for that month (established in accordance with clause D.5.(a) [of the maintenance annex]), the Government shall assess liquidated damages based on the most current average daily rate of BAQ plus VHA plus average daily lease cost for each calendar day in excess of the allowable downtime."  Beginning in 2002, the Army invoked these provisions in assessing liquidated damages against North Star.

In the court's view, these assessments cannot stand.  The demonstrated intent to injure exhibited by Mr. Peterson, Ms. Kiser and others, together with the various actions taken by these officials and others at their behest to complicate and delay the turnover process, renders arbitrary and capricious essentially every downtime determination that was made as a predicate to asserting liquidated damages.  Certainly, defendant has not shown that any of the downtime calculations, which Ms. Kiser refused to provide to North Star over extended periods of time, were unaffected by the host of bad faith breaches outlined above.  Moreover, it appears that the contracting officer decisions upon which these assessments are based are themselves suspect, given the lack of independence exhibited by Mr. Hopson and the fact that neither he nor Mr. Everett bothered to check carefully Ms. Kiser's calculations.

**Incentive fees.**  In addition to shelter and maintenance rent, Article VIII of the Lease provides that the Army, "at its option" may pay North Star an "incentive fee" of up to five percent of the maintenance rent for the period of time for which North Star's performance is found by the Army to "substantially exceed the established standards" of the Lease.  It further provides that "[t]he amount of the incentive fee shall be determined by an Incentive Fee Board based upon the performance of [North Star] in operating the Premises in accordance with its obligations."

Defendant strenuously asserts that the Lease contains no requirement that any incentive fee be awarded, thereby rendering the merits of the incentive fee decisions nonreviewable.  The case that defendant cites for this proposition, *George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 305 (2005), however, only states that such decisions are "not reviewable on the merits." That decision explicitly states that an agency fee decision may be set aside as arbitrary and capricious, drawing extensively on *Burnside-Ott Aviation Training Ctr. v. Dalton*, 107 F.3d 854 (Fed. Cir. 1997).  In the latter case, the Federal Circuit explicitly indicated that award fee decisions could be reversed if "the discretion employed in making the decision is abused, for example, if the decision was arbitrary and capricious."  *Id.* at 859-60; *see George Sollitt Const.*, 64 Fed. Cl. at 247 ("if the contract language supports a finding that unilateral discretion has been granted to the government to determine the amount of a performance award, this court is limited to reviewing whether the government's award decision was arbitrary or capricious").[59]  Various cases, including *George Sollitt*, thus hold that a range of seemingly unilateral contracting decisions may be set aside if agency officials considered factors that were not relevant, followed improper procedures, or otherwise acted arbitrarily.  *See, e.g.*, *NI Indus., Inc., v. United States*, 841 F.2d 1104, 1106 (Fed. Cir. 1988); *George Sollitt Constr.*, 64 Fed. Cl. at 247; *RCS Enterprises v. United States*, 53 Fed. Cl. 303, 309 (2002).[60]  Nor does any case remotely suggest that this court is powerless to set aside such agency fee decisions if it is clearly shown that the officials who made them were biased.  *See, e.g.*, *RCS Enterprises*, 53 Fed. Cl. at 309 (plaintiff remains free to challenge whether the unilateral decision "was generally in accordance with the law and with other duties that the Government owed to the plaintiff, including the duty of good

---

[59]  *See also McCarthy Bros. Const. Co. v. Pierce*, 832 F.2d 463, 468 (8th Cir. 1987) (holding that where a contract affords a particular party the right to make a decision, the determinations "are only binding as long as the decisions . . . are not in bad faith, the product of a gross mistake, or arbitrary or capricious").

[60]  These considerations flow directly from the Supreme Court's definition of arbitrary and capricious review.  Thus, in deciding whether a decision was arbitrary and capricious, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council Inc.*, 462 U.S. 87, 105 (1983).  The Supreme Court burnished these twin requirements in *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983), identifying four grounds upon which a holding of arbitrary and capricious agency action could be based:

> [I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43; *see also Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 709 (2006).

faith and fair dealing"); *see also* 23 Williston, *supra*, at § 63:22 ("even where a defendant is given absolute discretion, it must exercise that discretion in good faith").

Here, a host of factors lead to the conclusion that the fee decisions made for 1995 and years subsequent in suit must be set aside as arbitrary and capricious.  First, beginning with the consideration of the fee for 1995, it appears that, at Mr. Peterson's instigation, the Incentive Fee Boards relied upon factors that were not relevant to the established performance standards of the Lease.  In particular, it appears that the Board denied plaintiff incentive fees, in part, because North Star chose to dispute various interpretations of the Lease (*e.g.*, depreciation) and the 1995 settlement agreement (*e.g.*, refuse collection) under the dispute resolution clause.  North Star thus was punished for exercising its rights under the Lease, something that was clearly inappropriate.  Second, beginning with the consideration of the fee for 1997, the Army relied on resident surveys that were plainly envisioned and designed by Mr. Peterson as way of denying North Star incentive fees.  These surveys, *inter alia*, highlighted various disputes that were occurring between the Army and North Star and left the false impression that virtually every maintenance deficiency at Birchwood was North Star's fault.  In fact, as other Army employees corroborated, Mr. Peterson and Ms. Kiser took steps to minimize the Army's expenditures at Birchwood –  for example, leaving unrepaired occupant damage – which undoubtedly affected the resident's rating of North Star.  Accordingly, reliance on the unbalanced surveys as basis for determining the incentive fees was, in light of the circumstances, arbitrary and capricious.

Finally, it should not be overlooked that during the period at suit, the process for determining fees was necessarily biased by the dominant roles played by Mr. Peterson and, eventually, Ms. Kiser, both of whom, it has been established, were motivated, in their actions, by considerable animus toward North Star.  It is particularly ironic that during these years, Mr. Peterson preached to the other board members that they had an "ethical" responsibility not to provide North Star any award when, in fact, it was he who was performing in an unethical fashion.  His handling of the fee issues, in which he later enlisted Ms. Kiser's support, constituted a breach of the covenant of good faith and fair dealing, requiring the decisions made through the defective process to be set aside.[61]

## (5)    Other Issues

Plaintiff has raised a host of other issues with respect to which the court rules, as follows:

**Refuse Collection.**  On this count, plaintiff seeks a declaration of the current requirements for the frequency of refuse collection at Birchwood Estates.[62]  Again, this is far

---

[61]  Plaintiff asserts – and defendant does not deny – that the difference between the maximum incentive fee award amount and the actual inventive fees awarded by the Army to North Star through 2004 totals $513,041.

[62]  On August 8, 2005, this court, in an *ad limine* order, ruled that plaintiff could not pursue damages as to this count.

from a new issue. North Star raised questions relating to refuse collection in its 1993 complaint, but those issues involved who was responsible for providing this service, rather than the frequency thereof. In his summary judgment ruling, Judge Futey construed the contract and held that North Star, rather than the Army, was responsible for this task under the Lease and had to pay for the service. *See North Star Alaska*, 30 Fed. Cl. at 267-69. Subsequently, the parties settled the 1993 dispute, and allegedly resolved the refuse collection claim by agreeing that North Star would perform that service.

After the settlement, however, a dispute arose as to how often refuse had to be collected. Plaintiff argues that, prior to 1995, the Army provided refuse collection at Birchwood on a weekly basis and asserts that the 1995 settlement agreement incorporated that periodicity. It contends that when the Army later insisted that collection be done semi-weekly, it was required to incur additional costs beyond the requirements of the settlement, for which reimbursement is now owed. On two prior occasions, this court declined to grant summary judgment on this issue based on the need to consider evidence regarding the discussions and negotiations that led to the 1995 agreement. The trial in this matter provided the opportunity to do just that.

To be sure, the Lease plainly requires that refuse be collected twice weekly. It is undisputed, however, that prior to the 1995 settlement agreement, the Army contracted with the Fairbanks municipality to collect refuse only once weekly, albeit at curbside. Per the terms of the 1995 settlement agreement, North Star agreed "to assume full responsibility for refuse collection and disposal for the remainder of the lease and any extensions of the lease." Plaintiff asserts that it agreed to collect refuse only weekly, relying heavily, for this purpose, on the testimony of its attorney, John S. Stewart, who negotiated the 1995 settlement. At trial, on direct examination, Mr. Stewart testified that he had discussed the frequency of collection issue and "some other issues" with Mr. Donald Kinner, the government's attorney, "somewhere between a half a dozen and ten times over a period of several months." Mr. Stewart indicated that he had told Mr. Kinner that he was authorized to settle only if North Star "would collect the garbage on the same frequency as the government had been collecting the garbage before we agreed to take over that responsibility," and that was "once a week." His testimony, however, was contradicted by Mr. Kinner, who testified that he viewed the frequency of refuse collection as being "spelled out in the contract." He emphatically indicated that he never agreed with Mr. Stewart that North Star would have to collect refuse only at the same frequency as the Army had been collecting it, stating "that would be completely contrary to the whole point of what I was doing," which was to ensure that the Army was not receiving "anything less than the full refuse collection obligation that was spelled out in the contract" – the same one that had been upheld in Judge Futey's opinion.

Both parties attempt to buttress their cases with documentary evidence. Plaintiff, for example, points to a document that indicates that the Army "standard" for refuse collection in 1995 was weekly curbside pickup and points to a memorandum, issued by Ms. Goodrich following the settlement, which states that "[a]n out of court settlement was reached to allow the contractor to decrease pick-up from twice a week to once a week." Defendant, however, contends that Ms. Goodrich was simply misinformed. For its part, it points to a draft letter from

Mr. Kinner to Mr. Stewart, dated June 9, 1995, in which the former indicated that, as part of the proposed settlement, North Star agrees to "collect garbage from the 801 housing project twice each week." But, there is no definitive proof that the letter was ever sent.

Nonetheless, based upon the record, the court finds that the settlement agreement envisioned that North Star would collect refuse twice weekly. In this regard, the court views North Star's commitment "to assume full responsibility for refuse collection and disposal" as most likely a reference to the "responsibility" outlined in the Lease, rather than the Army's prior course of conduct. Had the parties intended to incorporate the Army's prior course, it is highly unlikely that they would not have spelled out in the settlement agreement what that prior conduct was. Such a definition, of course, was unnecessary if, as it appears, the settlement agreement simply reinstated the explicit requirements of the Lease. The court also credits this view of the agreement because, on this point, it finds the testimony of Mr. Kinner more credible than that of Mr. Stewart. In particular, there appears to be tension between Mr. Stewart's claim, on direct, that he discussed the frequency issue with Mr. Kinner between six and ten times, and his assertion, on cross-examination, that "there wasn't an issue between Mr. Kinner and me about the issue of frequency." While recollections may be faulty, both assertions cannot be true. Accordingly, the court finds for defendant on this issue.

**Authority to Order Disputed Work**. North Star alleges that the housing project manager does not possess the authority to direct North Star to perform disputed work. Section C.2.(b) of the maintenance annex states that the housing project manager and her staff "will be responsible for the day-to-day administration of the Government's responsibilities with respect to this lease separate from lease administrative functions." This section further states that "the housing manager shall serve as the primary point of contract for matters involving the day-to-day coordination and administration of the Government's responsibilities." More specifically, the Lease indicates that "day-to-day administration" at the housing site includes the following tasks: (i) "[n]otify[ing] [North Star] via work authorization of occupant-caused damages or conditions requiring correction or cleaning and reimbursing [North Star] for accomplishment of same;" (ii) "[n]otify[ing] [North Star] of any maintenance or repair work required of which [North Star] may be unaware;" and (iii) "[g]iv[ing] [North Star] written notice of either noncompliance or unsatisfactory work on the part of [North Star]." These provisions, taken together with others in the Lease, lead the court to conclude that the housing manager may order North Star to perform disputed work. That conclusion is confirmed by the basic nature of government contracting under the FAR, in which government contracts, such as the Lease at issue, typically include a disputes clause that provides that "all disputes arising under or relating to the contract shall be resolved under this clause." FAR § 52.2331. Among the purposes of this provision is to ensure the continuation of performance while disputes are being resolved. *See, e.g.*, *Alliant Techsystems*, 178 F.3d at 1266; S. Rep. No. 95-1118, *supra*, at 32. Indeed, as is often the case in contracts that include the disputes clause, the Lease explicitly states this, indicating that "[p]ending final decision of a dispute hereunder, [North Star] shall proceed diligently with the performance of the contract."

In its post-trial briefs, plaintiff has abandoned this issue, perhaps recognizing the force of the plain meaning of the Lease provisions. That said, the court can well understand why North Star was hesitant to perform services directed by Ms. Kiser. In fact, in the court's view, the contracting officers, who plainly were aware of her animus and that of Mr. Peterson, were obliged to take steps to ensure that the administration of contract was unaffected. But, as will be discussed in greater detail below, they stood silent and, in that regard, themselves breached the covenant of good faith and fair dealing.

**Possible Breaches as to Particular Units.** Although several disputes with respect to individual units do not loom large in the context of North Star's monetary claims, the court, nonetheless, resolves those claims as follows:

○ **Unit 884 (carpet matching).** North Star challenges a contracting officer's decision that it was financially responsible for replacing carpet in unit 884. North Star replaced occupant-damaged carpet in that unit with brown carpet, for which the Army paid. However, the Army demanded that the blue carpeting in rooms adjacent to the recarpeted rooms be replaced with brown carpet by North Star at its expense. In this regard, the Army cited the portions of the maintenance annex that provide that "repaired areas shall be fully compatible with adjacent surfaces," that "[a]ll replacements shall match existing . . . color," and that "replacement of carpeting shall be in kind." In the court's view, these provisions do not require North Star to replace carpeting in other rooms, simply because it has installed different-colored carpeting in rooms on the same floor owing to occupant damage. Moreover, if the Lease does require the replacement of all the carpeting on a given floor, then it seemingly also requires the Army to cover that cost where some of the carpeting is being replaced due to occupant damage. Indeed, such was the ruling of the contracting officer when faced with a similar situation involving counter tops. Accordingly, the court finds that the Army was responsible for the cost of replacing the carpeting in unit 884.

○ **Units 633, 1090 and 1111 (vinyl replacement).** Section E.2.(b)(4) of the maintenance annex states that "[a]ll linoleum and/or resilient tile floor coverings shall be maintained free of cracks, chips, and torn or excessively worn material to provide floor coverings that are useable and have a pleasing appearance." While defendant would interpret this clause in absolute terms – that is, that a one-inch crack behind the toilet would require the entire bathroom floor to be replaced at North Star's expense – a more reasonable construction suggests that minor cracks in areas not easily visible could be repaired by North Star, provided that the

end result met the "pleasing appearance" requirement in section E of the maintenance annex, defined as "an appearance similar to the original finished appearance with only minor, nonobjectionable deterioration resulting from normal use."  As to these three units, it appears, however, that the cracks were significant in size and obvious in their location.  Moreover, plaintiff made no attempt to prove that the cracks and other damage that occurred with respect to this vinyl were the result of occupant damage.  Accordingly, the court rejects plaintiff's claims as to this issue.

○    **Unit 833 (carpet and vinyl replacement).**  In this unit, the Army failed to correct previous occupant damage and, during a subsequent change of occupancy held North Star financially responsible for the replacement of carpet and vinyl.  Specifically, the record reveals that the previous occupant had spilled bleach on the carpeting and vinyl – a fact that was noted by Mr. Everett when, upon a later turnover, he inspected the carpeting.  While defendant claims that North Star was responsible because repairs to the carpeting and vinyl had failed or were insufficient, the record reveals that, due to occupant damage, the Army should have earlier covered the cost of replacing these same items.  Accordingly, the Army, and not North Star, should have been responsible for the cost when they eventually were replaced.

○    **Unit 1029 (light fixture).**  On this point, North Star alleges that defendant owes it $81.80 for replacing a light fixture.  The Lease provides, in section E of the maintenance annex, that "[a]ll replacements shall match existing . . . material . . . and design."  On March 21, 2003, the Army issued a work authorization to replace an occupant-damaged light fixture in unit 1029 for a price of $107.69, based upon a quote for the fixture of $89.  North Star, however, replaced the damaged fixture with one that was more expensive, asserting that it could not match the fixture that had been damaged.  The Army refused to pay the additional cost for the upgraded fixture.  In investigating the claim, Mr. Everett found that a light fixture like the one that was damaged was available at a local hardware store and the contracting officer, therefore, denied North Star's claim.  Based upon the record, the court sustains that ruling.

○    **Unit 638 (gutter down spout).**  The Army failed to issue an authorization for the replacement of a crushed and cracked gutter down spout, contending that the situation encountered was fair wear and tear.  The record reveals – and defendant does not dispute

– that the Army previously had treated crushed and cracked down
spouts as occupant damage.  Indeed, defendant offered no rebuttal
to Mr. Wartes' testimony that the gutter had been damaged by an
occupant.  Accordingly, the court finds that the Army is
responsible for the cost of this replacement.

The court has reviewed North Star's remaining contentions that Army officials breached
the Lease or the covenant of good faith and fair dealing, but has found either the legal reasoning
or proof underlying these claims to be lacking.[63]

### c.     Abuse of the Dispute Resolution Process – "always remember that you have home field advantage"

Among the most troubling aspects of the case *sub judice* is clear proof that Mr. Peterson,
Ms. Kiser and others eventually co-opted the contracting officer who was responsible for ruling
on North Star's claims.  Section 1.602-2 of the FAR provides that "[c]ontracting officers are
responsible for ensuring performance of all necessary actions for effective contracting, ensuring
compliance with the terms of the contract, and safeguarding the interests of the United States in
its contractual relationships."  That same section emphasizes that contracting officers shall
"[e]nsure that contractors receive impartial, fair, and equitable treatment."  *Id.* at 1.602-2(b); *see
also Wilner v. United States*, 24 F.3d 1397, 1412 (Fed. Cir. 1994) ("Contracting officers are
required to be unbiased, impartial arbiters of contractor disputes.") (Bennet, J., dissenting).
Indeed, the Federal Circuit has suggested that the latter regulation obliges the contracting officer
to avoid even the appearance of impropriety.  *See NKF Engineering, Inc. v. United States*, 805
F.2d 372, 377 (Fed. Cir. 1986) (indicating that the contracting officer has an obligation to act
when he "perceives a strong appearance of impropriety in a situation not precisely covered by the
[Ethics in Government Act].").

Maintaining impartiality, of course, does not prevent a contracting officer from consulting
with other government officials.  Indeed, FAR § 33.211 instructs the officer to "[s]ecure
assistance from legal and other advisors" and to "[c]oordinate with the contract administration
office or contracting office, as appropriate."  *See also Hardwick, Inc. v. United States*, 1997 WL

---

[63]  North Star did not prove, by clear and convincing evidence, that Army officials acted
in bad faith in enforcing section E.8.(d) of the maintenance annex, which required that
"[c]omplete interior painting will be accomplished at the first change of occupancy occurring
subsequent to the 3rd, 6th, 9th, 12th, 15th, and 18th years of the lease agreement."  While the court
suspects that Ms. Kiser wielded this provision in a way designed to harm North Star, the
evidence is simply to sketchy to conclude this.  Moreover, unlike other instances, the record does
not support a finding that the parties modified this provision of the Lease through a course of
conduct.  The court also finds plaintiff's proof lacking in terms of showing breaches as to the
Army's assignment of temporary occupants to Birchwood and the Army's alleged failure to
enforce housing rules at the development.

410475 at *6 (Fed. Cl. July 21, 1997).  As this regulation suggests, there is "no implied prohibition against [the contracting officer] first obtaining or even agreeing with the views of others." *Pacific Architects & Eng'rs, Inc. v. United States*, 491 F.2d 734, 744 (Ct. Cl. 1974); *see also J.A. Terteling & Sons, Inc. v. United States*, 390 F.2d 926, 927 (Ct. Cl. 1968); *Jacob Schlesinger, Inc. v. United States*, 94 Ct. Cl. 289, 307 (1941).  Consultation is one thing, however; abdication, quite another.  Hence, a contracting officer still must "'put his own mind to the problems and render his own decisions,'" *Pacific Architects*, 491 F.2d at 744 (quoting *New York Shipbuilding Corp. v. United States*, 385 F.2d 427, 435 (Ct. Cl. 1967)), "tak[ing] ownership of all determinations included in the final contracting officer's opinion," *CEMS, Inc. v. United States*, 65 Fed. Cl. 473, 479 (2005).[64]  Accordingly, in consulting with others, a contracting officer may not forsake his duties, but rather must ensure that his decisions are the product of his personal and independent judgment.  *Id.* at 479-80 (indicating that a contracting officer violated this duty where there was "a pattern of releasing authority to subordinates and remaining remarkably detached from the decision-making process").[65]  Only in exercising that judgment can the contracting officer hope to fulfill his personal obligation to "[e]nsure that contractors receive impartial, fair, and equitable treatment."  48 C.F.R. § 1.602-2(b).[66]  Conversely, abdication of those responsibilities in the face of pressure from government officials who plainly are driven by animus against a given contractor constitutes perhaps the most pernicious form of bad faith on

---

[64]  By way of fuller explanation, the Court of Claims stated in *New York Shipbuilding* –

> Nor can we agree that insistence on a decision by the contractual official is hypertechnical or unrealistic.  It may be that, in some instances, the "reality" is that the designated individual merely rubber-stamps a subordinate's or superior's findings, but we must presume that the parties intend otherwise that they desire that in the end he put his own mind to the problems and render his own decisions.  That has been the consistent teaching of this court in the past . . . and we shall not today sanction an erosion of responsibility by holding that it makes no difference whether or not the chosen officer does his work.

*New York Shipbuilding*, 385 F.2d at 435.

[65]  *See also Goltra v. United States*, 91 Ct. Cl. 42, 71-72 (Ct. Cl. 1940), *aff'd as modified by*, 312 U.S. 203 (1941); *Boeing Co. v. United States*, 2007 WL 113947 at * 11 (Fed. Cl. Jan. 17, 2007); *Lavezzo v. United States*, 2006 WL 3615061 at *7 (Fed. Cl. Dec. 7, 2006) *Impresa Construzioni Geom. Domenico Garufi v. United States*, 52 Fed. Cl. 421, 427 (2002); Cibinic, Nash & Nagle, *supra*, at 1306.

[66]  Indeed, the various boards have repeatedly emphasized the importance "to the disputes process that even the appearance of coercion be avoided" and that it is "vital to the process to restrain even the subtle influence of superiors."  *In re Edmund Leising Bdg. Contractor, Inc.*, 81-1 B.C.A. ¶ 14,925 (1981); *see also In re Indus. Refrigeration Serv. Corp.*, 87-3 B.C.A. ¶ 19,976 (1987); *In re Byrd Foods, Inc.*, 83-1 B.C.A. ¶ 16,313 (1983).

the part of the government, as it threatens the integrity of a dispute resolution process that is central to the government contracting system itself.[67]

     The record clearly demonstrates that such an abdication eventually occurred here. Early on during the period in question, Mr. Peterson attempted to bend the dispute resolution process to his will. On July 13, 1998, for example, he wrote Mr. Klein, then the contracting officer, indicating that "[w]e expect your support" in making rental deductions. To his credit, Mr. Klein resisted these demands, retorting that Mr. Peterson should "[p]lease refrain from directing the Contracting Officer." This response prompted Mr. Peterson, in a July 15, 1998, internal memorandum, to complain that there were "disturbing issues" regarding the "quality of the coordination and support which we feel that we are entitled to receive," adding that his office needed "a strong, aggressive proponent" and "may not find it" in the contracting officer. On July 20, 1998, Mr. Peterson directly responded to Mr. Klein, stating that the latter's July 14 e-mail "seems to be giving us poor legal advice" and that instead there should be a "bias toward action." Yet, it appears that Mr. Klein continued to resist Mr. Peterson's advances. Undaunted, Mr. Peterson continued to criticize both Mr. Klein and Mr. Everett for their lack of support. In response to one criticism of Mr. Everett, Mr. Klein responded, in a September 13, 1999, e-mail that "[t]here will always be unpopular COR determinations but I fully expect each call to be based upon the contract/lease provisions and made without prejudice to any of the parties." Yet, Mr. Peterson was apparently allowed to review draft CODs and requested that changes be made in those drafts.

     This alternating pattern of probing by Mr. Peterson and resistance by Mr. Klein continued until early 2001, when the former again accused the latter of inadequate support. On January 30, 2001, Mr. Peterson informed Mr. Klein that Col. Thompson felt that Mr. Everett "should be more responsive to supporting our requirements (specifically supporting Connie [Kiser])," the next day stating to Mr. Klein that "[i]t's time to back [Ms. Kiser] 100%." A few days later, Mr. Peterson sent Mr. Klein and others an e-mail in which he stated "[i]f there is lease ambiguity, our project manager's position should still be supported as completely and clearly as possible by [Mr. Everett]," adding that "[h]e is not paid to be neutral, but to aggressively support a reasonable government position." The latter statement, of course, clashes harshly with the instructions given contracting officers by the FAR. Several months later, Col. Meeks, Mr. Peterson's superior, requested that a formal protocol be established under which his staff, including Mr. Peterson, would review and comment on draft contracting officer decisions before they were finalized. While the record indicates that such a process likely was implemented in August of 2001, it

---

    [67] Although no decision holds this, various cases emphasize that the integrity of the dispute resolution process should not be undercut by influence and meddling. *See Goltra*, 91 Ct. Cl. at 71-72 (chief of engineers did not exercise his own judgment where he was coerced by a superior; contractor was entitled to an "uninfluenced decision"); *Lavezzo*, 2006 WL 3615061 at *1; *SIPCO Servs. & Marine Inc. v. United States*, 41 Fed. Cl. 196, 220-21 (1998) (where a contracting officer "fail[s] to exercise his own independent judgment due to improper influence from another party, 'it would represent an abdication rather than an exercise of his discretion'").

appears to have taken hold only after the settlement of this action collapsed and Mr. Klein was replaced by Mr. Hopson in January or February of 2002.  Describing the review practice under which he operated, Mr. Hopson acknowledged at trial that "there was an agreement in place that the [Department of Public Works] would review the draft [contracting officer decision] before it was finalized."[68]

There are indications in the record that, while Mr. Klein resisted Mr. Peterson's interference, Mr. Everett and, later, Mr. Hopson finally succumbed to the constant drone of criticism they received from Mr. Peterson, Ms. Kiser and others.  The record suggests that at least one COD, involving whether depreciation was applicable to counter tops, was changed by Mr. Hopson after concerns were expressed by Mr. Peterson's successor, who complained that "if we allow this COD to go out as is, we are opening ourselves up for complete failure on all key issues and litigation will CONSUME our daily efforts."  While the record does not reveal what other modifications were made to draft decisions following the review by the DPW, there are indications that this process was not simply consultative, but rather designed to coerce Mr. Hopson into abandoning his independence.  In this regard, it appears to have been successful.

---

[68]  By way of further explanation, Mr. Hopson responded to questions on this subject posed by defendant's counsel, as follows:

> Q:     Yes.  When you were in agreement with Mr. Killian that you allowed the [A]rmy to review and approve draft contracting officer's decision[s], what did you mean?

> A:     I meant that we allowed the [A]rmy to review and approve the draft [contracting officer decisions (CODs] before they were finalized.

> Q:     How did the [A]rmy approve those CODs?

> A:     There was a little form, a one-page form that they just put on.  It was concur or nonconcur, or I think there was a place on there for comments as well.

> Q:     Do you remember if they ever nonconcurred with a draft contracting officer's decision?

> A:     Yes.

> Q:     Do you remember if you ever changed a draft contracting officer's decision based upon a noncurrence by the [A]rmy?

> A:     No, sir, I do not.

Thus, at trial, Mr. Hopson admitted that he did not personally investigate many of North Star's claims – in some of those instances, he admitted at trial that he ruled adversely without reviewing all the documentation; in other instances, his failure to investigate led him never to reach a final decision on important claims (*e.g.*, stockpiling); and in another instance, he testified that he had presumed that documents explaining the government's position on the calculation of downtime had been provided to North Star, when, in fact, a simple inquiry would have revealed that they had not. Further, at trial, Mr. Everett described instances in which he raised issues with Mr. Hopson and did not receive responses over lengthy periods of time.[69]

In the court's view, the record, as a whole, supports a finding that, under mounting pressure from Mr. Peterson, Ms. Kiser and others, Mr. Hopson abdicated his responsibility to make independent decisions that were, as required by the FAR, impartial, fair, and equitable. *See Sergent Mech. Sys., Inc. v. United States*, 34 Fed. Cl. 505, 523 (1995) (contracting officer breached duty under FAR to be impartial and unbiased where he failed to consider documents produced by contractor); *Beals Plumbing & Heating, Inc.*, 1964 B.C.A. ¶ 4358 (1964) (contracting officer did not render a personal and independent decision where he "acquiesced completely"). Because Mr. Hopson received various of the communications in which Mr. Peterson expressed his contempt for North Star, the court is left with no conclusion but that, in ruling (or declining to rule) on many of the critical issues discussed above, he participated in, or at least facilitated, the breach of the covenant of good faith and fair dealing.[70] In short, the record gives unfortunate meaning to that portion of the Miami football analogy in which Mr. Peterson observed – "always remember that you have home field advantage."

---

[69]  One of the times this apparently occurred involved providing North Star with the calculations that allegedly supported the Army's reductions in rent due to alleged excessive downtime. These reductions first occurred in February of 2002. On April 30, 2002, Mr. Wartes sent a letter to Mr. Everett requesting the backup documentation for the reductions made in February and March of 2002. Mr. Everett did not respond to the letter. On May 24, 2002, Mr. Wartes sent a second letter to Mr. Everett, which he forwarded to Mr. Hopson. On May 30, 2002, Ms. Ronnie Sekyra of North Star made a request for the same materials directly to Mr. Hopson. Mr. Everett testified that he did not receive any response from Mr. Hopson regarding this issue. With the rent reductions continuing, on August 1, 2002, Mr. Wartes sent a third letter complaining that the backup documentation was still not being supplied to North Star. When asked, at trial, why that documentation had not been forwarded, Mr. Everett responded that it was because "I hadn't heard back from the contracting officer."

[70]  Mr. Hopson, indeed, was one of the individuals who received the "Miami football" e-mail. Contradicting Mr. Peterson's alleged impressions, he testified at trial that he did not think that the tone of this e-mail was "fair and equitable and impartial." Yet, it appears that he took no steps to address the situation. *Compare Libertatia*, 46 Fed. Cl. at 711 ("The CO's failure to inquire into and remedy the COR's bad faith coupled with the lack of evidence that the CO exercised independent judgment in applying the standards of the contract results in the court's finding of bad faith on the part of the government in administering the contract.").

Apparently unsatisfied with disrupting the internal dispute resolution mechanism, Mr. Peterson, Ms. Kiser and perhaps others sought to wield other government processes to harass North Star. Thus, in November 2001, Mr. Peterson recommended that the DPW request that North Star be audited for fraud by IRACO. This recommendation appeared to be based, in large part, on the fact that North Star had replaced the tumblers in several locksets with used tumblers, while charging defendant for new ones. When this issue was raised with North Star, it readily reimbursed the Army the $135 involved. Yet, even after the IRACO audit yielded little in the way of adverse findings – indeed, attributing most of the identified problems to faulty government accounting – Mr. Peterson and others pressed for, and eventually obtained, a criminal investigation of the matter. That investigation delayed resolution of this case by more than a year, during which period, Mr. Peterson, Ms. Kiser and others continued to abuse North Star on an almost daily basis. While the court cannot determine definitively whether other government officials improperly pursued the criminal investigation,[71] it finds that Mr. Peterson's and Ms. Kiser's involvement therein represented yet another example of their desire to use the wheels of government to grind down North Star for its failure to comply with their interpretations of the Lease.

### d.    Redux

This court is thoroughly convinced, based on the record as a whole, that a number of Army officials acted in bad faith in administering the Lease during the period in question, seeking to evade the spirit of the contract, wilfully rendering imperfect performance and interfering with North Star's performance of the contract. The actions these officials took far exceeded strict insistence on contract compliance and instead took the form of a prolonged campaign designed to harm North Star. Over time, their bad faith infected virtually every aspect of the administration of the Lease, including, most remarkably, the dispute resolution process. To be sure, not every government actor here is equally culpable – some, like Mr. Peterson and Ms. Kiser, were aggressive prime movers, seemingly obsessed with an intent to injure North Star; others, like Mr. Hopson and to a lesser extent, Mr. Everett, contributed to the harm by allowing themselves to be co-opted and by failing to address the bad faith exhibited by other officials. Nonetheless, in the court's view, the cumulative and pernicious impact of these individual acts of bad faith exceeded their individual weight, leading the court to conclude that,

---

[71] Disturbingly, the record reveals that an IRACO representative viewed the agency's audit as a way to support the development of defenses in this litigation. The court is concerned with the prospect of defendant using an investigation to supplement its discovery in a case before this court, an act that seemingly constitutes abuse of both the investigative and discovery processes. *See United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 433-34 (1985) ("In either case, limitations imposed on investigation and discovery exist for sound reasons – ranging from fundamental fairness to concern about burdensomeness and intrusiveness . . . . To allow these agencies to circumvent their usual methods of discovery also would not only subvert the limitations and procedural requirements built into those methods, but would grant to the Government a virtual *ex parte* form of discovery . . . .").

collectively, the conduct of the governmental actors who dealt with North Star fell far below the standard of good faith that is integral to the Federal procurement system.

The court must next determine the relief plaintiff is owed.

## C.      Damages

"The general rule in common law breach of contract cases," the Federal Circuit has oft-stated, "is to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed," *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997), in short, to give the injured party "the benefits [it] expected to receive had the breach not occurred." *Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (citing Restatement, *supra*, at § 344(a)); *see also Franconia Assocs.*, 61 Fed. Cl. at 746. Conversely, it is also axiomatic that "the non-breaching party should not be placed in a better position through the award of [expectancy] damages than if there had been no breach." *Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d 1341, 1345 (Fed. Cir. 2003). As such, "[e]xpectation damages are recoverable provided they are 'actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty.'" *National Australia Bank v. United States*, 63 Fed. Cl. 352, 355 (2004), *aff'd in part, rev'd in part on other grounds*, 452 F.3d 1321 (Fed. Cir. 2006) (quoting *Bluebonnet*, 266 F.3d at 1355); *see also Cuyahoga Metro. Housing Auth. v. United States*, 65 Fed. Cl. 534, 543 (2005).

### 1.      Loss of Value

Relying on testimony from its expert, Dr. Bill Mundy, North Star attempted to quantify the cumulative impact of the various breaches – both of Lease provisions and the covenant of good faith and fair dealing – effectuated by Army officials. Specifically, it measured the alleged diminution in the value of Birchwood by comparing the market value of that development as of September 1, 2002 (the "after value"), to what that value would have been as of that date absent any breaches of the Lease (the "before value"). North Star claims that the resulting figure – $8.6 million – is the loss in the value of Birchwood incurred as of September 1, 2002.

For its part, defendant asserts that any diminution of the value of Birchwood falls into the category of nonrecoverable consequential damages. Indeed, various cases have rejected claims that the government's conduct under a contract allegedly led to the destruction of the contractor's business. *See, e.g.*, *Ramsey v. United States*, 101 F. Supp. 353, 357-58 (Ct. Cl. 1951), *cert. denied*, 343 U.S. 977 (1952); *United Med. Supply Co. v. United States*, 63 Fed. Cl. 430, 440 (2005); *Industrial Indem. Co. v. United States*, 26 Cl. Ct. 443, 445-46 (1992); *see also* Cibinic, Nash & Nagle, *supra*, at 719-20. Moreover, the Federal Circuit and this court have emphasized that "the preferred way for a contractor to prove increased costs is to submit actual cost data because such data 'provides the court, or contracting officer, with documented underlying expenses, ensuring that the final amount of the equitable adjustment will be just that – equitable – and not a windfall for either the government or the contractor.'" *Propellex Corp. v. Brownlee*,

342 F.3d 1335, 1338-39 (Fed. Cir. 2003) (quoting *Dawco. Constr. Inc. v. United States*, 930 F.2d 872, 882 (Fed. Cir. 1991), *overruled on other grounds by Reflectone v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995)).  Nonetheless, various decisions have allowed contractors to pursue damage methods in which their total costs in performing a contract are compared to the reasonable cost of providing the same services.

An example of such a method is the modified total cost method.  Before a contractor can obtain the benefit of that method, it must prove: "(1) the impracticability of proving its actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for the added costs."  *Propellex*, 342 F.3d at 1338-39 (citing *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861 (Fed. Cir. 1991)).  The modified total cost method is the total cost method adjusted for any deficiencies in the contractor's proof in satisfying the requirements of the total cost method.  *Id.*  In *Boyajian v. United States*, 423 F.2d 1231 (1970), the Court of Claims described the use of this method, thusly:

> [T]he total cost computation was used as "only a starting point" with such adjustments thereafter made in such computation as allowances for various factors as to convince the court that the ultimate, reduced, figure fairly represented the increased costs the contractor directly suffered from the particular action of defendant which was the subject of the complaint.

*Id.* at 1240 (citation omitted); *see also Propellex Corp.*, 342 F.3d at 1339.   Based upon these cases, it is conceivable that plaintiff could prove that the economic impact of the sundry breaches effectuated by the Army were individually impractical to prove and instead could be collectively captured, provided that adjustments were made to ensure that the resulting figure "fairly represented the increased costs the contractor directly suffered from the particular action of defendant."  *Boyajian*, 423 F.2d at 1240; *see also* Cibinic, Nash & Nagle, *supra*, at 730 (discussing how to measure loss of efficiency).

In attempting to isolate the costs attributable to defendant's breaches, Dr. Mundy compared the operating expenses at Birchwood with those at another housing development, Sprucewood Homes (Sprucewood).  Sprucewood is owed by Polar Star Alaska Housing Corporation (a subsidiary of North Star) and is also leased to the United States.  As reflected in

Table 10 below, taken from his report, Dr. Mundy used the 1996 expenses of each facility as a
base and determined that from 1996 through 2001, Sprucewood's operating expenses dropped by

**Table 10    Operating Expense Analysis**

| Polar Star (Sprucewood Homes) | | | | | |
|---|---|---|---|---|---|
| | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |
| Net | $3,949,630 | $3,976,644 | $4,014,984 | $4,059,579 | $4,060,929 | $4,331,276 |
| Debt Serv | $3,115,078 | $3,115,076 | $3,115,078 | $3,115,076 | $3,115,076 | $3,374,668 |
| Prop Tax | $199,615 | $226,371 | $239,224 | $253,387 | $239,289 | $258,862 |
| Ins. | $35,745 | $34,442 | $45,179 | $54,787 | $61,767 | $49,092 |
| Repl Res | $75,000 | $75,000 | $75,000 | $75,000 | $97,435 | $81,250 |
| | | | | | | |
| Oper Exp | $524,192 | $525,755 | $540,503 | $561,329 | $547,362 | $567,404 |

| North Star (Birchwood Homes) | | | | | |
|---|---|---|---|---|---|
| | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |
| Net | $7,893,346 | $7,488,953 | $7,909,868 | $7,953,263 | $8,461,875 | $7,816,801 |
| Debt Serv | $6,594,062 | $6,048,517 | $6,599,390 | $6,597,457 | $7,141,637 | $6,596,392 |
| Prop Tax | $561,666 | $550,000 | $588,664 | $600,000 | $650,000 | $590,000 |
| Ins. | $41,596 | $37,698 | $43,692 | $56,595 | $72,994 | $73,951 |
| Refuse | $12,000 | $15,973 | $26,383 | $19,543 | $25,265 | $12,000 |
| | | | | | | |
| Oper Exp | $684,022 | $836,765 | $651,739 | $679,668 | $571,979 | $544,458 |

| Deviation from Base Year | | | | | |
|---|---|---|---|---|---|
| | 1996 Base Yr | 2001 | 2000 | 1999 | 1998 | 1997 |
| Polar | $567,404 | -$43,212 | -$41,649 | -$26,901 | -$6,075 | -$20,042 |
| North | $544,458 | $139,564 | $292,307 | $107,281 | $135,210 | $27,521 |
| per year | | $182,776 | $333,956 | $134,182 | $141,285 | $47,563 |

| Total Deviation | |
|---|---|
| Polar | -$137,879 |
| North | $701,883 |
| | |
| Polar Star /North Star Difference | $839,762 |
| Rounded | $840,000 |

$137,879, while Birchwood's expenses increased by $701,883.  Dr. Mundy attributed the entire
difference of approximately $840,000 to the Army's conduct.

He then performed two additional calculations.  First, he estimated the value of the
deviation in operating expenses as of September 1, 2002, essentially assuming that the additional
operating expenses expended as a result of the breaches had been reinvested at a 15 percent rate
of return, yielding a value, as of September 1, 2002, of approximately $1.3 million.  Second, he
compared the "before" and "after" values of Birchwood, that is, he estimated the diminution in
the market value of Birchwood as of September 1, 2002, by comparing the value of the property
with the excess operating expenses to the value without such expenses.  As reflected in Fact
Appendix III, which reproduces Tables 12, 13 and 14 from his report, Dr. Mundy estimated the
present value of the future cash flows associated with the property, using discount rates of 11 and
13 percent, respectively, for the "before" and "after" models.  As of September 1, 2002, the

difference between these two figures – $60,800,000 for the before value and $52,200,000 for the after value – yielded a loss in value of $8,600,000, which he attributed to the Army's conduct.

However, Dr. Mundy's analysis and calculations are riddled with flaws – so many, in fact, as to render his findings worthless. Although by no means exclusive, among the most serious of his mistakes are the following:

- o **Comparability of the two facilities**. Dr. Mundy made no adjustments to his comparison between Sprucewood and Birchwood, even though the former has fewer units that, on average, are smaller than those at Birchwood. In assessing operating expenses, Dr. Mundy also did not take into account the fact that, unlike Birchwood, Sprucewood had been renovated between 1994 and 1996. Nor, in comparing the two facilities, did he account for the fact that certain services provided by North Star at Birchwood were not provided by Polar Star at Sprucewood – for example, refuse removal, snow removal, maintenance of common areas, and appliance replacements. In fact, as indication of the depth of his prior investigation (or lack thereof), Dr. Mundy did not even know that the latter services were provided via other contractors at Sprucewood. Overall, the court is left unable to determine, for itself, an accurate comparability of the two facilities.

- o **Assumption that increased costs at Birchwood were attributable to the Army's improper actions.** Dr. Mundy made no individual investigation to determine which government actions, if any, accounted for the $840,000 deviation in operating expenses between the two facilities. Indeed, even a cursory review of the expenses at Birchwood reveals that Dr. Mundy included within the amount that he believed recoverable, for example, the costs for repairing a garbage truck and other vehicles; moneys expended on purchasing a new vehicle, a computer, a copier and a fax machine, uniforms, and a snow plow; and expenses for boiler maintenance, landscaping maintenance, deposits to reserve accounts, training and for Mr. Wartes to attend a conference.[72]

_____

[72] At trial, Dr. Mundy claimed that his failure to segregate these costs was harmless, because similar types of expenditures were incurred at Sprucewood. The record, however, did not bear out this claim and, certainly, there is no indication that prior to trial, Dr. Mundy determined, for example, whether there was any significant variance between the two facilities in terms of capital and other significant expenditures. Indeed, Dr. Mundy admitted that had Sprucewood failed to make certain expenditures listed on its books that were not essential – for example, $2,800 for Christmas cards and a party – he would have attributed the additional

These costs were significant – amounting to hundreds of thousands of dollars.  Moreover, Dr. Mundy did not account for inflation in his cost analysis, thereby essentially assuming that the inflation components of salaries and other types of expenses associated with Birchwood are recoverable from defendant.  The court is left in no position, at least from Dr. Mundy's study, to determine what portion of the increased costs at Birchwood is reasonably attributable to the Army's conduct.

○   **Failure to investigate obvious anomalies in the cost data**.  Dr. Mundy was faced with operating expenses for Sprucewood that declined over the period in question – from $567,404 in 1996 to $524,192 in 2001.  Accordingly, while he assumed that the growth in Birchwood's operating expenses from 1996 through 2001 was abnormal, he failed to consider whether Sprucewood's apparent decrease in operating expenses over that same period was the actual abnormality.  And, of course, the record indicates that the latter statistics were understated because, *inter alia*, they did not include all the expenses that were being incurred by the Army to maintain Sprucewood.[73]  The statistics that Dr. Mundy quoted in his report also show that the expenses for North Star inexplicably surged to $836,765 in 2000 (the year that the preliminary settlement of this action occurred) and then rolled back to $684,022 in 2001 (the year that the settlement collapsed).  These unanswered questions only heighten the unreliability of Dr. Mundy's study.

○   **Faulty mathematics and assumptions in the cash flow analysis**.  The record indicates that Dr. Mundy miscalculated the operating expenses for Birchwood, with financial reports indicating that the actual expenses from 1996 through 2001 were nearly $300,000

_____

difference between Birchwood's and Sprucewood's costs as recoverable damages.  Thus, when asked "[a]re you saying that your calculations are not sensitive to what the specific expenditures were made for?  Just looking at the overall amount, but not sensitive at all to what they're actually being expended for?", he answered, "[w]ell that is true."

[73]  Indeed, while one can envision that defendant might be liable for a portion of the increased costs at Birchwood, it is difficult to conceive why defendant should be liable to the extent that operating costs decreased at Sprucewood.

less.[74]  In addition, Dr. Mundy relied on several assumptions that the record demonstrates are faulty.  For example, in determining his cash flows, he did not take into account the fact that the Lease expires on March 5, 2007, but rather assumed that income and expenses could be projected through 2018.  Accordingly, he did not consider what North Star's income and expenses would be under an alternative scenario, such as the leasing of Birchwood units to private individuals.[75]

Given the many problems that plague Dr. Mundy's cost analysis, pointing out further deficiencies in his valuation of the deviation in operating expenses and income valuation of Birchwood is

---

[74]  The following chart compares the actual operating expenses for the given years with those employed by Dr. Mundy:

|  | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|
| **Dr. Mundy** | $544,458 | $571,979 | $679,668 | $651,739 | $836,765 | $684,022 |
| **Actual** | $540,776 | $534,634 | $624,714 | $558,716 | $745,591 | $644,258 |
| **Overstatement** | $3,682 | $37,345 | $54,954 | $93,023 | $91,174 | $39,764 |

[75]  If Dr. Mundy's assumptions are correct, the termination of the Lease could: (i) decrease North Star's operating expenses by removing the Army as the primary tenant; (ii) decrease its income, particularly as the facility is transferred to private use (assuming that is possible); and (iii) increase North Star's costs to the extent that the Army utilized a clause in the lease of the underlying land to North Star that required rent to be paid the Army from the termination of the Lease until the expiration of the land lease in 2018.

perhaps asking to be flagged for "piling on." Yet, those deficiencies are many.[76]  The result is an expert opinion that bears none of the considerable evidentiary weight plaintiff piles upon it.

Indeed, even if Dr. Mundy had succeeded in isolating the sorts of costs that could be reasonably attributed to defendant's breaches, it is far from clear that plaintiff could recover a figure corresponding to the alleged diminished value of Birchwood, at least without the incidence of a transfer.  Such an approach seemingly crosses beyond the recovery of the additional costs attributable to defendant's conduct and into the recovery of the sort of consequential damages prohibited by the law.  *See Northern Helex Co. v. United States*, 524 F.2d 707, 720-21 (Ct. Cl. 1975), *cert. denied*, 429 U.S. 866 (1976) (indicating a party may not recover damages "if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract") (quoting *Myerle v. United States*, 33 Ct. Cl. 1, 26 (1897)); *see also Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997).

## 2.    Other Damages

North Star claims additional damages, totaling over $2.5 million, allegedly incurred from 1997 through September 1, 2002, that it asserts are not included in Dr. Mundy's report.  These damages can be grouped into two categories: (i) $1,445,972 for damages (including overhead and profit) associated with carpet depreciation and matching, interior paints and wall repairs, short-term occupancies, fire damage and other 2003 claims, as well as unpaid overhead, rent deductions, lost incentive fees and cleaning costs;[77] and (ii) $1,193,593 for damages for

---

[76]  For example, in estimating the value of the deviation in operating expenses, Dr. Mundy assumed that North Star would have reinvested the expenses saved at a return rate of 15 percent.  While he does not refer to the latter category as interest, in fact, his calculation serves the same purpose.  *See Library of Congress v. Shaw*, 478 U.S. 310, 321 (1986) (recovery of interest subject to sovereign immunity considerations, which "cannot be avoided simply by devising a new name for an old institution").  As such, his calculations would appear to afford plaintiff interest at a rate that plainly exceeds the interest rate provided by the CDA.  *See* 41 U.S.C. § 611.  Further, Dr. Mundy's cash flow analysis employs discount rates for both scenarios (with and without the additional costs) that appear to be lower than what would be indicated by the risks associated with the property.  If the spread between the two discount rates remained the same, the raw difference in value calculated would diminish as the discount rates increased.  In particular, the fact that a prudent buyer would not know under either scenario whether the Lease would be extended beyond May 5, 2007, seemingly would mitigate in favor of a very high discount rate.

[77]  As reflected in a damage chart attached to plaintiff's post-trial brief, this figure is calculated thusly:

additional payroll and subcontractor costs.  While plaintiff attempted to prove these damages primarily with testimony from Ms. Sekyra, its Treasurer, there are several obvious problems with these figures.  First, significant portions of the dollars represented by them correspond to monetary claims that have not yet been resolved by the contracting officer and over which, as analyzed above, the court lacks jurisdiction (at least in terms of establishing a monetary amount owed).  Second, some portions of the damages claimed correspond to categories for which the court has found against plaintiff, owing either to contractual interpretation (*e.g.*, refuse) or a lack of proof as to the underlying liability (*e.g.*, short-term occupants).  Third, it is difficult to segregate from the categories of damages sought those that relate to the claims that the court has sustained – for example, the erroneous imposition of depreciation, and the improper assertion of rent deductions, as well as payroll and subcontractor costs attributable to bad faith practices such as stockpiling.  Fourth, based upon the court's rulings, some of the damages sought are premature – for example, plaintiff's entitlement to incentive fees awaits further determinations on a remand to the agency.  In general, while the record contains mounds of data, plaintiff has yet to place the court in a position where it can definitively determine an appropriate amount of damages.[78]

Much the same can be said of plaintiff's attempt to prove, alternatively, the same sorts of damages covered by Dr. Mundy's report.  Significant portions of these damages are attributable to North Star's replacement of items – vinyl, carpet, refrigerators and stoves – that were either

| | | |
|---|---|---|
| Damages for matching, depreciation, interior paints, wall repairs, fire, 2003 claims except cleaning and short-term occupants. | | $492,343 |
| Overhead (40% times $492,343) | | $196,937 |
| Profit (10% times $196,937 | | $ 19,964 |
| | Subtotal | $708,974 |
| Unpaid overhead, rent deductions, incentive fees and cleaning | | $736,998 |
| | **Total** | $1,445,972 |

[78]  The court has considered whether to apply the "jury verdict method" of awarding damages.  That method, however, is highly disfavored.  *Dawco Constr.,* 930 F.2d at 880-81.  It is employed only where:  (i) there is clear proof of injury; (ii) there is no more reliable method of computing damages; and (iii) the evidence is sufficient for the court to make a fair and reasonable approximation of damages.  *WRB Corp*, 183 Ct. Cl. at 425.

damaged or not maintained by occupants at Birchwood.  The process for deriving these figures, however, involved little more than Mr. Wartes performing "back-of-the-napkin" type estimates and lacks the reliability necessary for the court to award damages.  Accordingly, the court finds that plaintiff's proof of these alternative damages is also inadequate.

## III.   CONCLUSION

Vince Lombardi once described "[a] game that requires the constant conjuring of animosity."  But, he was talking about football, not government contract administration.  His statement, nonetheless, captures the essence of defendant's administration of the contract *sub judice*, in which there was a "constant conjuring of animosity."  Certainly, North Star is not entirely blameless in this matter.  Yet, the law requires those administering government contracts to measure their responses even as to, and perhaps particularly as to, perceived malperformance.  Even the worst suspicions do not dislodge the expectation, solidly rooted in the FAR, that contracts be administered fairly and impartially.  Nor do defects in performance, perceived or real, permit administrators to cross the dividing line from good faith into bad by imposing their own form of vigilante justice.  By clear and convincing evidence, the record shows that the latter occurred here, both in the context of specific breaches of the subject contract and in other calculated efforts to diminish the profitability of plaintiff's performance thereunder.

But, such liability, no matter how egregious, does not obviate the necessity for plaintiff to prove its damages.[79]  And, as noted, plaintiff's proof is lacking in critical regards.  Nonetheless, based upon the foregoing, it would appear that, for the periods in question, as properly before the court, plaintiff is entitled to recover the costs associated with rent abatements (liquidated damages).  In terms of other relief, plaintiff is also entitled to declarations regarding the following items: (i) the depreciation of carpeting and other items; (ii) the matching of adjacent replacement items; (iii) carpet and vinyl in unit 833; (iv) the gutter down spout in unit 638; (v) the repainting of unit 961; (vi) the correctness of its interpretations of the Lease, and the requirements of the covenant of good faith and fair dealing, with respect to the enumerated actions that increased downtime and otherwise increased North Star's costs; and (vii) any other issues resolved in plaintiff's favor herein or in prior rulings.  In addition, the court finds that the incentive fee determinations for 1997 through 2003 are arbitrary and capricious and shall be set aside.  Those fees shall be redetermined by the Army, said issues to be resolved in conformity with the rulings herein and specifically without reference to the resident surveys and any other materials or evaluations prepared by, or significantly impacted by the directions of, Mr. Peterson or Ms. Kiser.[80]

---

[79]  Whether plaintiff is entitled to attorney's fees and other costs is an issue for a later day.  *See* 28 U.S.C. § 2412(d).

[80]  Based upon the many adverse findings rendered herein, the court also expects the Army to exercise proper care in considering the weight that should be afforded to materials or other evaluations prepared by other officials.

To effectuate this ruling:

1.      The incentive fee matter is remanded to the Army for
        redetermination in accordance with this opinion, with a final
        decision as to each of the affected years to be filed on or before
        June 22, 2007.  Said decision shall contain a detailed description of
        the materials relied upon by the Incentive Fee Board in rendering
        its decision and specific findings in support of the fee
        determination.

2.      On or before May 4, 2007, the parties shall file a status report
        proposing the judgment amount that otherwise should be entered in
        these cases, taking into account this and all prior rulings in this
        case.

3.      Should the parties agree as to the amount of the proposed
        judgment, they shall so indicate.  Agreeing to the entry of such
        judgment neither signifies agreement with this court's findings and
        conclusions nor waives any arguments or rights the parties might
        otherwise have, nor, in particular, impacts upon any party's right to
        an appeal.

4.      If the parties disagree as to the proposed judgment, they shall, in
        the filing described in paragraph 2, submit competing proposals for
        that judgment, together with an explanation as to why they believe
        their proposal more accurately tracks this court's opinion.

5.      Should the procedure in paragraph 4 prove necessary, on or before
        May 25, 2007, the parties may file a response to the proposed
        judgment and rationale offered by the other party.

6.      This process shall not be employed to reargue or seek
        reconsideration of any of the points resolved by this court's
        findings and conclusions.

7.      This opinion shall be published, as issued, after April 2, 2007,
        unless the parties identify protected and/or privileged material
        subject to redaction prior to said date.  Said materials shall be
        identified with specificity, both in terms of the language to be
        redacted and the reasons for the redaction.

The parties are, yet gain, encouraged to settle these cases, as well as the cases pending before the court involving later Lease years – *dum vitas est, spes est*.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

# FACT APPENDIX I

| CLAIM | COMPLAINT | CO CORRESPONDENCE | RESULT |
|---|---|---|---|
| Rent deductions based on alleged excess downtime:<br><br>Between May 02 and Dec 04 (for the months of Feb 02 through Oct 04) | 98-168C (2nd Am.) ¶¶ 29-34, page 18 ¶3<br><br>02-1632C ¶¶64-76 | 11/25/97, 5/6/97 Request for decision regarding the meaning of the 3 day turnaround set forth in lease (no sum certain)<br><br>9/4/02 Request indicating improper downtime calculations and including specific sums for Feb-June 2002 | 7/29/05 Court denied motion in limine to exclude 98-168C claims<br><br>Jurisdiction is lacking over monetary claims other than for Feb-June 2002 |
| Placement of short-term occupants at Birchwood from 9/1/02 through 3/31/05 | 02-1632C ¶¶27-30 | 9/4/02 Request for decision | Jurisdiction is lacking for claims after 9/4/02 |
| Matching surfaces adjacent to occupant damage replacements from 2/02 through 11/04 | 03-2699C ¶¶ 11-19 | 10/23/02 Request for a decision regarding carpet replacement (no sum certain)<br><br>12/4/02 Request for a decision regarding matching counter tops (no sum certain) | Jurisdiction appropriate for declaratory relief |

| CLAIM | COMPLAINT | CO CORRESPONDENCE | RESULT |
|---|---|---|---|
| Unnecessary interior paints performed after a lease anniversary date between 11/02 and 12/04 (unbilled)<br><br>Billed unnecessary interior paints performed after a lease anniversary date post 9/02 | 03-2699C ¶¶ 20-28 | 11/21/02 Request for decision regarding Unit 704 (no sum certain) | Jurisdiction is lacking for units other than 704.  Jurisdiction is lacking for a monetary claim regarding Unit 704 |
| Claims that plaintiff alleges relate to defendant's decision not to grant incentive awards, downtime calculations that led to rent deductions, increased payroll costs, and increased subcontractor costs but that do not specifically appear in Plaintiff's damages chart:<br><br>1) Plaintiff did not receive extra time for change of occupancy work<br><br>2) Units released (to be turned over) without adequate notice<br><br>3) Stockpiling of units by govt.<br><br>4) Change of inspection procedures through 2005 | 98-168C (2nd Am) ¶ 49 (stockpiling)<br><br>02-1632C ¶¶59-61 | 9/4/02 Request for decision outlines these practices | Jurisdiction is lacking for claims after 9/4/02 |

| CLAIM | COMPLAINT | CO CORRESPONDENCE | RESULT |
|---|---|---|---|
| Reduction and Elimination of Incentive Fee Awards Through 2004 | 98-168C (2nd Am) ¶¶ 57-62, page 18 ¶ 7 (the court struck the phrase "and thereafter" on 5/31/02 so this complaint is only for 1998)<br><br>02-1632C ¶¶ 77-82 | 3/29/99 Requests decision for 1998 award.<br><br>9/4/02 Request describes failure to make awards (no sum certain) | Jurisdiction appropriate for declaratory relief. |
| Depreciation between 2002 and 2004 | 98-168C (2nd Am) ¶¶41-42, page 18 ¶4 | 1/28/98 Requesting decision (no sum certain)<br><br>9/4/02 Requesting decision (no sum certain) | 10/4/04 Court granted summary judgment for plaintiff as to liability (but only for carpet) with amount of damages to be determined<br><br>Jurisdiction is lacking for monetary claims |
| Matching carpet in Unit 884 | 03-2699C ¶¶11-19 | 10/23/02 Requesting determination of responsibility (no sum certain) | Jurisdiction is lacking for monetary claims |
| Interior Painting of Unit 704 | 03-2699C ¶¶20-28 | 11/21/02 Requesting determination of responsibility (no sum certain) | Jurisdiction is lacking for monetary claims |
| Carpet and Vinyl in Unit 833 | 03-2699C ¶¶ 29-38 | 12/16/02 Requesting determination of financial responsibility (no sum certain) | Jurisdiction is lacking for monetary claims |

| CLAIM | COMPLAINT | CO CORRESPONDENCE | RESULT |
|---|---|---|---|
| Vinyl in Units 1090 and 1111 | 03-2699C ¶¶43-48 | 3/25/03 Requesting decision whether plaintiff repaired vinyl satisfactorily to avoid replacement (no sum certain) | Jurisdiction is lacking for monetary claims |
| Gutter down spout in Unit 638 | 03-2699C ¶¶63-66 | 8/11/03 Requesting decision whether defendant contractually obliged to issue work authorization for correction of occupant damage (no sum certain) | Jurisdiction is lacking for monetary claims |
| Carpet and Counter top in Unit 961 | 03-2699C ¶¶72-76 | 8/11/03 Requesting decision regarding financial responsibility | Jurisdiction is lacking for monetary claims |
| Vinyl in Unit 633 | 03-2699C ¶¶49-52 | 6/13/03 Requesting determination whether vinyl damaged by occupants is plaintiff's responsibility to replace (no sum certain) | Jurisdiction is lacking for monetary claims |
| Repainting bathroom in Unit 961 | 03-2699C ¶¶67-71 | 8/11/03 Requesting determination as to whether painting quality should be evaluated with naked eye or black light (no sum certain) | Jurisdiction is lacking for monetary claims |

| CLAIM | COMPLAINT | CO CORRESPONDENCE | RESULT |
|---|---|---|---|
| Cleaning of Units | 03-2699C ¶¶77-81 | 8/26/03<br>Requesting decision regarding responsibility (no sum certain) | Jurisdiction is lacking for monetary claims |
| General claims that relate to the above repair claims but are not specifically included in plaintiff's damages chart:<br><br>1) changing and failing to approve list of repair costs; requiring invoices<br><br><br>2) authority to order disputed work | <br><br><br><br>03-2699C ¶¶53-58<br><br><br><br>03-2699C ¶¶59-62 | <br><br>7/22/03<br>Requesting decision re: Army failure to approve list and Army imposition of new invoice requirement (no sum certain)<br><br>7/31/03<br>Requesting decision on whether Housing Manager has authority to direct disputed work (no sum certain) | <br><br><br><br>Jurisdiction is lacking for monetary claims<br><br><br><br>Jurisdiction is lacking for monetary claims |
| Occupant damage wall repairs | 02-1632C ¶¶38-47 (general occupant damage) | Plaintiff did not raise to CO<br><br>9/4/02 Requesting decision on issuing work authorizations for general occupant damage. | Jurisdiction is appropriate for declaratory relief on general occupant damage |
| Replacement of occupant damaged stoves | 02-1632C ¶¶38-47 (general occupant damage) | Plaintiff did not raise to CO<br><br>9/4/02 Requesting decision on issuing work authorizations for general occupant damage. | Jurisdiction is appropriate for declaratory relief on general occupant damage |

| CLAIM | COMPLAINT | CO CORRESPONDENCE | RESULT |
|---|---|---|---|
| Replacement of occupant damaged refrigerators | 02-1632C ¶¶38-47 (general occupant damage) | Plaintiff did not raise to CO<br><br>9/4/02 Requesting decision on issuing work authorizations for general occupant damage. | Jurisdiction is appropriate for declaratory relief on general occupant damage |
| Vinyl replaced due to occupant failure to maintain | 02-1632C ¶¶38-47 (general occupant damage) | 6/13/03<br>Requesting decision as to whether vinyl with a non-pleasing appearance due to occupant damage is the responsibility of North Star | Jurisdiction is appropriate for declaratory relief |
| Carpet replaced due to occupant failure to maintain | 02-1632C ¶¶38-47 (general occupant damage) | Plaintiff did not raise to CO | Jurisdiction is lacking |
| Additional payroll due to additional accounting and scheduling burden (97-02) | 1/13/06 Plaintiff's post trial brief | Plaintiff did not raise to CO | Jurisdiction is lacking |
| Additional payroll 97-05 | 1/13/06 Plaintiff's post trial brief | Plaintiff did not raise to CO | Jurisdiction is lacking |
| Additional subcontractor costs (1996-2004) | 1/13/06 Plaintiff's post trial brief | Plaintiff did not raise to CO | Jurisdiction is lacking |
| Full interior painting of units when only a touch-up was necessary (1997-9/1/02) | 1/13/06 Plaintiff's post trial brief | Plaintiff did not raise to CO | Jurisdiction is lacking |

| CLAIM | COMPLAINT | CO CORRESPONDENCE | RESULT |
|---|---|---|---|
| Outstanding Overhead and Profit from 1998-5/00 | 1/13/06 Plaintiff's post trial brief | 9/4/02 Request for decision notes overhead issue (no sum certain) | Jurisdiction is lacking for monetary claim |
| Outstanding Unpaid Overhead (this appears to refer to overhead post 5/00) | 1/13/06 Plaintiff's post trial brief | 9/4/02 Request for decision notes overhead issue (no sum certain) | Jurisdiction is lacking for monetary claim |
| Refuse Collection from 1999-9/1/02 | 98-168C 2nd amended complaint ¶¶ 26-28, pages17-18 ¶ 2 | 11/25/97 Request for decision regarding responsibility | August 8, 2005 court granted motion in limine to exclude<br><br>Jurisdiction is lacking for monetary claim |
| Variance in costs to operate Birchwood (1997-2001)<br><br>Diminution in value of Birchwood as of 9/1/02 | 1/13/06 Plaintiff's post trial brief | 9/4/02 (for 1997-2001) - there are calculations appended for this claim | Jurisdiction over claims through 2001 |

# FACT APPENDIX II

| Unit | Inspections | | | | | | Downtime | | | Failure to pay |
|---|---|---|---|---|---|---|---|---|---|---|
| | Improper notice of change of occupancy | Late work authorization | Extra inspection | No joint acceptance inspections | No list of occupant damage from pre-termination inspection | Last minute rescheduling of turnover for work date | No extra time for extra work | Late acceptance inspection and charge for lag | Counting weekends | F/W/T - Characterizing occupant damage as fair wear and tear. Matching - requiring matching to replaced adjacent surfaces Invoice - requiring receipt of invoice before reimbursement |
| 895 | ✔ | ✔ | | ✔ | ✔ | ✔ | ✔ | | ✔ | |
| 1223 | ✔ | | | ✔ | ✔ | | | | | |
| 948 | ✔ | | | | | | | | | F/W/T |
| 954 | ✔ | | | | | | | | | F/W/T |
| 1127 | ✔ | | | | | ✔ | | | | |
| 619 | ✔ | | | | | | ✔ | ✔ | ✔ | |
| 760 | ✔ | | | | | | | | ✔ | F/W/T |
| 920 | ✔ | | | ✔ | | | | ✔ | ✔ | |
| 1227 | ✔ | | | | | | | | | |
| 1118 | | | | | ✔ | | | | | |
| 622 | | | | | | | | | | |
| 812 | ✔ | | | | | | | | | |
| 856 | | ✔ | | | | | | | | Invoice |
| 1145 | | | | | | | | | | Matching |
| 1148 | | ✔ | | | | | ✔ | | | F/W/T |
| 1229 | | | | | | | ✔ | | | F/W/T |
| 941 | | | | | | | | ✔ | ✔ | Invoice |

| Unit | Inspections | | | | | | Downtime | | | Failure to pay |
|------|---|---|---|---|---|---|---|---|---|---|
| 1117 | | | | | | | | ✔ | | |
| 1008 | | | | | | | | | | Invoice |
| 722 | | | | | | | | | | Invoice |
| 1028 | | | | ✔ | | | | | | |
| 915 | | ✔ | | | ✔ | | | | | F/W/T |
| 1003 | | | | | | | | ✔ | | |
| 883 | | | | | | | | ✔ | | Invoice |
| 961 | | | | | | ✔ | | | | |
| 638 | | | | | | | ✔ | | | |
| 948 | | | | | | | ✔ | | | |
| 1032 | | | | | | | ✔ | | | |
| 1253 | | | | | | | ✔ | | | |
| 903 | | | | | | | ✔ | | | |
| 1085 | | | | | | | ✔ | | | |
| 949 | | | | | | | ✔ | | | |
| 1261 | | | | | | | ✔ | | | |
| 1031 | | | | | | | ✔ | | | |
| 971 | | | | | | | ✔ | | | |
| 885 | | | | | | | ✔ | | | |
| 1237 | | | | | | | | | | Invoice |
| 1004 | | | | | | | | | | F/W/T |
| 748 | | | | | | | | | | F/W/T |
| 745 | | | ✔ | | | | | | | |
| 646 | | | ✔ | | | | | | | |

| Unit | Inspections | | | | | | Downtime | | | Failure to pay |
|------|---|---|---|---|---|---|---|---|---|---|
| 1040 | | | | | ✔ | | | | | |
| 884 | | | | | | | | | | Matching |
| 833 | | | | | | | | | | F/W/T |
| 1090 | | | | | | | ✔ | | | |
| 1111 | | | | | | | ✔ | | | |

# FACT APPENDIX III

**Table 12   Before Condition Cash Flows**

*(table illegible)*

Notes:
1. Military obligation to rent ends in 2067.
2. Land lease ends in 2018.
3. Discount rate = 11.00%
4. Expense growth is at Polar Star historic rate
5. Discounted as of September 1, 2002
6. 2001 expense is 2001 actual minus elevation "Alaska"

because both conditions the "before" and "after" would incorporate the same yearly rent amount.

**Table 13   After Condition Cash Flows**

*(table illegible)*

Notes:
1. Military obligation to rent ends in 2067.
2. Land lease ends in 2018.
3. Discount rate = 13.00%
4. NPV discounted as of Sept 1, 2002.

## Table 14   Present Value Deviation

| | End of 2001 | End of 2002 | Sept 1, 2002 | Rounded to: |
|---|---|---|---|---|
| Before | $61,416,738 | $60,484,122 | $60,794,994 | $60,800,000 |
| After | $52,580,235 | $51,991,722 | $52,187,893 | $52,200,000 |
| Variance | $8,836,503 | $8,492,400 | $8,607,101 | |

| | Deviation | Rounded to: | $8,600,000 |
|---|---|---|---|

Note:
1. The present value on a per month basis is approximated by a prorata of the overall change for the year